# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

THE ESTATE OF NAJEE ALI BAKER,
by and through his Ancillary
Administrator, Jemel Ali Dixon;

        Plaintiff,

v.

WAKE FOREST UNIVERSITY, a North
Carolina non-profit corporation and
institution of higher education; THE PI
OMICRON CHAPTER OF DELTA
SIGMA THETA SORORITY, INC., a
North Carolina unincorporated
association; RHINO SPORTS &
ENTERTAINMENT SERVICES, LLC, a
North Carolina Limited Liability
Corporation; JOHN DOE OFFICER OF
THE WAKE FOREST UNVIERSITY
POLICE DEPARTMENT, individually
and as an agent of Wake Forest
University; JOHN DOE SECURITY
STAFF OF THE WAKE FOREST
UNIVERSITY POLICE DEPARTMENT,
individually and as an agent of Wake
Forest University; JOHN DOE RHINO
SECURITY STAFF 1–2, individually and
as agents and employees of Rhino Sports
& Entertainment Services, LLC;

        Defendants.

Civil Action No. 1:19-cv-00477

## COMPLAINT AND JURY DEMAND

Plaintiff Jemel Ali Dixon, as Ancillary Administrator of the Estate of Najee Ali

Baker, for her Complaint against Defendants states as follows:

1

# INTRODUCTION

1.      In the early morning hours of January 20, 2018, Najee Ali Baker ("Najee"), a student and football player at Winston-Salem State University ("WSSU"), was gunned down and bled to death on the campus of Wake Forest University ("Wake Forest," "WFU," or the "University").  Najee was attending a large party hosted by the Pi Omicron Chapter of the Delta Sigma Theta Sorority, Inc. ("Pi Omicron" or the "Chapter") at The Barn, an event venue owned and operated by Wake Forest, and located on the Wake Forest campus.

2.      The Barn had a history of dangerous incidents and altercations requiring intervention by the Wake Forest University Police Department ("WFUPD") and the Winston-Salem Police Department ("WSPD").  As a result, events at The Barn were historically overseen and monitored by up to nine trained law enforcement officers from the WFUPD and WSPD, as well as additional personnel from a private event management and security firm.  WFU also required guests to pass through several distinct security checkpoints before they could enter the venue.

3.      In late 2014 and early 2015, WFU proposed new event management guidelines that would save the University money by sharply cutting law enforcement staffing and other security measures at The Barn.  Police and professional security consultants openly warned against the proposed security cutbacks.  One WFUPD officer publicly stated that a substantial police presence at The Barn was warranted given past

2

dangerous incidents, including one melee involving six fights that required the already substantial police presence at the Barn to call for back up.

4.     Despite such objections and warnings, the new guidelines were implemented.  Events at The Barn that had been regularly staffed by up to nine trained law enforcement officers, now had only one uniformed, trained WFUPD officer present to secure crowds of several hundred attendees.

5.     As foreseen, the slash in security had tragic consequences for Najee when he attended the January 19-20, 2018 party sponsored by Pi Omicron.

6.     Due to the new lax security, countless people who were neither students at WFU, WSSU, nor any other institution of higher education in the area, wrongly gained entry to WFU's campus and the party at The Barn.

7.     Two such individuals – Jakier Shanique Austin, then 21 years old, and Malik Patience Smith, then 16 years old – along with a third underage companion, started a fight with Najee on the dance floor inside The Barn that quickly spread and escalated. Austin, Smith, and their companion had gained entry to The Barn without valid student IDs, simply by walking up and buying tickets at the door.  Austin and Smith had brought firearms with them in their car, which they drove and parked on the Wake Forest campus. The fight and commotion they started was widespread and dangerous.  There were not enough adequately trained law enforcement or security personnel to safely and reasonably control Austin, Smith, or the situation, or to safely disperse attendees.

8.      The law enforcement and security personnel present failed, *inter alia*, to detain Austin or Smith, escort them from The Barn and away from the area, secure and control The Barn and the single roadway leading from The Barn to WFU's nearby parking lots, or otherwise reasonably protect the other attendees, including Najee – who had been threatened and assaulted by Austin and Smith. Austin and Smith went directly to their car in the parking lot and retrieved their guns.

9.      Najee and others left The Barn and headed down the only road from The Barn to the parking lots where their cars were parked. Smith and Austin, with weapons drawn, confronted Najee and another student as they were walking down the road.

10.      Smith aimed his gun at the other student. Austin aimed his gun at Najee and shot him in the abdomen. Najee fell to the ground, bleeding profusely and in obvious pain and suffering. The two gunmen fled the scene without any interference by security. Najee slowly bled out and died in the arms of a female WSSU student who bravely, and instinctively, came to his aid.

11.      Najee's Estate, through this action, seeks to hold the Defendants responsible for their grossly negligent and negligent acts and omissions that led to Najee's brutal death.

## PARTIES

12.      Plaintiff Jemel Ali Dixon is the mother of Najee Ali Baker, and the duly appointed Ancillary Administrator of the Estate of Najee Ali Baker. The Ancillary Estate file in Forsyth County has a file number of 19 E 889. At all relevant times hereto, Najee

was a student at Winston-Salem State University in Forsyth County, North Carolina, and a citizen and resident of Kings County, New York. Plaintiff is a citizen and resident of Kings County, New York.

13.     Defendant Wake Forest University is a non-profit corporation and an institution of higher education organized and existing under the laws of the State of North Carolina, located and operating in Forsyth County, North Carolina, and with its principal office at 1834 Wake Forest Road, Winston-Salem, NC 27109-6000.

14.     Defendant Pi Omicron Chapter of Delta Sigma Theta Sorority is a North Carolina unincorporated association that is chartered, governed, managed, and controlled by the policies, charter, and recognition of Delta Sigma Theta Sorority, Inc. and WFU. Pi Omicron maintains its principal place of business in Winston-Salem, Forsyth County, North Carolina.

15.     Defendant Rhino Sports & Entertainment Services, LLC ("Rhino" or "Rhino Sports") is a limited liability company organized under the laws of North Carolina, and maintains its principal place of business at 926 Brookstown Avenue, Winston-Salem, Forsyth County, North Carolina 27101. Upon information and belief, Rhino is a single member limited liability company, and its single member is a resident and citizen of North Carolina.

16.     Upon information and belief, Defendant John Doe Officer of the Wake Forest University Police Department was, at all relevant times, an employee of WFU, and is a resident and citizen of North Carolina.

5

17.     Upon information and belief, Defendant John Doe Security Staff of the Wake Forest University Police Department was, at all relevant times, an employee of WFU, and is a resident and citizen of North Carolina.

18.     Upon information and belief, Defendants John Doe Rhino Security Staff 1–2 were, at all relevant times, employees of Rhino Sports, and are residents and citizens of North Carolina.

19.     The names and addresses of Defendant John Doe Officer of the Wake Forest University Police Department, Defendant John Doe Security Staff of the Wake Forest University Police Department, and Defendants John Doe Rhino Security Staff 1–2 are unknown and, despite a good faith effort by Plaintiff and her counsel, their names and addresses could not be ascertained prior to the preparation and filing of this Complaint. Upon information and belief, the names and addresses of these John Doe defendants is known by and available to WFU and/or Rhino Sports, and Plaintiff will seek such information from WFU and/or Rhino Sports through discovery in this case.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs, and is between citizens of different States.

21.     Venue is proper pursuant to § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## FACTUAL ALLEGATIONS

### <u>Najee Ali Baker</u>

22.     Najee was born and raised in Brooklyn, New York, where he attended Abraham Lincoln High School in Coney Island.  Najee was the loving son of Jemel Ali Dixon and Ronald Baker, and beloved older brother to two younger siblings.

23.     Najee was a quiet young man known for his reserved demeanor, work ethic, consistently positive attitude, and winning smile.  Family members describe him as a lovable soul.

24.     At 6'1" and 240 pounds, Najee also was an imposing force on the football field, his reserved demeanor notwithstanding.  He was a valued member and leader of Lincoln High School's varsity football team for two years, winning back-to-back city championships in 2013 and 2014.  Najee's high school football coach credits Najee's determination for helping to raise the football program to one of the premier programs in New York City.

25.     After Najee graduated from high school in 2015, he enrolled at Dean College, an NCAA Division III school in Franklin, Massachusetts, where he played one season on the college's football team and earned his associate degree.

26.     In March 2017, Najee transferred to Winston-Salem State University in Winston-Salem, North Carolina.

27.     In Fall 2017, Najee enrolled at WSSU.  Najee redshirted the Rams' 2017 season and planned, through hard work, to be a valuable contributor to the team's

7

defensive unit in the 2018 season—the first of three years he would have been eligible to play football at WSSU.

28.    At WSSU, Najee was pursuing a degree in physical education, with a minor in sports medicine.  His goal was to become a high school athletic director in a career dedicated to working with and serving youth.

## Student Events at Wake Forest University

29.    Wake Forest is a private university located in Winston-Salem, North Carolina, with an undergraduate student population of approximately 5,000.

30.    Wake Forest maintains its own police department, the WFUPD, which is "comprised of professional trained police officers [and] security officers" who patrol and protect the Wake Forest campus and its students.

31.    Because of its relatively small size, at all relevant times herein, Wake Forest and its students frequently invited students from other local colleges and universities, especially WSSU, to attend Wake Forest campus events.

32.    According to Wake Forest's President, Nathan O. Hatch, Wake Forest's "open campus contributes to a sense of shared community and vibrant social life, particularly for [its] underrepresented students."  Wake Forest's student population is approximately 70% white.  Black students make up only 6.6% of Wake Forest's student population.

33.     Wake Forest currently recognizes 243 different student organizations, including 24 fraternities and sororities, many of which routinely host events on Wake Forest's campus.

34.     Wake Forest publicly promotes the "many benefits" its "[c]hartered student organizations (CSOs) receive," including "free or reduced-cost room reservations on campus; potential funding from Student Government; involvement in CSO programs like the activities fair; and a free web portal."

35.     Student organizations and the events those organizations host and sponsor are overseen by Wake Forest's Office of Student Engagement, part of the University's Division of Campus Life.

36.     The Office of Student Engagement maintains event-planning guidelines and procedures for all student-sponsored events, including specific procedures for events at which alcohol is available or events for more than 200 attendees, both of which must be approved and registered in advance with the Office of Student Engagement.

37.     Wake Forest's guidelines and procedures dictate where student-sponsored events may be held, when student-sponsored events must be registered, how long student-sponsored events may last, when and how alcohol may be served, who may attend which student-sponsored events, how events may be advertised or marketed, the training that student hosts must complete before hosting events, and the responsibilities host organizations have with regard to the events.

9

38.     A host organization's responsibilities include, *inter alia*, to check the identification of each guest, to monitor the size of the event, to prevent uninvited guests from attending, to "[h]elp maintain order and ensure responsible behavior," and to "[c]onsult with the 'on-duty' residence life and housing staff, Event Resource Managers, and University Police officials as necessary."

39.     As part of Wake Forest's event guidelines and procedures, the Office of Student Engagement has the authority to "determine that a sponsoring organization will be required to hire security personnel to perform the [listed] responsibilities at social functions."

## Campus Security at Wake Forest University

40.     Wake Forest maintains stricter standards for public entry onto Wake Forest's campus at night than during normal business hours.  Wake Forest University Police security staff monitor and control all traffic entering the Wake Forest campus between 10:00 p.m. and 6:00 a.m.  Students and faculty are provided decals or tags for their cars.  With proper identification, members of the Wake Forest community pass through campus entry checkpoints without being stopped.

41.     According to Wake Forest policy, security staff are supposed to stop any car entering the Wake Forest campus after 10:00 p.m. without such identification. Drivers are asked for their name and destination in order to issue a short-term visitor pass, if they qualify for one.

10

42.     For on-campus events with large numbers of off-campus guests, such as student events held at The Barn, the event hosts are required to provide a list of registered guests attending the event to the WFUPD in advance of the event to verify who may legitimately enter the campus.  In addition, one or more student representatives is assigned to each gatehouse at a campus entrance, purportedly to assist, direct, monitor, and vet guests seeking to enter campus to attend the event.

43.     Wake Forest allows student groups to host events after 10:00 p.m. at on-campus lounges, as well as at several on-campus large event spaces, including The Barn.

## The Barn at Wake Forest

44.     The Barn, completed in 2011, at all relevant times herein, was routinely advertised by WFU as "a student-centered social space on the Reynolda campus of Wake Forest University."  Until January 20, 2018, undergraduate student groups could reserve The Barn for events, "such as receptions, dances, cookouts, parties, movie screenings and concerts."

45.     There was "no cost to rent the Barn for undergraduate student groups hosting a university-related student-centered social event."  However, under Wake Forest's policies, "[e]vents hosting over 200 people may be charged fees for security."

46.     The Barn has a maximum capacity of 570 people.

47.     Because The Barn is a large-capacity venue, at all relevant times herein, Wake Forest maintained guidelines specific to events held at The Barn.

11

48.     Under those guidelines, any student group planning an event at The Barn was required to "participate in an event planning process with staff from the Office of Student Engagement."

49.     In addition, "[a]ll student organizations hosting an event at The Barn must attend Event Management Training (start of the semester)."

50.     The Event Management Training Wake Forest provided to student organizations was inadequate to properly prepare them for the increased event management responsibilities Wake Forest assigned to students as a result of the new event management guidelines it adopted in 2015, as alleged in further detail, *infra*.

51.     Up until and including January 20, 2018, The Barn was often a location for parties hosted by National Pan-Hellenic Council historically black fraternities and sororities.  Such parties were frequently attended by students from both Wake Forest and WSSU.

### Changes to Wake Forest's Event Management Guidelines

52.      In January 2014, the Wake Forest chapter of Kappa Alpha Psi, a historically black fraternity and member of the National Pan-Hellenic Council, hosted a party on the Wake Forest campus.  Wake Forest University Police shut down the party.

53.     In response, Wake Forest students organized a town hall meeting in February 2014 to express and discuss their frustrations about alleged racial bias in campus policing.

12

54.     At the meeting, Wake Forest students accused Wake Forest University Police of disproportionately policing minority-run student events.  Students alleged that black fraternity and sorority parties, in particular, were subject to higher scrutiny by campus police than parties or events held by white fraternities and sororities.  Minority students also expressed anger and frustration that they were asked for identification or given citations by campus police at much higher rates than white students.

55.     Following the town hall, WFUPD's Police Chief commissioned an independent review of the alleged racial bias in on-campus policing.  Wake Forest hired Developmental Associates, a third-party consulting firm, to conduct the investigation and review.

56.     Developmental Associates' investigation was led by two career law enforcement officials: Willie Williams, a senior consultant at Developmental Associates and a three-time police chief who had recently retired from the North Carolina Central University, where he had served as Chief of Police since November 2006; and Thomas M. Moss, a senior consultant at Developmental Associates, who had retired after a thirty-three year career in North Carolina law enforcement, the last twenty of which he served as Chief of Police in Garner, North Carolina, and who chaired the Education and Training Committee of the North Carolina Criminal Justice Education and Training Standards Commission and the Criminal Justice Improvement Committee of the Governor's Crime Commission for many years prior to his retirement.

57.     In April 2014, while the investigation was underway, Kappa Alpha Psi hosted a party at The Barn with 650 attendees—80 more than the stated capacity at The Barn.

58.     A fight broke out at the event, and officers from the WFUPD and WSPD shut down the party and arrested three WSSU students for their involvement in the fight.

59.     In August 2014, Developmental Associates concluded its investigation and review, and provided its final report, known as the "Williams-Moss Report" (or the "Consultants' Report"), to Wake Forest.

60.     Although the Consultants' Report found no evidence of actual or targeted bias by WFUPD officers, Developmental Associates concluded that the pervasive perception among students of such bias strained and damaged the student community's relationship with the Wake Forest campus police.

61.     Among its findings, the Consultants' Report substantiated students' perception that events hosted by minority student groups were more heavily policed than events hosted by predominantly white student organizations:

> As noted in the Consultants' Report, disparate levels of supervision regarding campus lounges, which are utilized by mostly white fraternities and sororities, and large event venues, which are typically used by traditional minority fraternities and sororities have generated much discussion. The large event venues were heavily policed, while activities in campus lounges, many of which involved alcohol consumption, were not policed.

62.     Shortly after the Consultants' Report was released, WFU's Vice President for Campus Life, Dr. Penny Rue, welcomed students back to campus for the 2014–2015

14

school year, reassuring the student community that "[c]onsistent with Wake Forest's commitment to creating a safe and inclusive environment, University Police, along with the Office of Campus Life and Office of Diversity and Inclusion, spent the summer reviewing concerns expressed by students related to perceived racial bias on campus and event management practices at parties held in the Barn and Reynolds Gym."

63.     Dr. Rue told students that the Williams-Moss Report recommended that Wake Forest "[i]mprove the cultural awareness and sensitivity of [the Wake Forest] university police department and campus community," "[i]ncrease the timeliness of complaint investigations," "[e]nhance University Police and Community Relations," and "evaluate risk management practices at [National Pan-Hellenic Council] events and lounge parties."  Dr. Rue also described the steps that Wake Forest had already taken to implement those recommendations.

64.     According to Dr. Rue, "a social event management working group ha[d] been active this summer developing a plan for evaluating risks associated with student events where more than 200 people are expected to attend.  This approach defines a richer partnership between students and staff regarding event and risk management."

65.     Dr. Rue also explained that Wake Forest, in collaboration with the City of Winston-Salem Human Relations Commission, planned to host a series of "Trust Talks" based on programs used in other U.S. cities "that have been proven to be successful in breaking down barriers and improving communication between the police and the communities they serve."

66.     On November 13, 2014, the City held the inaugural collegiate Trust Talk,

bringing together students and campus police representatives from several area schools,

as well as members of the WSPD and Forsyth County District Attorney's Office.

67.     During the November 2014 Trust Talk, Wake Forest students reiterated

their concerns and frustrations that minority-hosted student events at WFU were policed

more heavily than events sponsored by primarily white student groups.

68.     Wake Forest students specifically stated concerns about policing of events

at The Barn hosted by Wake Forest's black fraternities and sororities, expressing

frustration that campus police patrolled those events heavily, but rarely if ever policed

events hosted by white fraternities and sororities, which were primarily held in on-

campus lounges or at fraternity houses.  Students believed that the security policies for

events held at The Barn were perpetuating the inequity.

69.     In response to these comments, WFUPD Corporal James Gravely stated

that there had been incidents at The Barn that warranted a greater police presence.

70.     Corporal Gravely recounted a time when six fights had broken out at The

Barn at one time.  Corporal Gravely explained that during that incident, the three campus

police officers patrolling the event could not handle the situation alone, and required

assistance from three additional Winston-Salem police officers.

71.     In December 2014, Dr. Rue created the Wake Forest University Police

Accountability Task Force, a group comprised of student, faculty, staff, and community

law enforcement representatives tasked with overseeing the implementation of the Consultants' Report recommendations.

72.     Among the enumerated recommendations, Developmental Consultants recommended "updating the Large Social Event Management Guidelines and reinstituting the Major Event Committee."

73.     The Consultants' Report also recommended that "the administration review [the] procedure [for student events held at on-campus lounges] to make sure that all student events are policed in an equal manner."

74.     The Consultants' Report further stated, with regard to WFU's Large Social Event Management Guidelines, that "[a]dults and police should play a major role in the decision of assigning students to tasks that may be better managed by an adult," thereby making it clear that the authors of the Report – career law enforcement officials, one of whom had extensive experience with college students as police chief at a university – did not believe it was reasonable or responsible for WFU to treat college students as "adults" capable of responsibly, safely, or adequately managing or policing their own large events.

75.     Despite the clear recommendations from Developmental Associates regarding large social events, and the Consultants' Report's clear warning that "adults" and "police" – not students – are best equipped to oversee and manage student-hosted events, the Event Management Protocol Committee of the Task Force expressly declined to implement the event management recommendations from the Williams-Moss Report.

76.     In declining to follow the Consultants' Report recommendations, the Committee announced that it "believed that pursuing the recommendations in the Consultants' Report would increase law enforcement staff and use of undesired crowd control techniques at student-sponsored events.  It was determined that this approach would not ease tension or reduce concerns in the community."

77.     Instead of following Developmental Associates' recommendation to equalize levels of policing and security at all student events – which would have required WFU to increase spending on policing and security to ensure that events hosted by primarily white student groups were policed as vigorously as events hosted by primarily minority student groups – the Committee "chose to pursue new event management strategies that targeted issues unique to each campus event and venue."

78.     Pursuant to these new event management strategies, WFU "increased partnership and role for students in the management of the events they sponsor," hired "students to support management of events," and "reduced law enforcement staffing at large event venues."

79.     As a result of this process, Wake Forest knowingly, deliberately, and purposely reduced the presence of trained law enforcement and security staff at its largest student events, including events at The Barn.

80.     In short, rather than invest in equal policing for all student events, as was recommended by its paid, and deeply experienced, consultants, Wake Forest dramatically increased the responsibility of students – the very population WFU's consultants warned

18

were not properly equipped to police and manage those events – for policing and providing security at their own events. At the same time, WFU dramatically reduced the involvement and presence of trained law enforcement personnel at student events.

81.     WFU's decision to replace trained law enforcement personnel with students and third-party event staff had particularly dramatic consequences for the safety and security of student-sponsored events at The Barn, which WFU knew had been the site of prior incidents requiring high levels of law enforcement intervention, including altercations among attendees, and presented unique circumstances and challenges requiring a certain level of police presence and security.

82.     Although Wake Forest purported to craft event management strategies "targeting issues unique to each campus event/venue," it ignored or disregarded the "unique" circumstances at The Barn that justified, at a minimum, maintenance of the prior levels of security.

83.     Instead, Wake Forest dramatically reduced the requirements for security at all student events, including those held at The Barn.

84.     Wake Forest also replaced its paper-ticket system with a new online ticketing procedure using a website called "Eventbrite," which the Task Force touted as a way "to improve management of facility capacity, financial record-keeping, and payment of the North Carolina entertainment tax," and to reduce "the amount of time required for an attendee to enter" an event at The Barn.

85.     In reality, the reduced time to enter The Barn was not due solely to the use of Eventbrite, but also to a substantial decrease in the number of required security checkpoints attendees were required to pass through before gaining admission to the venue.

86.     Before Wake Forest revised its event management guidelines, The Barn required three separate checkpoints—one to verify student identification, one to check tickets, and one to provide wristbands to students over 21, a process, upon information and belief, that required checking each attendee's identification a second time. Under the new event management guidelines, by contrast, students were able to enter an event at The Barn after passing through only one security checkpoint at the campus gates used to verify student identification.

87.     In addition, as part of its deliberate effort to reduce the presence of law enforcement officers from WFUPD and WSPD at large events at The Barn, Wake Forest created an "Event Resource Managers" program. Through that program, event management and security responsibilities for student-sponsored events at The Barn were turned over, in substantial part, to Wake Forest students themselves. WFU publicly announced that an express aim of the "Event Resource Managers" program was to "increase student involvement and reduce law enforcement in the management of student-sponsored events."

88.	According to public statements by WFU, the use of student Event Resource Managers not only "changed the dynamic of student-sponsored events held at the Barn," but also "significantly reduced the cost of holding events in that facility."

89.	In an assessment of WFU's deliberate decision to reduce the presence of trained law enforcement personnel at student-sponsored events at The Barn, and to entrust WFU students with significant responsibility for the oversight, management, and security of events at The Barn, the Task Force highlighted a side-by-side comparison of two similar events held at The Barn—one before and one after WFU's implementation of the new policies and practices for large student-sponsored events.

90.	The first event—a National Pan-Hellenic Council event hosted by Kappa Kappa Psi in September 2014—relied on the old paper-ticket method and included three security checkpoints before students or guests could enter the event.  If an attendee left the event for any reason, he or she was not permitted to re-enter.  The September 2014 event included a security presence of three WFUPD officers, six WSPD officers, and seven event staff provided by Defendant Rhino Sports, a private contractor, for a total of 16 security and/or event management personnel, nine of whom were trained law enforcement officers.  Security and event management services for that event cost $2,600.00.

91.	The second event—also a National Pan-Hellenic Council event hosted by Kappa Kappa Psi in January 2015—implemented the new Eventbrite ticketing system and event management protocol.  The event had only one security checkpoint, and

21

attendees were allowed to leave and re-enter the event at any time using the new online ticketing system. There also was a dramatically reduced security presence at the event. In contrast to the nine trained law enforcement officers at the September 2014 event, the January 2015 event was supervised and managed by only one WFUPD officer, along with five outsourced Rhino event staff, and five student Event Resource Managers. Security and event management services for that event cost $840.00, a reduction of more than two-thirds from what was spent on the September 2014 event.

92.     The Task Force was so impressed by the financial benefits to Wake Forest of these changes, it recommended that Wake Forest expand the Event Resource Manager program in its push toward "greater student-ownership for management of their events."

93.     In or around 2017, WFU promoted WFUPD Corporal James Gravely to Special Events Sergeant. In that supervisory role within WFUPD, Special Events Sergeant Gravely was in charge of coordinating student-sponsored events and security personnel at those events, and was expected to collaborate regularly with the Office of Student Engagement, the Event Resource Managers, and student organizations "to reduce risk and ensure event safety."

94.     Although Sergeant Gravely had openly expressed his concerns about reducing the presence of trained police officers at student-sponsored events at The Barn during the November 2014 Trust Talk, and therefore knew or should have known that WFU's revised event management protocol would make events at The Barn and other large-event venues at WFU significantly less safe for attendees, particularly when

altercations among attendees broke out, that revised protocol remained in effect when Najee arrived on Wake Forest's campus on January 19, 2018, for a student-sponsored event at The Barn.

<u>**The Events of January 19–20, 2018**</u>

95.     On January 19, 2018, the Pi Omicron Chapter of Delta Sigma Theta, a historically black sorority and member of the National Pan-Hellenic Council, hosted a WFU-approved student-sponsored event at The Barn.

96.     Under Wake Forest's event management policies, as hosts of the party, members of the Pi Omicron Chapter expressly agreed to be responsible for managing and overseeing the event, including monitoring who was allowed into the event and assessing the need for adequate security.

97.     The event, a kick-off to the new semester, was called Level 1913 and referred to the year that Delta Sigma Theta was founded.

98.     Tickets to Level 1913 were $7 in advance and $10 at the door, and the event began at 10:00 p.m. – when WFU's enhanced, after hours campus security procedures were supposed to be in effect – and was scheduled to continue until 2:00 a.m.

99.     The Eventbrite registration page for the event required attendees to "[p]lease bring a valid student ID."

100.    Guests at the party purportedly were required to show a ticket to enter the party and purportedly were required to show a valid student ID to enter WFU's campus.

23

101.    Consistent with WFU's revised event managements policies, there was only one security checkpoint in place for the event at the entrance to WFU's campus, and none of the attendees had to pass through metal detectors or subject themselves or their vehicles to checks, inspections, or other security measures before they were allowed to enter the party or park their vehicles in the parking lots closest to The Barn.

102.    In comparison, attendees at large events sponsored by college students at other venues in Winston-Salem during the same period often had to pass through metal detectors or go through pat-downs before they were allowed to enter the events.

103.    The level of security personnel at the event, consistent with WFU's revised event management policies, was limited to one WFUPD officer – John Doe Officer of the Wake Forest University Police Department – and a handful of security and event management staff employed by Defendant Rhino Sports, which contracted with Wake Forest to provide private security and event management services at The Barn.  No WSPD officers were present at the event.

104.    According to public statements by Wake Forest, at least 475 people attended the event.

105.    Najee and other members of the WSSU football team were among the attendees.

106.    Jakier Shanique Austin, Malik Patience Smith, and another companion also attended the event, although none of the three were students at Wake Forest, WSSU, or any other area school, and therefore under WFU's event management guidelines should

24

not have been permitted to enter the Wake Forest campus, The Barn, the parking lots closest to The Barn, or the party on January 19, 2018.

107.    Despite this, on January 19, 2018, John Doe Security Staff of the Wake Forest University Police Department and members of Pi Omicron assigned to the Wake Forest gatehouse at the University Parkway entrance to the Wake Forest campus permitted Austin, Smith, and their companion to enter the campus, who proceeded to drive to, and park at, the parking lots closest to The Barn.

108.    Members of Pi Omicron then sold three tickets to Austin at the door of the event.  He gave the two extra tickets to Smith and their other companion.

109.    Smith had been previously arrested twice.  Smith was first arrested and criminally charged for carrying a concealed weapon and possessing a stolen firearm.  In October 2017, Smith was arrested a second time and criminally charged for gun possession and possession of heroin with intent to sell.  On the night on January 19, 2018, Smith was out on bond for his two prior arrests.

110.    Sometime after 12:00 a.m., Austin, Smith, and the companion started an altercation with Najee inside The Barn.  Najee defended himself, and the fight spilled toward the back of The Barn.  The fight and commotion it sparked was widespread and dangerous.

111.    John Doe Officer of the Wake Forest University Police Department and/or John Doe Rhino Security Staff 1–2 intervened to break up the fight, but there were not enough law enforcement or security personnel present to properly control the situation

and maintain order. To make matters worse, the personnel who intervened were inadequately trained, and they failed to exercise reasonable care in breaking up the fight to reduce the foreseeable risk of harm to Najee and the other attendees at the event.

112.    John Doe Officer of the Wake Forest University Police Department and/or John Doe Rhino Security Staff 1–2 failed, *inter alia*, to detain Austin or Smith, escort them from The Barn and away from the area, secure and control The Barn and the roadway leading from The Barn to WFU's nearby parking lots, or otherwise reasonably protect Najee – who had been threatened and assaulted by Austin and Smith – and the other students as they left The Barn. As a result, Austin and Smith were able to go directly to their car in the parking lot and retrieve their guns.

113.    After the DJ announced the party was over, Najee and others left The Barn and headed down the only road from The Barn to the parking lots where their cars were parked.

114.    Smith and Austin, with weapons drawn, confronted Najee and another student as they were walking down the road

115.    Smith used his gun to hold back the other student, while Austin shot Najee, fatally, in the stomach.

116.    The shooting occurred at approximately 1:01 a.m.

117.    Najee fell to the ground, bleeding and in excruciating pain. He was pronounced dead at the Wake Forest Baptist Medical Center at approximately 1:55 a.m. on January 20, 2018. The identified cause of death was a gunshot wound to his abdomen.

26

118.     Due to the lax security at the event, both Smith and Austin were able to flee the scene and WFU's campus after the shooting.  Although an arrest warrant for Austin issued shortly after the shooting, he was not arrested in connection with Najee's murder until April 2018.

**COUNT I**
**Wrongful Death Pursuant to N.C. Gen Stat. 28A-18-2**
**Against Wake Forest University**
**(Negligent Conduct)**

119.     The allegations of the preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

120.     This claim is brought against Wake Forest, and is brought pursuant to N.C. Gen. Stat. 28A-18-2.

121.     Wake Forest knew, or in the exercise of reasonable care should have known, that a substantial, well-trained law enforcement and security presence at student-sponsored events at The Barn was necessary to ensure the safety and well-being of attendees, including to control and defuse altercations among attendees, and to protect attendees from the criminal acts of third parties.

122.     Wake Forest also knew, or in the exercise of reasonable care should have known, that students were not capable of responsibly, safely, or adequately managing or policing their own large, student-sponsored events.

123.     Despite such knowledge, Wake Forest permitted and authorized the Pi Omicron Chapter of Delta Sigma Theta Sorority, Inc., to host the party at The Barn on January 19–20, 2018.

27

124.    Wake Forest, individually and through its agents, including WFUPD, WFUPD officers and security staff, private security staff with whom Wake Forest contracted, and student Event Resource Managers, undertook to provide security and event management oversight for the party at The Barn on January 19–20, 2018.

125.    Wake Forest accordingly owed a duty to the party attendees, including Najee, to exercise reasonable care in: supervising and training the members of the Pi Omicron Chapter of Delta Sigma Theta Sorority in managing and policing the January 19–20, 2018, party; ensuring there was an adequate and adequately trained law enforcement, security, and event management presence at the party; selecting law enforcement, security, and event management personnel for the party; ensuring that the law enforcement, security, and event management personnel selected to work the party were adequately trained; and providing adequate security for the party.

126.    Wake Forest breached those duties, and was negligent, by:

    a.    failing to provide adequate security for the January 19–20, 2018, party at The Barn, a venue that Wake Forest knew had a history of altercations among and between attendees requiring high levels of law enforcement intervention, and presented unique circumstances and challenges requiring significant police presence and security;

    b.    knowingly, deliberately, and purposely reducing the number of trained law enforcement and security personnel at student-sponsored events at The Barn, including for the party on January 19–20, 2018;

28

c.   establishing and adopting inadequate security policies and practices for student-sponsored events at The Barn, which WFU knew or should have known were inadequate under the circumstances;

d.   failing to adequately train WFUPD officers, private security staff with whom Wake Forest contracted, and student Event Resource Managers in event management and/or event-security procedures, practices, and techniques for events at The Barn, including failing to provide them training in how to respond adequately and appropriately to altercations between and among attendees;

e.   failing to put reasonable safeguards, restrictions, and controls in place at the January 19–20, 2018, event to prevent, reduce the likelihood of, and/or minimize the risk of harm from foreseeable altercations and physical violence among attendees at the event;

f.   failing to adequately train members of the Pi Omicron Chapter of Delta Sigma Theta in event management or event security, while entrusting those same members with responsibility for providing event management and event security for the January 19–20, 2018, party;

g.   knowingly, purposely, and deliberately entrusting untrained and/or inadequately trained student members of the Pi Omicron Chapter of Delta Sigma Theta with significant responsibilities for managing and

29

providing security at the event at The Barn on January 19–20, 2018, in lieu of trained law enforcement officers, despite previous warnings from its consultants that students were not properly equipped to police and manage events at large venues, like The Barn;

h.     knowingly, purposely, and deliberately entrusting undergraduate and graduate students employed as Event Resource Managers with significant responsibilities for providing and managing security at The Barn on January 19–20, 2018, in lieu of trained law enforcement officers, despite warnings from its consultants that students were not properly equipped to police and manage events at large venues, like The Barn;

i.     failing to provide effective and adequate supervision over the Event Resource Managers and student members of the Pi Omicron Chapter of Delta Sigma Theta during the party at The Barn on January 19–20, 2018;

j.     permitting Austin and Smith to enter WFU's campus after hours, The Barn, The Barn's parking lot, and the January 19–20, 2018 party without valid student IDs, and armed with deadly weapons, in violation of WFU policy; and

k.     was otherwise negligent.

127. As a direct and proximate result of Wake Forest's negligence, Najee was shot, experienced conscious pain and suffering, and died.

128. As a direct and proximate result of Wake Forest's negligence, Najee died and his beneficiaries suffered, and will suffer in the future, damages including, but not limited to, loss of society, companionship, comfort, guidance, kindly offices and advice of Najee.

129. As a further direct and proximate result of Wake Forest's negligence, Najee's beneficiaries have suffered damages arising out of the loss of reasonably expected net income of Najee, and have incurred expenses for care, treatment, and hospitalization incident to the injury resulting in Najee's death and reasonable funeral and burial expenses.

## COUNT II
### Wrongful Death Pursuant to N.C. Gen Stat. 28A-18-2
### Against Wake Forest University
### (Gross Negligence)

130. The allegations of the preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

131. This claim is brought against Wake Forest, and is brought pursuant to N.C. Gen. Stat. 28A-18-2.

132. Wake Forest knew that a substantial, well-trained law enforcement and security presence at student-sponsored events at The Barn was necessary to ensure the safety and well-being of attendees, including to control and defuse altercations among attendees, and to protect attendees from the criminal acts of third parties.

31

133.    Wake Forest also knew that students were not capable of responsibly, safely, or adequately managing or policing their own large, student-sponsored events.

134.    Despite such knowledge, Wake Forest permitted and authorized the Pi Omicron Chapter of Delta Sigma Theta Sorority, Inc., to host the party at The Barn on January 19–20, 2018.

135.    Wake Forest, individually and through its agents, including WFUPD, WFUPD officers and security staff, private security staff with whom Wake Forest contracted, and student Event Resource Managers, undertook to provide security and event management oversight for the party at The Barn on January 19–20, 2018.

136.    Wake Forest accordingly owed a duty to the party attendees, including Najee, to exercise reasonable care in: supervising and training the members of the Pi Omicron Chapter of Delta Sigma Theta Sorority in managing and policing the January 19–20, 2018, party; ensuring there was an adequate and adequately trained law enforcement, security, and event management presence at the party; selecting law enforcement, security, and event management personnel for the party; ensuring that the law enforcement, security, and event management personnel selected to work the party were adequately trained; and providing adequate security for the party.

137.    In conscious and/or reckless disregard of, and indifference to, the rights and safety of the attendees at the January 19–20, 2018 party at The Barn, Wake Forest breached those duties, and was grossly negligent, by:

a.   knowingly, deliberately, purposely, needlessly, and recklessly failing to provide adequate security for the January 19–20, 2018, party at The Barn, a venue that Wake Forest knew and had been warned and advised had a history of altercations among and between attendees requiring high levels of law enforcement intervention, and presented unique circumstances and challenges requiring a certain level of police presence and security;

b.   knowingly, deliberately, purposely, needlessly, and recklessly reducing the number of trained law enforcement and security personnel at student-sponsored events at The Barn, including for the party on January 19–20, 2018;

c.   knowingly, deliberately, purposely, needlessly, and recklessly establishing and adopting security policies and practices for student-sponsored events at large-event venues on campus, including The Barn, which WFU knew and had been warned were inadequate under the circumstances;

d.   knowingly, deliberately, purposely, needlessly, and recklessly electing not to put safeguards, restrictions, and controls in place at the January 19–20, 2018, event that would have prevented, reduced the likelihood of, and/or minimized the risk of harm from

foreseeable altercations and physical violence among attendees at the event;

e. knowingly, deliberately, purposely, needlessly, and recklessly entrusting untrained and/or inadequately trained student members of the Pi Omicron Chapter of Delta Sigma Theta with significant responsibilities for managing and providing security at the event at The Barn on January 19–20, 2018, in lieu of trained law enforcement officers, despite previous warnings from it consultants that students were not properly equipped to police and manage events at large venues, like The Barn;

f. knowingly, deliberately, purposely, needlessly, and recklessly entrusting undergraduate and graduate students employed as Event Resource Managers with significant responsibilities for providing and managing security at The Barn on January 19–20, 2018, in lieu of trained law enforcement officers, despite warnings from its consultants that students were not properly equipped to police and manage events at large venues, like The Barn;

g. knowingly, deliberately, purposely, needlessly, and recklessly failing to provide effective and adequate supervision over the Event Resource Managers and student members of the Pi Omicron Chapter of Delta Sigma Theta during the party at The Barn on January 19–

Case 1:19-cv-00477   Document 1   Filed 05/07/19   Page 34 of 48

20, 2018, despite warnings from its consultants that students were

not properly equipped to police and manage events at large venues,

like The Barn, and that adults, not students, were best equipped to

oversee and manage student-hosted events; and

    h.    was otherwise grossly negligent.

138.    As a direct and proximate result of Wake Forest's gross negligence, Najee

was shot, experienced conscious pain and suffering, and died.

139.    As a direct and proximate result of Wake Forest's gross negligence, Najee

died and his beneficiaries suffered, and will suffer in the future, damages including, but

not limited to, loss of society, companionship, comfort, guidance, kindly offices and

advice of Najee.

140.    As a further direct and proximate result of Wake Forest's gross negligence,

Najee's beneficiaries have suffered damages arising out of the loss of reasonably

expected net income of Najee, and have incurred expenses for care, treatment, and

hospitalization incident to the injury resulting in Najee's death and reasonable funeral and

burial expenses.

**COUNT III**
**Wrongful Death Pursuant to N.C. Gen Stat. 28A-18-2**
**Against the Pi Omicron Chapter of Delta Sigma Theta Sorority**
**(Negligent Conduct)**

141.    The allegations of the preceding paragraphs are re-alleged and incorporated

by reference as if fully set forth herein.

142.    This claim is brought against the Pi Omicron Chapter of Delta Sigma Theta, and is brought pursuant to N.C. Gen. Stat. 28A-18-2.

143.    The Pi Omicron promoted and widely advertised on social meeting the party it was hosting at The Barn on January 19–20, 2018, and charged admission to, and generated revenue from, that party.

144.    The Pi Omicron Chapter, individually and through its officers and members, undertook and expressly agreed to undertake significant responsibilities in providing security and event management at the event it hosted at The Barn on January 19–20, 2018, including, *inter alia*, responsibilities for assisting WFUPD in determining who was authorized to enter the Wake Forest campus for purposes of the event; checking the identification of each guest seeking entry to the event; monitoring the size of the event; preventing uninvited and unauthorized guests from attending the event; helping to "maintain order and ensure responsible behavior"; and consulting with Event Resource Managers and WFUPD officials, "as necessary."

145.    Through these agreements and undertakings, the Pi Omicron Chapter assumed, undertook, and owed a duty to the attendees of the party, including Najee, to provide reasonable and adequate security at the event at The Barn on January 19–20, 2018, and to exercise reasonable care in providing that security.

146.    The Pi Omicron Chapter knew, or in the exercise of reasonable care should have known, that the provision of reasonable and adequate security at The Barn on

January 19–20, 2018, was necessary to ensure the safety and well-being of the attendees, including to protect them from the criminal acts of third parties.

147.    The Pi Omicron Chapter breached its duty, and was negligent, by:

a.    failing to provide reasonable and adequate security at the January 19–20, 2018, event held at The Barn, a large-event venue with a history of altercations requiring law enforcement intervention;

b.    failing to put reasonable safeguards, restrictions, and controls in place at the January 19–20, 2018, event at The Barn to prevent and/or reduce the likelihood of foreseeable altercations and physical violence among attendees at the event;

c.    entrusting its own inadequately trained or untrained student-members and officers with providing and managing security at the January 19–20, 2018, event;

d.    permitting Austin and Smith to purchase tickets to and attend the January 19–20, 2018, event and enter WFU's campus after hours, The Barn, and The Barn's parking lot without valid student IDs, without proper confirmation that they were registered attendees for the January 19-20, 2018, party, and armed with deadly weapons, in violation of WFU policy; and

e.    was otherwise negligent.

148.    As a direct and proximate result of Pi Omicron's negligence, Najee was shot, experienced conscious pain and suffering, and died.

149.    As a direct and proximate result of Pi Omicron's negligence, Najee died and his beneficiaries suffered, and will suffer in the future, damages including, but not limited to, loss of society, companionship, comfort, guidance, kindly offices and advice of Najee.

150.    As a further direct and proximate result of Pi Omicron's negligence, Najee's beneficiaries have suffered damages arising out of the loss of reasonably expected net income of Najee, and have incurred expenses for care, treatment, and hospitalization incident to the injury resulting in Najee's death and reasonable funeral and burial expenses.

**COUNT IV**
**Wrongful Death Pursuant to N.C. Gen Stat. 28A-18-2**
**Against Rhino Sports & Entertainment Services**
**(Negligent Conduct)**

151.    The allegations of the preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

152.    This claim is brought against Rhino Sports & Entertainment, and is brought pursuant to N.C. Gen. Stat. 28A-18-2.

153.    Rhino Sports & Entertainment agreed, undertook, assumed, and owed a duty to exercise due care to adequately and properly train, oversee, and supervise its employees in event management and security practices and procedures, including by

38

contracting with WFU to provide security and event management services at The Barn on January 19–20, 2018.

154. Through these agreements and undertakings, Rhino Sports & Entertainment assumed, undertook, and owed a duty to the attendees of the party, including Najee, to provide reasonable and adequate security at the event at The Barn on January 19–20, 2018, and to exercise reasonable care in providing that security.

155. Rhino Sports & Entertainment knew, or in the exercise of reasonable care should have known, that the provision of reasonable and adequate security at The Barn on January 19–20, 2018, was necessary to ensure the safety and well-being of the attendees, including to protect them from the criminal acts of third parties.

156. Rhino Sports & Entertainment breached its duty, and was negligent, by:

    a.    failing to adequately train its employees in event management and security practices and procedures for large-venue events like the January 19–20, 2018, event at The Barn;

    b.    failing to properly oversee, manage, and supervise the employees it selected and assigned to provide event management services at The Barn on January 19–20, 2018; and

    c.    was otherwise negligent.

157. As a direct and proximate result of Rhino's negligence, Najee was shot, experienced conscious pain and suffering, and died.

158.    As a direct and proximate result of Rhino's negligence, Najee died and his beneficiaries suffered, and will suffer in the future, damages including, but not limited to, loss of society, companionship, comfort, guidance, kindly offices and advice of Najee.

159.    As a further direct and proximate result of Rhino's negligence, Najee's beneficiaries have suffered damages arising out of the loss of reasonably expected net income of Najee, and have incurred expenses for care, treatment, and hospitalization incident to the injury resulting in Najee's death and reasonable funeral and burial expenses.

**COUNT V**
**Wrongful Death Pursuant to N.C. Gen Stat. 28A-18-2**
**Against John Doe Officer of the Wake Forest University Police Department**
**(Negligent Conduct)**

160.    The allegations of the preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

161.    This claim is brought against John Doe Officer of Wake Forest University Police Department, and is brought pursuant to N.C. Gen. Stat. 28A-18-2.

162.    At all relevant times, John Doe Officer was employed by Wake Forest University and selected and assigned to provide law enforcement oversight and security for the event at The Barn on January 19–20, 2018.

163.    John Doe Officer undertook, assumed, and owed a general duty to attendees at the January 19–20, 2018, event, including Najee, to exercise reasonable care in overseeing, managing, and providing law enforcement oversight and security for the event, and to otherwise discharge his duties as a law enforcement personnel hired to

40

provide law enforcement oversight and security at the event in a reasonable manner. John Doe Officer also undertook and assumed duties to the attendees of the event including, specifically, Najee, when he intervened in the altercation involving Austin, Smith and Najee in The Barn.

164.   John Doe Officer breached those duties, and was negligent, by:

    a.   failing to properly and adequately detain and/or remove Austin or Smith from the party and WFU's campus after their altercation with Najee, failing to check their IDs to confirm they were permitted at the party, and/or failing to otherwise effectively control the situation; and

    b.   was otherwise negligent.

165.   As a direct and proximate result of John Doe Officer's negligence, Najee was shot, experienced conscious pain and suffering, and died.

166.   As a direct and proximate result of John Doe Officer's negligence, Najee died and his beneficiaries suffered, and will suffer in the future, damages including, but not limited to, loss of society, companionship, comfort, guidance, kindly offices and advice of Najee.

167.   As a further direct and proximate result of John Doe Officer's negligence, Najee's beneficiaries have suffered damages arising out of the loss of reasonably expected net income of Najee, and have incurred expenses for care, treatment, and

hospitalization incident to the injury resulting in Najee's death and reasonable funeral and burial expenses.

## COUNT VI
### Wrongful Death Pursuant to N.C. Gen Stat. 28A-18-2
### Against John Doe Security Staff of the Wake Forest University Police Department
### (Negligent Conduct)

168.    The allegations of the preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

169.    This claim is brought against John Doe Security Staff of Wake Forest University Police Department, and is brought pursuant to N.C. Gen. Stat. 28A-18-2.

170.    At all relevant times, John Doe Security Staff was employed by Wake Forest University and selected and assigned to provide campus security on January 19–20, 2018, including but not limited to, to staff the gatehouse at the University Parkway entrance to the Wake Forest Campus, and to monitor, verify, and vet visitors attempting to enter the campus through that entrance after 10 p.m. on January 19, 2018, for the January 19, 2018, event at The Barn.

171.    John Doe Security Staff undertook, assumed, and owed a general duty to attendees at the January 19–20, 2018, event, including Najee, to exercise reasonable care in staffing the gatehouse and monitoring, verifying, and vetting visitors permitted to enter the Wake Forest campus for the January 19–20, 2018, event.

172.    John Doe Security Staff breached those duties, and was negligent, by:

a.    permitting Austin and Smith to enter WFU's campus after hours, The Barn, The Barn's parking lot, and the January 19–20, 2018,

42

party without valid student IDs, without proper confirmation that they were registered attendees for the January 19–20, 2018, party, and armed with deadly weapons, in violation of WFU policy; and

b. was otherwise negligent.

173. As a direct and proximate result of John Doe Security Staff's negligence, Najee was shot, experienced conscious pain and suffering, and died.

174. As a direct and proximate result of John Doe Security Staff's negligence, Najee died and his beneficiaries suffered, and will suffer in the future, damages including, but not limited to, loss of society, companionship, comfort, guidance, kindly offices and advice of Najee.

175. As a further direct and proximate result of John Doe Officer's negligence, Najee's beneficiaries have suffered damages arising out of the loss of reasonably expected net income of Najee, and have incurred expenses for care, treatment, and hospitalization incident to the injury resulting in Najee's death and reasonable funeral and burial expenses.

## COUNT VII
### Wrongful Death Pursuant to N.C. Gen Stat. 28A-18-2
### Against John Doe Rhino Security Staff 1 and 2
### (Negligent Conduct)

176. The allegations of the preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

177. This claim is brought against John Doe Rhino Security Staff 1 and John Doe Rhino Security Staff 2, and is brought pursuant to N.C. Gen. Stat. 28A-18-2.

178.    At all relevant times, John Doe Rhino Security Staff 1 and 2 were employed by Defendant Rhino Sports and selected and assigned to provide security and event management services for the event at The Barn on January 19–20, 2018.

179.    John Doe Rhino Security Staff 1 and 2 undertook, assumed, and owed a general duty to attendees at the January 19–20, 2018, event, including Najee, to exercise reasonable care in overseeing, managing, and providing security for the event, and to otherwise discharge their duties as hired event management staff in a reasonable manner. John Doe Rhino Security Staff 1 and 2 also undertook and assumed duties to the attendees of the event including, specifically, Najee, when they intervened in the altercation involving Austin, Smith, and Najee in The Barn.

180.    John Doe Rhino Security Staff 1 and John Doe Rhino Security Staff 2 each breached those duties, and were negligent, by:

    a.    permitting Austin and Smith to enter WFU's campus after hours, The Barn, The Barn's parking lot, and the January 19–20, 2018, party without valid student IDs, without proper confirmation that they were registered attendees for the January 19–20, 2018, party, and armed with deadly weapons, in violation of WFU policy;

    b.    failing to properly and adequately detain and/or remove Austin or Smith from the party and WFU's campus after their altercation with Najee, failing to check their IDs to confirm they were permitted at

the party, and/or failing to otherwise effectively control the situation; and

    c.    were otherwise negligent.

181.    As a direct and proximate result of John Doe Rhino Security Staff 1 and John Doe Rhino Security Staff 2's negligence, Najee was shot, experienced conscious pain and suffering, and died.

182.    As a direct and proximate result of John Doe Rhino Security Staff 1 and John Doe Rhino Security Staff 2's negligence, Najee died and his beneficiaries suffered, and will suffer in the future, damages including, but not limited to, loss of society, companionship, comfort, guidance, kindly offices and advice of Najee.

183.    As a further direct and proximate result of John Doe Rhino Security Staff 1 and John Doe Rhino Security Staff 2's negligence, Najee's beneficiaries have suffered damages arising out of the loss of reasonably expected net income of Najee, and have incurred expenses for care, treatment, and hospitalization incident to the injury resulting in Najee's death and reasonable funeral and burial expenses.

**COUNT VIII**
**Wrongful Death Pursuant to N.C. Gen Stat. 28A-18-2**
**Against Wake Forest**
**(*Respondeat Superior*/Vicarious Liability)**

184.    The allegations of the preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

185.    Pursuant to the doctrine of *respondeat superior* or vicarious liability, because John Doe Officer, John Doe Security Staff, John Doe Rhino Security Staff 1, and

John Doe Rhino Security Staff 2, with whom Wake Forest had contracted to provide security at the event at The Barn on January 19–20, 2018, and the Event Resource Managers were acting as Wake Forest's agents and within the scope of their agency at all relevant times, and/or because Wake Forest ratified the actions of the John Doe Officer, John Doe Security Staff, John Doe Rhino Security Staff 1 and 2, and the Event Resource Managers, Wake Forest is vicariously liable for all damages caused by its agents.

186.    For such injuries proximately resulting from the conduct of John Doe Officer, John Doe Security Staff, John Doe Rhino Security Staff 1 and 2, and the Event Resource Managers, as described and fully set forth herein, Wake Forest is vicariously liable to the Estate of Najee Ali Baker.

## COUNT IX
### Wrongful Death Pursuant to N.C. Gen Stat. 28A-18-2
### Against Rhino Sports & Entertainment Services
### (*Respondeat Superior*/Vicarious Liability)

187.    The allegations of the preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

188.    Pursuant to the doctrine of *respondeat superior* or vicarious liability, because John Doe Rhino Security Staff 1 and John Doe Rhino Security Staff 2 were acting as Rhino Sports & Entertainment's employees and agents within the scope of their employment and agency at all relevant times, and/or because Rhino ratified the actions of John Doe Rhino Security Staff 1 and 2, Rhino Sports & Entertainment is vicariously liable for all damages caused by John Doe Rhino Security Staff 1 and 2.

189.    For such injuries proximately resulting from the conduct of John Doe Rhino Security Staff 1 and 2, as described and fully set forth herein, Rhino is vicariously liable to the Estate of Najee Ali Baker.

## JURY DEMAND

Plaintiff demands trial by jury.

## PRAYER FOR RELIEF

Plaintiff, as Ancillary Administrator of the Estate of Najee Ali Baker, prays the Court for judgment against the Defendants, jointly and severally, as follows: (1) compensatory damages in excess of $75,000.00, exclusive of interests and costs; (2) attorneys' fees as allowed by law; (3) costs; (4) pre- and post-judgment interest; and (5) such other further relief as the Court deems just and proper.

Dated:  May 7, 2019                    Respectfully submitted,

/s/ Jonathon N. Fazzola
**THE FIERBERG NATIONAL LAW GROUP, PLLC**
Jonathon N. Fazzola* – Lead Attorney
Douglas E. Fierberg*
Chloe M. Neely*
161 East Front Street, Suite 200
Traverse City, MI  49684
              &
1701 Pennsylvania Avenue, Suite 200
Washington, DC  20006
Telephone: (231) 933-0180
Facsimile: (231) 252-8100
Email: jfazzola@tfnlgroup.com
Email: dfierberg@tfnlgroup.com
Email: cneely@tfnlgroup.com
(*appearing by special appearance)

/s/ Jay H. Ferguson

**THOMAS, FERGUSON & MULLINS, LLP**
Jay H. Ferguson
N.C. State Bar No. 16624
119 East Main Street
Durham, NC 27701
Telephone: (919) 682-5684
Email: ferguson@tfmattorneys.com

*Counsel for Plaintiff*