## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### Case No. 1:19-cv-00477-CCE-LPA

THE ESTATE OF NAJEE ALI BAKER,
by and through his Ancillary
Administrator, Jemel Ali Dixon,

               Plaintiff,

     v.

WAKE FOREST UNIVERSITY, a North
Carolina non-profit corporation and
institution of higher education; *et al.,*

               Defendants

## WAKE FOREST UNIVERSITY'S
## BRIEF IN SUPPORT OF SUMMARY JUDGMENT MOTION

Robert J. King III
rking@BrooksPierce.com
   N.C. State Bar No. 15946
Shana L. Fulton
sfulton@BrooksPierce.com
   N.C. State Bar No. 27836
Tanisha Palvia
tpalvia@BrooksPierce.com
   N.C. State Bar No. 43117
BROOKS, PIERCE, McLENDON,
   HUMPHREY & LEONARD, LLP
P.O. Box 26000
Greensboro, NC 27420
336.373.8850

William K. Davis
wdavis@belldavispitt.com
   N.C. State Bar No. 1117
Mark A. Jones
mjones@belldavispitt.com
   N.C. State Bar No. 36215
Andrew A. Freeman
afreeman@belldavispitt.com
   N.C. State Bar No. 41248
BELL, DAVIS & PITT
P.O. Box 21029
Winston-Salem, NC 27120
336.722.3700

*Counsel for Defendant Wake Forest University*

# TABLE OF CONTENTS

NATURE OF MATTER .................................................................... 1

STATEMENT OF FACTS ............................................................... 2

   I.  THE BARN. ........................................................................ 2

   II.  THE HYBRID APPROACH .............................................. 4

   III. THE NIGHT OF THE SHOOTING ................................... 7

QUESTIONS PRESENTED ............................................................ 10

ARGUMENT .................................................................................. 10

   I.  APPLICABLE STANDARDS. ......................................... 10

   II.  BAKER'S DEATH WAS NOT REASONABLY FORESEEABLE ...... 12

      A.  Reasonable Foreseeability ................................. 12

      B.  There were no prior relevant incidents .............. 13

   III. PLAINTIFF HAS NO ADMISSIBLE EVIDENCE AS TO THE APPLICABLE STANDARD OF CARE ................ 15

      A.  Expert testimony is required ............................ 15

      B.  Kirkham's opinions are not admissible ........... 18

         1.  *Kirkham is not qualified to offer his opinions* ...... 19

         2.  *Kirkham's opinions lack any valid basis* ...... 20

   IV. PLAINTIFF MAKES NO EFFORT TO SHOW PROXIMATE CAUSE ........................................ 21

CONCLUSION ............................................................................... 22

CERTIFICATE OF SERVICE ........................................................ 25

# TABLE OF AUTHORITIES

## CASES

*Bogle v. Duke Power Co.*,
   27 N.C. App. 318, 219 S.E.2d 308 (1975) ................................................................ 21

*Brown v. North Carolina Wesleyan College, Inc.*,
   65 N.C. App. 579, 309 S.E.2d 701 (1983) ........................................................ 12, 14

*Callaway v. Travis County*,
   No. A-15-CA-00103-SS, 2016 WL 8740498 (W.D. Tex. Nov. 30, 2016)................ 19

*Connelly v. Family Inns of America, Inc.*,
   141 N.C. App. 583, 540 S.E.2d 38 (2000) ........................................................ 12, 14

*Crescent University City Venture, LLC v. AP Atlantic, Inc.*,
   No. 15 CVS 14745, 2019 WL 3765313 (N.C. Super. Aug. 8, 2019) ........................ 16

*Dash v. Mayweather*,
   731 F.3d 303 (4th Cir. 2013) .................................................................................... 11

*Est. of Collins v. Wilburn*,
   253 F. Supp. 3d 989 (E.D. Ky. 2017) ....................................................................... 19

*Food Lion, Inc. v. Cap. Cities/ABC, Inc.*,
   964 F. Supp. 956 (M.D.N.C. 1997).......................................................................... 21

*Foster v. Winston-Salem Joint Venture*,
   303 N.C. 636, 281 S.E.2d 36 (1981)........................................................................ 11

*Frankenmuth Insurance v. City of Hickory*,
   235 N.C. App. 31, 760 S.E.2d 98 (2014) .......................................................... 15, 16

*Hayes v. GGP-Four Seasons, L.L.C.*,
   No. 1:10CV423, 2011 WL 6027443 (M.D.N.C. Dec. 5, 2011) ........................... 13, 14

*James v. Duquesne University*,
   936 F. Supp. 2d 618 (W.D. Pa. 2013) ...................................................................... 14

*Lees v. Carthage College*,
   714 F.3d 516 (7th Cir. 2013) .............................................................................. 16, 17

ii

*Liller v. Quick Stop Food Mart, Inc.*,
  131 N.C. App. 619, 507 S.E.2d 602 (1998) ...................................................12, 14, 22

*Marquez v. City of Albuquerque*,
  399 F.3d 1216 (10th Cir. 2005) .................................................................................. 18

*Michael v. Huffman Oil Co., Inc.*,
  190 N.C. App. 256, 661 S.E.2d 1 (2008) .................................................................... 17

*Pharr v. Wille*,
  No. 1:14-CV-762-DAE, 2016 WL 4082740 (W.D. Tex. July 29, 2016) .................... 18

*Reagin v. Terry*,
  675 F. Supp. 297 (M.D.N.C. 1986).............................................................................. 22

*Roberts v. Mars Hill University*,
  802 S.E.2d 621 (N.C. Ct. App. 2017) ................................................................... 12, 14

*Sawyer v. Carter*,
  71 N.C. App. 556, 322 S.E.2d 813 (1984) .................................................................. 12

*Stahle v. CTS Corp.*,
  817 F.3d 96 (4th Cir. 2016) ........................................................................................ 11

*Sullivan v. City of Round Rock*,
  No. A-14-CV-349-AWA, 2016 WL 4257747 (W.D. Tex. Feb. 10, 2016)................. 19

*United States v. White*,
  660 F. App'x 779 (11th Cir. 2016) .............................................................................. 18

*Varner v. D.C.*,
  891 A.2d 260 (D.C. 2006) ........................................................................................... 17

## RULES

Fed. R. Civ. P. 4(m) ......................................................................................................... 2

Fed. R. Civ. P. 56(a) ...................................................................................................... 10

Fed. R. Evid. 702 ........................................................................................................... 19

iii

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### Case No. 1:19-cv-00477-CCE-LPA

THE ESTATE OF NAJEE ALI BAKER,
by and through his Ancillary
Administrator, Jemel Ali Dixon,

        Plaintiff,

    v.

WAKE FOREST UNIVERSITY, a North
Carolina non-profit corporation and
institution of higher education; *et al.,*

        Defendants

**WAKE FOREST UNIVERSITY'S
BRIEF IN SUPPORT OF SUMMARY
JUDGMENT MOTION**

## <u>NATURE OF MATTER</u>

On January 20, 2018, Najee Baker was shot and killed by Jakier Austin on a roadway on Wake Forest University's ("WFU") campus after they both attended a party at the Barn, an on-campus event facility. Plaintiff alleges that WFU's security measures were unreasonable, primarily because WFU had, years earlier, decreased the number of armed police officers at Barn events and shifted overall event management from the WFU Police Department ("WFUPD") to the Office of the Dean of Students ("DOS").

In North Carolina, a property owner is not liable for, and has no duty related to, the criminal acts of unrelated third parties unless the criminal acts were reasonably foreseeable. If the plaintiff shows that the subject crime was reasonably foreseeable, the plaintiff then

1

must show that the property owner was negligent and that such negligence was proximately related to the plaintiff's injuries.

Summary judgment should be granted to WFU on three grounds. First, the shooting of Baker was not reasonably foreseeable. Second, Plaintiff has developed no admissible evidence of the applicable standard of care, because she relies exclusively on opinions from Dr. George Kirkham. As discussed herein as well as in the forthcoming Motion to Exclude Opinions of Dr. George Kirkham,[1] Kirkham's opinions are inadmissible – *a conclusion reached by numerous other courts*. Third, Plaintiff has no evidence of a causal connection between WFU's supposed breach of duty (inadequate security) and Baker's death.[2]

## STATEMENT OF FACTS

### I. THE BARN

The Barn is an event facility on WFU's campus built in 2011 that has a capacity of over 500 people. *See* Lawson Aff. ¶¶12-13 (Ex. 1). WFU student groups, including member organizations of the National Pan-Hellenic Council ("NPHC") (which includes WFU's historically-Black sororities and fraternities, including former defendant Delta Sigma

---

[1] WFU is mindful of the Local Rules' limitations on brief length; therefore, WFU is not incorporating the Motion to Exclude into this Brief. The instant Brief contains all of the grounds for granting summary judgment, including the exclusion of Kirkham's opinions. The Motion to Exclude discusses the grounds for excluding Kirkham's opinions in more detail.

[2] Plaintiff also asserts wrongful death claims against John Does WFUPD Officer and Security Staff. Compl. ¶¶160-75. Dismissal of these claims is warranted under Fed. R. Civ. P. 4(m) because these defendants remain unserved after the close of discovery and more than 24 months after the filing of Plaintiff's Complaint. These claims also fail as a matter of law for the same reasons that the claims against WFU fail.

2

Theta ("Sorority")), routinely used the Barn for fundraising parties. *See* Rue Dep. at 18:18-21 (Ex. 2). Alcohol was prohibited at these parties. Goldstein Aff. ¶7 (Ex. 3). Non-WFU students from neighboring colleges were typically invited and many times outnumbered WFU students due to the relatively small number of Black WFU students. *See* Gravely Dep. at 54:18-55:4, 117:1-12 (Ex. 4). WFU permitted these parties because they supported the NPHC organizations and fostered social development and activities for WFU's Black students. Goldstein Aff. ¶¶5-6.

Prior to 2013, no single WFU administrative office had responsibility for Barn parties or events. *See* Goldstein Dep. at 100:17-106:20 (Ex. 5), Lawson Dep. at 171:14-173:14 (Ex. 6). This led to ticketing and capacity management problems. *See* Rue Dep. at 27:15-29:3; Lawson Aff. ¶14. These issues in turn sometimes led to physical altercations, with some resulting in a large police response. *Id.*

The shooting of Baker was unprecedented. Prior to January 20, 2018, *there had never been a homicide or shooting on WFU's campus since the opening of the Winston-Salem campus in 1956. Id.* ¶¶27-28. *No one had ever been injured in a shooting by a firearm on campus. There has never been a confirmed report of a deadly weapon at a Barn party. See id.* ¶24. The crime rate on WFU's campus is *significantly lower* than Winston-Salem's crime rate. *Id.* ¶29. In fact, the University's Clery Act report shows only three aggravated assault offenses and three illegal weapons arrests in the three years preceding Baker's death, with no incidents of either type in 2017 and zero conduct similar to the shooting of Baker. *Id.* ¶¶31-37.

3

From the opening of the Barn, WFUPD officers were present at events to provide a level of security. *Id.* ¶13. Because they were usually the only professional staff present, WFUPD became the *de facto* event managers. *Id.* ¶15. However, event management is not within the mission or training of police. *Id.* As a result, when problems arose WFUPD used the only resource they had at their disposal: adding more police. *Id.* The increased number of police did not fix the behavior problems at the Barn, and instead created tensions with many students due to the lack of corresponding police presence at white Greek parties. *See Id.* ¶16; Rue Dep. at 30:16-33:19.

## II.    THE HYBRID APPROACH

By 2013, it was clear that WFUPD was not the appropriate department to manage Barn events since police are not event managers and simply adding more police was not working. *See* Lawson Aff. ¶¶16-17. WFU convened a working group of administrators, WFUPD officials, and students to try to develop a better approach to event management, including security staffing. *See* Lawson Dep. at 26:3-27:10.

In 2014, WFU Vice-President Penny Rue assigned the newly-hired Dean of Students, Dr. Adam Goldstein, to develop an event management plan, including security, for Barn events. Rue Dep. at 74:2-75:14. Both Rue and Goldstein had event management experience from their prior professional experience at other major universities. *See id.* at 10:7-12; Goldstein Dep. at 34:18-35:18. DOS took over event management and worked with WFUPD to improve event management at the Barn. Goldstein Dep. at 55:13-61:7; Gravely Dep. at 126:7-22. For example, Goldstein and his staff analyzed the underlying

ticketing and crowd capacity issues that were the sources of the majority of the physical alterations and implemented effective solutions, *i.e.,* Eventbrite ticketing. *See* Goldstein Dep. at 55:23-56:3; Gravely Dep. at 126:7-128:2.

Goldstein and his staff also worked with Lawson and Event Sergeant James Gravely to design and implement a staffing plan that would encourage safety at Barn parties. Goldstein Dep. at 55:5-61:7; Gravely Dep. at 55:24-57:11. The plan, "the Hybrid Approach," employed a combination of staffing:

- WFUPD officers;
- licensed security officers from former defendant Rhino Sports & Entertainment ("Rhino");
- WFU-employed and trained WFU students called Event Resource Managers ("ERMs");
- student hosts;
- student host advisors; and
- DOS staff members.

Lawson Aff. ¶20; Goldstein Aff. ¶8. The configuration and positioning of each staffing component were constantly reviewed and adjusted. Goldstein Dep. 57:5-18; Gravely Dep. 58:13-21.

The Hybrid Approach was created in the context of other campus safety measures already in place on campus, including:

- sworn, armed WFUPD patrolling officers;
- mutual aid agreement with WSPD;
- direct radio contact with WSPD and Forsyth County Emergency Management Services ("EMS");
- WFU student volunteer Emergency Medical Technicians ("EMT");
- surveillance cameras at the Barn and other areas of campus;
- numerous security call boxes across campus; and
- 24-hour escort services.

5

Lawson Aff. ¶7.

WFU's 340-acre main campus, where the Barn is located, is in Winston-Salem and accessible by foot at many points. *Id.* ¶8. The campus's two gatehouses were not intended to keep people off campus, although they could be used for that purpose. *See id.* ¶10. Their main purposes were to reduce cut-through vehicular traffic and allow the University to restrict access to campus if the circumstances called for such a restriction (like limiting the number of vehicles on student move-in days). *Id.* After 10PM, gatehouse security officers followed guidelines for entrance, but used their discretion to account for competing concerns. For example, security officers had to comply with the WSPD requirement that vehicles not be allowed to back up on the nearby major public roads. *Id.* ¶11.

While working on the Hybrid Approach, WFU hired outside consultants to investigate allegations of racial bias against WFUPD. Rue Dep. at 33:4-14. In Summer 2014, the consultants found no actual bias but confirmed that perceptions of bias existed among students. *See* Williams-Moss Report Executive Summary (DE 27-1). The Report made suggestions to address the bias issues, including some suggestions about event management, although the consultants had not been engaged to evaluate event management and did not actually do so. *See id.*; Goldstein Dep. at 168:3-174:22. WFU implemented most of the Report's suggestions. *See id.*[3]

---

[3] In response to WFU's Motion to Dismiss, Plaintiff was unable to substantiate her assertions about the Report, resulting in an admonition by the Court. DE 30 at 1-2.

The results of the Hybrid Approach were positive.[4] The number of physical alterations decreased. Lawson Aff. ¶21; Gravely Dep. at 55:5-56:23, 77:1-78:6, 130:1-24; Riseling Dep. at 162:9-24, 185:2-190:3, 215:3-20 (Ex. 7). For example, in the three-year period between the implementation of the Hybrid Approach and Baker's death, there were only eight parties out of 31 where any physical altercations were noted. Lawson Aff. ¶21. Two of those involved only pushing and shoving. *Id.*

As part of the Hybrid Approach, WFU typically stationed one WFUPD officer at Barn events (in addition to all of the other personnel listed above), with the officer able to quickly summon nearby WFUPD officers if needed. *See* Goldstein Dep. at 57:19-58:24; Gravely Dep. at 137:7-20. This staffing decision was agreed to by Chief Lawson and also WSPD.[5] Lawson Dep. at 190:17-193:5; Lawson Aff. ¶22.

## III.   THE NIGHT OF THE SHOOTING

On January 19–20, 2018, the Sorority hosted the "Level 1913" fundraising party ("the Party") at the Barn. Goldstein Aff. ¶9.  The Sorority used social media to advertise the Party to WFU students and non-WFU students in the surrounding area. *Id.* Consistent with the Hybrid Approach, the following staffing was present: WFUPD Officer Michael

---

[4] Both WFUPD and WFU's experts (two Chiefs of Police at major universities and a professional large event manager) found that behavior significantly improved once the Hybrid Approach began in late 2014. *See e.g.,* Riseling Dep. at 162:9-24, 215:3-20 (Ex. 7); Lawson Aff. ¶21. The experts relied on records relating to every Barn event from the Barn's opening in 2011 until the shooting of Baker and a summary of the same. *See, e.g.*, Riseling Dep. at 31:6-32:14.

[5] The Hybrid Approach's posting of a police officer at the Barn's entrance (although the officer frequently was inside the Barn) was consistent with how WSPD staffed many events. Miles Dep. at 41:14-42:8 (Ex. 8).

7

Bottoms, seven licensed private Rhino security officers, six ERMs, two Sorority hosts, four Sorority Advisors, and one DOS staff member. *See id.* While Bottoms was the only WFUPD officer stationed at the Barn, two other officers, including Officer Dana Felts and Officer Dan Paquette, were at the Barn at times, and a fourth officer, Humberto Gonzalez, was also on duty. *See* Felts Dep. at 19:2-10, 34:13-23 (Ex. 9).

Austin and his teenage friends Malik Smith and Jadakiss Hall attended the Party. Austin Dep. at 14:10-15:24 (Ex. 10). All three had tickets which Austin purchased online prior to the Party. *Id.* at 16:8-24. Najee Baker also attended the Party. *See* WFU's Answer (DE 34 ¶105).

During the Party, Smith and Baker became involved in an altercation with several others on the dance floor. Austin Dep. at 24:4-26:18. Austin joined in defense of Smith. *See id.* Smith, Baker, and Austin were quickly separated. *Id.* at 27:19-28:15. Austin was led out of the Barn by a party guest. *Id.* at 28:10-15. Smith and Hall left shortly thereafter together. *Id.* at 28:22-25. Moments later, Baker left the Barn. *See* Dixon Dep. 77:1-18 (Ex. 11). The dance floor disturbance, which had been reduced to a single individual (who was not involved in the subsequent shooting of Baker) who was simply being rowdy, continued behind them. *See* Bottoms Dep. 62:18-69:7 (Ex. 12). Rhino staff and Bottoms escorted the rowdy individual out of the Barn, along with his friends. *Id.* The Party was shut down early by the Sorority. *See id.* at 72:21-73:10.

Outside, in front of the Barn, a student ERM heard an individual he has identified as Baker yell at Smith and others, "Go get your gun." Wille *de bene esse* Dep. at 18:15-

8

19:12 (Ex. 13). The ERM did not take the comment seriously because he viewed it as "trash talk" and he did not hear anyone say that they actually had, or were going to get, a weapon. *Id.* at 24:14-25:21. As a result, he did not report the comment to anyone. *Id.*

Officers Bottoms and Felts, who were both outside at this point, were already taking precautions because of the altercation that had just occurred inside. Bottoms Dep. at 67:20-72:24. Bottoms directed Felts to follow down the roadway the rowdy individual who had been removed from the Party. *Id.* at 70:6-14. Felts followed them. Felts Dep. at 67:7-20. Bottoms notified dispatch to inform all officers on campus that the Party was ending early and directed additional units to Lot W, where some guests had parked. Bottoms Dep. at 120:3-24. At the same time, WFU EMT vehicles were traveling on the roadway between the Barn and the parking lots to assist with an intoxicated guest at the Barn. *See id.* at 72:6-20.

Despite the close presence of Felts, Bottoms, emergency vehicles, and droves of exiting party guests, all present on the short roadway between the Barn and the parking lots, Smith retrieved a gun from a car and Austin used that gun to shoot Baker. *See* Austin Dep. at 20:10-21:7.

Austin did not know that, when Smith left the Party after the fight, Smith went to get a gun. *Id.* at 31:11-21. Austin testified that, in the subsequent confrontation, Baker acted aggressively and, fearful for his safety, Austin shot Baker. *Id.* at 35:14-36:6. Austin, Smith and Hall then fled. *Id.* at 36:7-23.

9

Austin pled guilty on June 11, 2020 to voluntary manslaughter for the shooting of Baker. Austin Plea (Ex. 14). Smith pled guilty on April 9, 2020 to gun-related charges stemming from the shooting. Smith Plea (Ex. 15).

Baker's death is the first and only homicide to ever occur in the 64-year history of WFU in Winston-Salem. It was the first and only time a firearm had ever been used to injure anyone. While Baker's death was an undeniable tragedy, it was not foreseeable to, or caused by, WFU.

## QUESTIONS PRESENTED

The University presents the following questions in its Brief:

1. Was the shooting of Baker reasonably foreseeable by the University?
2. Does Plaintiff have any evidence as to the applicable standard of care?
3. Does Plaintiff have any evidence that a breach of the standard of care proximately caused Baker's death?

The answer to each question is: No.

## ARGUMENT

## I. APPLICABLE STANDARDS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[6] "Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations,

---

[6] References to internal citations and quotes are omitted.

10

mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013).

Plaintiff's wrongful death claims fall within the sub-genre of premises liability for criminal acts of unrelated third parties. To establish such a claim under North Carolina law,[7] a plaintiff must show that:

1.  the criminal actions were reasonably foreseeable, thereby creating a duty for the property owner to take action to protect guests;
2.  a reasonable property owner would have conformed to a certain standard of care;
3.  the property owner breached the standard of care;
4.  the breach of the standard of care proximately caused the decedent's death; and,
5.  damages.

*See Foster v. Winston-Salem Joint Venture*, 303 N.C. 636, 640, 281 S.E.2d 36, 39 (1981). To survive summary judgment, Plaintiff must present admissible evidence as to each element. Except for the issue of damages (Baker's death), Plaintiff cannot satisfy any of these elements.[8]

---

[7] North Carolina law governs the substantive legal aspects of this matter since jurisdiction is based upon diversity. *See Stahle v. CTS Corp.*, 817 F.3d 96, 99-100 (4th Cir. 2016).

[8] To the extent that Plaintiff seeks to impose a duty of care on WFU based upon any alleged voluntary undertaking by WFU, her claims fail for the reasons articulated in this Brief. Plaintiff's claim for gross negligence on the same facts also fails. *See* Compl. ¶¶130-40. Plaintiff's claims against WFU based upon "vicarious liability" suffer from the same facts as allegations directly against WFU. *See id.* ¶¶187-89. Plaintiff's claims, no matter how creatively pled, boil down to the same legal theory: property owner liability for the criminal acts of an unrelated third party. Therefore, all claims are subject to dismissal for the reasons discussed herein.

11

## II. BAKER'S DEATH WAS NOT REASONABLY FORESEEABLE.

### A. Reasonable Foreseeability

North Carolina law is clear: a property owner "is not ordinarily liable for injuries to invitees resulting from intentional, criminal acts of third persons[.]" *Liller v. Quick Stop Food Mart, Inc.*, 131 N.C. App. 619, 622, 507 S.E.2d 602, 604 (1998). To establish a duty, a plaintiff must first show that the crime was reasonably foreseeable. Otherwise, "to impose a duty absent true foreseeability of criminal activity [at a particular location] would be grossly unfair." *Sawyer v. Carter*, 71 N.C. App. 556, 562, 322 S.E.2d 813, 817 (1984).

As with any premises liability claim, the "[f]oreseeability of the criminal [act] determines a college's duty to safeguard its students from criminal acts of third persons." *Brown v. N.C. Wesleyan Coll., Inc.*, 65 N.C. App. 579, 583, 309 S.E.2d 701, 703 (1983). "The most probative evidence on the question of whether a criminal act was foreseeable is evidence of prior criminal activity committed." *Connelly v. Family Inns of Am., Inc.*, 141 N.C. App. 583, 588, 540 S.E.2d 38, 41 (2000). The Court should consider forecasts of evidence to determine whether there was a repeated course of conduct which should have put the defendant on notice that a plaintiff's injury could occur. *See Roberts v. Mars Hill Univ.*, 802 S.E.2d 621, 622 (N.C. Ct. App. 2017) (Table).

When considering evidence of prior criminal activity, the location, type, and amount of prior crimes are relevant. Prior incidents not close enough in time, type, or location will not suffice. *See id.* (reports of "physical assaults, fire alarms, alcohol and drug violations, larcenies, and break-ins," were "distinguishable from the [physical] attack on Plaintiff" and

12

did not establish foreseeability). *See also Connelly*, 141 N.C. App. at 588, 540 S.E.2d at 41-42; *Liller*, 131 N.C. App. at 624, 507 S.E.2d at 606.

**B.  There were no prior relevant incidents.**

Plaintiff failed to allege that a single prior homicide (regardless of the weapon) or shooting, or any other relevant crime, had occurred in the history of WFU's campus. Lawson Aff. ¶¶27-28; Kirkham Dep. at 103:23-104:12 (Ex. 16). The Court allowed Plaintiff to conduct discovery on this and other issues, and fifteen months of discovery has not cured this fundamental problem for Plaintiff. The shooting of Baker was unprecedented on a campus that was and is considerably safer than the city in which WFU is located.

As frequently the case when young people congregate, there have been fights on campus and at the Barn. *See* Rue Dep. at 19:12-20; Lawson Aff. ¶30. However, once the Hybrid Approach was implemented, Barn event management improved significantly, resulting in fewer physical altercations. *See supra* at 7.

Of the cases deciding foreseeability in the premises liability context, no case is more salient than *Hayes v. GGP-Four Seasons, L.L.C.*, No. 1:10CV423, 2011 WL 6027443 (M.D.N.C. Dec. 5, 2011). In *Hayes*, the plaintiff alleged that the defendant property owner of a Greensboro shopping mall was liable for a shooting that occurred inside the mall. *Id.* at *1. At summary judgment, the plaintiff presented evidence of "nine robberies, one homicide, 11 burglaries, nine assaults, one aggravated assault, 71 instances of disorderly conduct and 336 larcenies on mall property" over the three-year period preceding the subject crime. *Id.* at *6 (italics omitted). The Court also took into account the size of the

13

subject property—a large shopping mall. *Id.* The Court found that this series of hundreds of prior crimes, including at least 20 incidents involving violence or threats of violence (robbery, homicide, assaults) over the three-year period preceding the subject crime, was insufficient to show foreseeability.[9] *Id.* at *7. *See also Brown*, 65 N.C. App at 582-84, 309 S.E.2d at 702-04; *Roberts*, 802 S.E.2d at 622. Accordingly, the Court recommended entry of summary judgment in favor of defendants on plaintiff's negligence claims.

The similarity of the shopping mall to the WFU campus is obvious: Both are large properties, privately-owned but generally accessible by the public, that are frequented by thousands of people on a regular basis. Lawson Aff. ¶¶5, 9. If the Court found that "nine robberies, one homicide, 11 burglaries, nine assaults" and one aggravated assault over the three-year period immediately preceding the subject crime was insufficient in *Hayes* to satisfy the foreseeability requirement, how can the facts in the instant case be found to do so?

It is undisputed that, prior to the shooting of Baker, there had never been a homicide and never been a firearm used to injure anyone on WFU's campus. There is no evidence

---

[9] The facts in this lawsuit are almost identical to *James v. Duquesne Univ.,* 936 F. Supp. 2d 618 (W.D. Pa. 2013). In *James*, Duquesne students attending a dance on campus were shot by two other attendees unrelated to Duquesne, after leaving the party. *Id.* at 622-24. The court dismissed the students' lawsuit in large part because there had been only two incidents on campus that involved a handgun, which were over a year apart from one another, and the closest one was over a year prior to the dance. *Id.* at 629-43. The assaults reported in Duquesne's Clery Act reports did not involve a handgun or conduct similar to the shooting. *Id.* at 640.

14

that a deadly weapon has ever been brought into the Barn, except by police officers. [10] The crime rate on WFU's campus is well below that of Winston-Salem or North Carolina – which in itself distinguishes this case from others addressed by the courts. *See* Lawson Aff. ¶29. For the Court to nonetheless let this case proceed to a jury would stretch the meaning of "foreseeability" to all but eliminate that requirement under North Carolina law. The result would cast property owners as the *de facto* guarantors of the safety of every guest from every criminal act, no matter how random or unpredictable.

## III. PLAINTIFF HAS NO ADMISSIBLE EVIDENCE AS TO THE APPLICABLE STANDARD OF CARE.

The essence of Plaintiff's Complaint is that the security at the Barn was unreasonable; i.e., that WFU failed to provide the level of security that a reasonable property owner would have provided. Therefore, the second question (after foreseeability) is: What security *should* WFU have provided? Plaintiff has failed to develop any admissible evidence on this question.

### A. Expert testimony is required.

"Where common knowledge and experience of the jury is [not] sufficient to evaluate compliance with a standard of care, the plaintiff is required to establish the standard of care through expert testimony." *Frankenmuth Ins. v. City of Hickory*, 235 N.C. App. 31, 35, 760

---

[10] There are two unconfirmed reports of weapons related to the Barn in 2013 and 2015. Lawson Aff. ¶25. After investigation by WFUPD, neither could be substantiated. *Id.* The closest confirmed report of any type of weapon at the Barn was on April 4, 2014, over three years before Baker's death, when non-lethal pepper spray was discharged by an unknown individual. *Id.* ¶26.

S.E.2d 98, 101 (2014). Plaintiff's complaints about WFU's campus security plainly sound in professional negligence. *See id.* (characterizing negligence action brought against municipal water treatment system operator as professional negligence); *Crescent Univ. City Venture, LLC v. AP Atl., Inc.*, No. 15 CVS 14745, 2019 WL 3765313, at *46 (N.C. Super. Aug. 8, 2019) ("This requirement is not limited to negligence claims brought against the classic learned professions, however, but applies in all cases where some degree of professional judgment or esoteric knowledge is required to evaluate the defendant's standard of care."). The subject matter of campus security is so specialized that there are professional organizations such as the International Association of Campus Law Enforcement Administrators ("IACLEA") that sets standards for and certifies campus law enforcement organizations.[11] *See Lees v. Carthage Coll.*, 714 F.3d 516, 525 (7th Cir. 2013) ("The IACLEA guidelines are an authoritative set of recommended practices specific to the field of campus security and are regularly consulted by campus-security professionals.").

At issue here is the complex question of what security should have been provided on a 340-acre campus that is regularly frequented by thousands of people, taking into account issues such as: the number, type, and training of security and other personnel; physical security measures (such as cameras, barricades, metal detectors, etc.); limitations

---

[11] IACLEA includes over 4,200 members of law enforcement and security personnel at higher education institutions across the globe. About IACLEA, https://web.archive.org/web/20200423180254/https://www.iaclea.org/about/. WFU is certified by IACLEA and was re-certified after the subject shooting. Lawson Aff. ¶6.

16

on admission to campus and sites within campus; and, the myriad other elements that go into designing and implementing a security strategy for a large college campus.

The average juror cannot be expected to know how many police officers should provide security at college parties; what the training of those officers should be; where those officers should be stationed; whether the officers should be sworn or unsworn, armed or unarmed; whether access to parties should be limited to college students with ID's; whether and what types of cameras should be employed; or, how many private security personnel should be provided. *See Varner v. D.C.*, 891 A.2d 260, 268 (D.C. 2006) (noting a juror's common knowledge and experience with large events "is a far cry from any experience with the process of planning for the handling of large crowds in such circumstances, both architecturally and through various crowd control measures").

Courts in North Carolina and other jurisdictions have repeatedly found that expert testimony is required in premises liability cases. *See Michael v. Huffman Oil Co., Inc.*, 190 N.C. App. 256, 271, 661 S.E.2d 1, 11 (2008) (holding that expert testimony is required in factually-complex premises liability cases); *Lees*, 714 F.3d at 522 (applying Wisconsin law) (holding expert testimony was required to establish standard of care in premises liability action against college); *Varner*, 891 A.2d at 267 (applying District of Columbia law) ("[E]xpert testimony is required to establish the standard of care in negligence cases . . .which involve issues of safety, security and crime prevention.").

17

Therefore, Plaintiff needs an expert to establish the requisite standard of care.[12] Plaintiff failed to retain such an expert.

## B. Kirkham's opinions are not admissible.

The problems with Kirkham and his opinions are so numerous, and his opinions are so essential to Plaintiff's case, that WFU will shortly file a Motion to Exclude his testimony.[13] Kirkham is not qualified to offer opinions on campus security and his opinions were formed with no analysis or research. This is not unusual for Kirkham. *He has been repeatedly rejected by federal courts because he either lacked the expertise to offer the proffered opinions, or he performed no analysis or research, or both.* Word limits do not permit a full discussion of all of these cases, but the District Court's opinion in *Pharr v. Wille*, No. 1:14-CV-762-DAE, 2016 WL 4082740, at *7-8 (W.D. Tex. July 29, 2016) collects several of these opinions. As that Court noted: "This Court's determination that Dr. Kirkham is an unqualified expert witness whose conclusions are unreliable is not an unchartered conclusion. . . . [T]his Court's review of case law reveals that federal district courts have summarily rejected his qualifications and opinions." *Id.* at *8.[14]

---

[12] To be clear: Plaintiff has *no* evidence of the applicable standard of care, expert or otherwise. Therefore, even if the Court were to find that expert testimony is not required, summary judgment is still appropriate.

[13] WFU will move to exclude Kirkham's testimony at this stage because of his indispensable role in Plaintiff's case and Plaintiff's ability to avoid summary judgment. *See supra* n.1. Even if Plaintiff somehow shows that the shooting was foreseeable, Plaintiff cannot proceed without valid expert testimony, and Kirkham is Plaintiff's only liability expert.

[14] In addition to the cases cited in *Pharr*, federal courts have excluded Kirkham's testimony on substantive grounds in a number of other cases. *See, e.g., U.S. v. White*, 660 F. App'x 779, 785 (11th Cir. 2016); *Marquez v. City of Albuquerque*, 399 F.3d 1216, 1222 (10th Cir.

1.      *Kirkham is not qualified to offer his opinions.*

Kirkham has no experience with campus security or event management. Kirkham Dep. at 32:22-33:25, 34:19-21, 237:15-18. He is merely an academician and a criminologist, with remote and limited experience as a police officer in the 1970's and part-time experience in the 1990's, which he did for research purposes.[15] *Id.* at 208:7-211:15. Kirkham acknowledged the limitations of his qualifications in his deposition. He:

- has no knowledge as to how security or event management is handled at any college *anywhere or at any time*. *See, e.g., id.* at 27:9-29:11, 30:13-32:2, 159:25-160:4, 162:11-163:9, 164:11-170:13; 184:6-25; 228:23-231:15;
- has never worked in the field of campus security or administration, *id.* at 34:19-21, 143:23-25;
- has never designed or advised a school regarding security, *id.* at 32:22-33:25, 285:9-12;
- had never even heard of IACLEA, *id.* at 59:3-19.

In short, Kirkham lacks "knowledge, skill, experience, training, or education" (Fed. R. Evid. 702) to opine on any security system, let alone one for a college campus.[16]

---

2005); *Est. of Collins v. Wilburn*, 253 F. Supp. 3d 989, 992 (E.D. Ky. 2017); *Callaway v. Travis Cty.*, No. A-15-CA-00103-SS, 2016 WL 8740498, *1 (W.D. Tex. Nov. 30, 2016); *Sullivan v. City of Round Rock*, No. A-14-CV-349-AWA, 2016 WL 4257747, *2 (W.D. Tex. Feb. 10, 2016). Despite these plentiful cases, Kirkham testified in his deposition that courts had only excluded his opinions "a couple of times" and it was "a very rare occurrence." Kirkham Dep. at 282:13-284:13.

[15] One example of Kirkham's lack of understanding about modern policing: Kirkham testified that "over-policing" does not actually exist and has "never been part of [his] professional vocabulary." Kirkham Dep. at 235:22-24, 59:20-62:12. Kirkham stated that over-policing is nothing more than a "PR problem" and one simply has to explain to African-Americans that the heavy police presence is for their own good. *Id.* at 59:20-62:12, 260:9-263:7.

[16] Kirkham acknowledged that campus security presents different issues than security in other contexts, *id.* at 86:21-87:8, and, that policing in general has changed significantly in the quarter century since he last served as a part-time police officer, *id.* at 32:3-21.

19

2.     *Kirkham's opinions lack any valid basis.*

While Kirkham offers multiple opinions in his Report, almost all of his opinions

lack citation to any documents, sources, or research. Kirkham testified that, to the extent

that he had any basis for his opinions, he cited such bases in his Report. Kirkham Dep. at

191:21-194:14. As a result, Kirkham has no basis for most his opinions, other than a gut

reaction.

The Local Rules do not allow the space for a full discussion of all of the problems

with Kirkham's opinions, but WFU will highlight several here:

- Kirkham testified that understanding the physical environment is important to both designing and assessing a security approach. *Id.* at 104:13-105:1. However, he has never set foot on WFU's campus, nor did he send anyone to look at the campus. *Id.* Kirkham lacks the most basic understanding of the WFU campus. *Id.* at 105:2-14, 140:4-7, 144:9-145:3, 185:21-186:3.
- Kirkham testified that any assessment of security requires, as a first step, conducting a risk assessment to determine what risks are being guarded against. *Id.* at 43:24-45:4. Kirkham never conducted such an assessment, nor did he arrange for one. *Id.* at 49:4-50:5, 100:2-101:25.
- Kirkham has no idea what effects the Hybrid Approach had on behavior at the Barn – and did not care what the answer was. *Id.* at 73:13-74:7, 76:2-77:19.

Three specific examples are illustrative:

- Kirkham was harshly critical of WFU's campus lighting, and he explained that there were accepted standards for lighting adequacy, as well as accepted methods for measuring the lighting against such standards. *See id.* at 147:2-24; Kirkham Report at 14, 20-21(Ex. 17). Kirkham has employed experts in other situations to measure the lighting on properties. *Id.* at 149:2-150:6, 152:4-7. Kirkham did not engage the experts in this case, he did no analysis of the lighting (other than watching body-worn camera videos), and he had no idea what the actual lighting levels were at the time of the shooting. *Id.* at 147:25-156:13.

20

- Kirkham opined that the WFUPD officers were not properly trained, but he stated in his deposition he did not know what training they had received. *Id.* at 156:14-157:19; Kirkham Report at 13-15.

- While Kirkham opined in his Report on whether WFU was required to limit access to campus, his deposition testimony ranged from stating that: (1) WFU had *no* duty to restrict access to campus, to (2) WFU not only had a duty but was required to put in security around the entire perimeter of the sprawling campus, to (3) saying that he *did not know* if WFU had a duty to restrict access, to (4) testifying that he was *not expressing an opinion* on the topic at all. *Compare* Kirkham Dep. at 123:2-16, 140:8-141:12, 121:18-122:5, 213:22-218:5.

Kirkham's opinions should be disregarded, which means Plaintiff has no evidence as to the applicable standard of care.

## IV. PLAINTIFF MAKES NO EFFORT TO SHOW PROXIMATE CAUSE.

In a wrongful death action, summary judgment is appropriate when the alleged negligent conduct was not the proximate cause of the injury. *Bogle v. Duke Power Co.*, 27 N.C. App. 318, 321, 219 S.E.2d 308, 310 (1975). "Proximate cause necessarily includes two elements: (1) whether the action of the tort-feasor was the 'cause in fact' of plaintiff's injuries; and (2) whether the tort-feasor's liability should as a matter of public policy extend to those injuries." *Food Lion, Inc. v. Cap. Cities/ABC, Inc.*, 964 F. Supp. 956, 960 (M.D.N.C. 1997).

Plaintiff (through Kirkham) is highly critical of the Hybrid Approach. However, even if the lack of foreseeability and lack of any competent evidence as to what WFU should have done are ignored, Plaintiff still has a fundamental problem: She has offered no evidence that different security (whatever that should have been) would have prevented Baker's death. Even in the limited circumstances where Kirkham opines as to what WFU

21

should have done differently, his opinions facially have no relationship to the shooting. For example, Plaintiff complains about the lack of metal detectors and bag checks at the Barn, and also criticizes how identifications were checked at the Barn. However, Baker was not shot in the Barn; he was shot on a road some distance away.

If the Court allows this case to proceed to trial, WFU, the Court, and ultimately the jury would be left to guess: What was it that WFU reasonably should have done that would have changed the outcome? Should WFU have surrounded the campus with barbed wire and searched every vehicle entering campus?[17] How would having one, two, or ten more police officers have prevented Austin from shooting Baker on the road in front of multiple witnesses and in the vicinity of both police and EMTs? Plaintiff makes no effort to answer these basic questions. As a result, summary judgment is appropriate on this ground as well. *See Reagin v. Terry*, 675 F. Supp. 297, 302-03 (M.D.N.C. 1986) (holding plaintiff failed to establish causation arising from third party criminal acts at a gas station, concluding that "to determine that the assailant would have been deterred or thwarted by two attendants, or by additional lighting, is to speculate about mere possibilities, rather than to find reasonable probability"); *Liller*, 131 N.C. App. 619, 625-26, 507 S.E.2d 602, 606-07 (1998) (plaintiff's expert's conclusory statements were insufficient to establish genuine issue of material fact as to proximate cause element of plaintiff's negligence claim regarding third-party shooting during armed robbery).

---

[17] Even Kirkham agrees that searching every vehicle would be neither reasonable nor practical. *See* Kirkham Dep. at 160:5-14.

## CONCLUSION

For the foregoing reasons, WFU respectfully requests that the Court grant summary judgment to WFU on all of Plaintiff's claims.

23

Respectfully submitted on May 26, 2021.

/s/   Robert J. King III
Robert J. King III
rking@BrooksPierce.com
   N.C. State Bar No. 15946
Shana L. Fulton
sfulton@BrooksPierce.com
   N.C. State Bar No. 27836
Tanisha Palvia
tpalvia@BrooksPierce.com
   N.C. State Bar No. 43117
BROOKS, PIERCE, McLENDON,
   HUMPHREY & LEONARD, LLP
P.O. Box 26000
Greensboro, NC 27420
336.373.8850

William K. Davis
wdavis@belldavispitt.com
   N.C. State Bar No. 1117
Mark A. Jones
mjones@belldavispitt.com
   N.C. State Bar No. 36215
Andrew A. Freeman
afreeman@belldavispitt.com
   N.C. State Bar No. 41248
BELL, DAVIS & PITT
P.O. Box 21029
Winston-Salem, NC 27120
336.722.3700

*Counsel for Defendant Wake Forest University*

24

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send notification to all counsel

of record, on May 26, 2021.

*/s/* Robert J. King III
Robert J. King III

# CERTIFICATE OF WORD COUNT

I hereby certify that the foregoing document complies with the word count limits established in Local Civil Rule 7.3(d)(1) and 56.1(c). Specifically, the document contains 6,058 words, as counted in compliance with Local Civil Rule 7.3(d)(1).

/s/ Robert J. King III
Robert J. King III