# EXHIBIT 2

```
 1            UNITED STATES DISTRICT COURT
        FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
 2
 3
     THE ESTATE OF NAJEE ALI           :
 4   BAKER, by and through his         :
     Ancillary Administrator,          :
 5   Jemel Ali Dixon,                  :
                                       : No. 1:19-cv-00477
 6               Plaintiff,            : CCE-LPA
                                       :
 7            vs.                      :
                                       :
 8   WAKE FOREST UNIVERSITY, et        :
     al,                               :
 9                                     :
                 Defendants.           :
10
                            - - -
11
12
              DEPOSITION OF HENRIETTA RUE, Ph.D.
13                 (Taken by the Plaintiff)
                   Raleigh, North Carolina
14                    January 22, 2021
15
16
17
18
19
20
21
            Reported by:  Jackie Johnson Milam
22                        Court Reporter
                          Notary Public
23
24
25
```

1 background?
2 A. Yes. I have a Ph.D. from the University of
3 Maryland in counseling. I have a Masters from the Ohio
4 State University in student personnel services, and I
5 have a Bachelor's degree in English and religion from
6 Duke University.
7 Q. Do you have any training or education in event
8 management for large event venues?
9 A. I have many years of experience in event
10 management. I have certainly gone to conference
11 presentations on event management. I don't have a
12 specific degree in that field.
13 Q. Have you attended any trainings or presentations
14 on event management for large event venues?
15 A. I can't recall.
16 Q. Do you have any background or training in
17 policing?
18 A. I don't have formal background in policing.
19 Q. Do you have any background or training in private
20 security?
21 A. I have supervised private security.
22 Q. Has that been at other places other than Wake
23 Forest or exclusively at Wake Forest?
24 A. Yes. I did so at Georgetown University.
25 Q. In what way did you supervise private security at

Veritext Legal Solutions
www.veritext.com                                                  888-391-3376

Case 1:19-cv-00477-CCE-LPA   Document 77-2   Filed 05/26/21   Page 3 of 15

1  the Barn.
2     Q. And what was brought to your attention about the
3  Millennium Center events?
4     A. The Millennium Center events resulted in so many
5  alcohol transports that our emergency room was
6  overwhelmed, and so the medical center brought that to
7  the attention of the President of the university, and
8  this all happened before I arrived. So again, this is
9  what I was apprised of. So the person who was Provost
10 at the time, a woman named Jill Tiefenthaler, created
11 the idea of creating an on campus venue for events.
12    Q. And that idea led to the eventual development and
13 creation of the Barn?
14    A. That's right.
15    Q. Was the Millennium Center on Wake Forest's
16 campus?
17    A. No. It's downtown.
18    Q. Okay. Did you come to learn that the university
19 was allowing sororities and fraternities to use the Barn
20 for on-campus parties?
21    A. That was what it was created for, yes.
22    Q. Okay. Was it your understanding that those
23 parties were often hosted by fraternities sometimes
24 referred to as NPHC groups by the university?
25    A. I honestly don't remember when I understood that

1  it was primarily used by NPHC groups.
2      Q.  And Chief Lawson uses that term in her e-mail.
3  Do you have an understanding of what that term refers
4  to?
5      A.  I do.
6      Q.  Okay.  And what does it refer to?
7      A.  National Pan-Hellenic Council, sometimes called
8  the Divine Nine, the historically African American
9  fraternity and sorority that have about a 100 plus year
10 history in our country founding -- one founded at Howard
11 University and Cornell University, I believe.
12     Q.  And after you arrived at Wake Forest, were you
13 advised that some of the parties hosted by NPHC groups
14 at the Barn had had incidents where fights broke out or
15 there were crowd management problems?
16     A.  You know, I don't remember.  Fights are so common
17 at campus parties.  That's just such a normal thing.  I
18 don't really remember any specific focus on that.  I
19 shouldn't say normal, but not uncommon, right, not
20 uncommon.
21     Q.  Were you told, after arriving at Wake Forest,
22 that there had been -- there had been issues at Barn
23 events that raised concerns about -- concerns for the
24 safety of attendees at Barn events hosted by NPHC
25 groups?

1  Q. Do you recall being informed that an officer had
2  reported that many more officers are needed for events
3  like this, both WFUPD and WFPD?
4  A. I don't.
5  Q. Do you recall being informed by an officer that
6  it was his view that the event that night constituted a
7  serious officer safety issue as well as a safety issue
8  for those in attendance?
9  A. I do not.
10 Q. And do you recall being advised or told that an
11 officer had reported it was his view that if funding is
12 not available for an appropriate number of officers,
13 then the event should not be held?
14 A. I do not.
15 Q. Do you recall any discussions with Chief Lawson
16 or anyone else within her department regarding the
17 staffing level for Barn events?
18         MR. KING: Objection.
19         THE WITNESS: I do remember discussing the
20   need for a different approach to management of Barn
21   events.
22 BY MR. FAZZOLA:
23 Q. And what do you remember about that?
24 A. Again, I have significant experience with event
25 management, and so what strikes me, that I remember

1  discussing, is the problem with the way they were
2  pre-selling tickets that created part of what was
3  clearly the stress of this event.
4      Q.  In your view at the time, what was the problem
5  with the way that tickets were being pre-sold for Barn
6  events?
7      A.  It appears that more tickets were sold than that
8  they had space for in that facility; that could have
9  been, by the way, that they were counterfeited.
10     Q.  Did you reach any other conclusions about
11 deficiencies in the process of pre-selling tickets for
12 Barn events at that time?
13             MR. KING:  Object.
14             THE WITNESS:  Well, remember, I don't
15     remember this specific thing.  I do remember
16     conversations about ways to improve the management of
17     these events.
18 BY MR. FAZZOLA:
19     Q.  Okay.  Am I understanding right that one area of
20 conversation or one topic had to do with the way tickets
21 were sold for the events?
22     A.  That's correct.
23     Q.  What other topics did you discuss with regard to
24 how Barn events could or should be managed?
25     A.  I remember discussing the fact that we did not

1  have professional staff from Student Affairs, Student
2  Organizations and Leadership present at the events,
3  which was problematic to me.
4      Q.  With whom do you remember discussing that issue?
5      A.  I believe it would have been with Chief Lawson.
6      Q.  Do you have a specific memory of any specific
7  conversation or communication you had with Chief Lawson
8  on that topic?
9      A.  I don't.
10     Q.  Do you recall anyone other than Chief Lawson
11 being involved in that discussion?
12     A.  I don't really.
13         At the time, Associate Vice President Mary
14 Girardi supervised those areas.  So it would have been
15 normal to have discussed it with her, but I don't have a
16 specific recollection.
17     Q.  What areas did Associate Vice President Mary
18 Girardi supervise at that time?
19     A.  She supervised the Benson University Center, the
20 Volunteer Service Corps.  It might have had another
21 name, but it was all of our student volunteer programs
22 that worked in the community --
23     Q.  Did she --
24     A.  -- and --
25     Q.  Sorry.  Go ahead.

1  A.  -- and an area called Student Organizations and
2  Leadership.
3  Q.  Was her supervisory role in that area that gave
4  her supervisory responsibility over event management
5  issues for the Barn?
6  A.  That's correct.
7  Q.  Okay.  When you say during that time, what time
8  period are you referring to?
9  A.  My first full year, which was 2013, 2014.
10 Q.  When was it that Associate Vice President
11 Girardi, when did she cease having supervisory
12 responsibility for student organization events at the
13 Barn?
14 A.  When I created the Dean of Students position and
15 filled that position.
16 Q.  Okay.  And we'll get there in a little bit.  I
17 just want to make sure.
18     Were there any other issues or topics related to
19 event management for the Barn that you recall discussing
20 with Chief Lawson?
21 A.  There were student concerns that were raised
22 about differential policing of Barn events and lounge
23 events on campus.
24 Q.  And did you discuss those concerns with Chief
25 Lawson?

1  A. I did.
2  Q. What were the concerns that students raised?
3  A. They felt that the parties held in the lounges
4  presented risks due to high risk alcohol use in those
5  events.
6  Q. And what are lounge events?
7  A. Lounge events, they're all significantly smaller
8  than the Barn events. I think maybe the largest
9  capacity would be around 100, and most of them smaller
10 than that, and they are -- some of them are allocated to
11 student organizations, and some are reservable spaces.
12 Q. When students raise concerns about differential
13 policing as between events at lounges and events at
14 barns, was it true that when those concerns were raised,
15 there was no -- there were no police present for lounge
16 events?
17 A. That's correct.
18 Q. While at the same time there were police who
19 would be responsible -- there were police who were
20 staffed for Barn events?
21 A. That's correct.
22 Q. Were there any other specific concerns related to
23 differential policing that were raised with regard to
24 lounges and Barn events?
25           MR. KING: Objection.

1           THE WITNESS:  I don't quite get your
2     question.
3  BY MR. FAZZOLA:
4     Q.  Well, I had asked what concerns regarding
5  differential policing were raised, and you discussed the
6  concerns students raised that lounges were potentially
7  high risk events due to alcohol, and I understand you to
8  be testifying that part of the concern was, despite that
9  high risk, there was no police presence at those lounge
10 events, right?
11    A.  That's right.
12    Q.  Were there any concerns raised by students that
13 the differential policing between lounge events and Barn
14 events had to do with the race of the attendees of those
15 events?
16          MR. KING:  Objection.
17          THE WITNESS:  I would say that it's fair to
18    say that students have that interpretation.  Some
19    students have that interpretation.
20 BY MR. FAZZOLA:
21    Q.  Did students raise allegations or questions about
22 potential racial bias among the staffing decisions for
23 Barn events as to lounge events?
24    A.  They did.
25    Q.  Okay.  Those concerns, were they raised after you

Page 33

1  had assumed your role as Vice President for Campus Life
2  at Wake Forest?
3      A.  Yes.
4      Q.  Did Wake Forest hire any outside consultants or
5  commission any studies to evaluate whether there was
6  racial bias behind the differential policing applied to
7  lounge events and Barn events?
8      A.  So let me see the best way to answer this.  So I
9  can't -- I can't completely -- I have to broaden your
10 question, to be honest.
11         So the concerns that students raised about
12 discrimination and policing were broader than the issue
13 of campus events.
14         Does that make sense?
15     Q.  Yes, it does.
16         Just so I'm clear.  Did the concerns that they
17 raised include, as part of the concern, the policing of
18 student events?
19     A.  They did.
20     Q.  Okay.  Now, with that broader --
21     A.  With the --
22     Q.  Go ahead.
23     A.  The biggest concern that I remember was the
24 experience of students of color being asked to present
25 an ID from an officer as if they didn't belong on

1  Q. Thank you.
2     Did you end up hiring somebody in the role of
3  Dean of Students?
4  A. Yes.
5  Q. And who did you hire?
6  A. Adam Goldstein.
7  Q. Were you alone responsible for making that hiring
8  decision?
9  A. It was my decision, but I worked with the Search
10 Committee to come to the final outcome.
11 Q. And when did Dean Goldstein start at Wake Forest?
12 A. I'm going to say sometime between June and July
13 of 2014.
14 Q. During the interview process, did you talk with
15 Dean Goldstein about any issues or problems the
16 university had had with events at the Barn?
17 A. No, I would not have discussed that specifically
18 in the interviewing process.
19 Q. Okay. Did you ask for his views or input on
20 event management strategy for large events -- for events
21 at large venues on campus during the interview?
22        MR. KING: Objection.
23        THE WITNESS: I was looking for someone that
24    had experience in student organizations, advising on
25    activities. Yes.

1  BY MR. FAZZOLA:
2      Q.  After Dean Goldstein assumed his role as Dean of
3  Students, did you discuss with him issues or problems
4  the university had seen at events at the Barn?
5      A.  I did.
6      Q.  What do you recall discussing with Dean
7  Goldstein?
8      A.  I let him know that the people in his
9  organization were -- had not done a good job in planning
10 and managing those events.  I thought there were some
11 personnel management issues he would have to attend to,
12 and I told him that those events had not been properly
13 managed and that I needed him to create a better
14 approach to event management.
15     Q.  Did you share with Dean Goldstein any Incident
16 Reports or Event Evaluation Reports that the Wake Forest
17 Police Department had done with regard to Barn events?
18             MR. KING:  Objection.
19             THE WITNESS:  I don't recall.
20 BY MR. FAZZOLA:
21     Q.  Did you say you don't recall, Doctor Rue?
22     A.  That's what I said.
23     Q.  Do you recall discussing with Dean Goldstein any
24 particular incident that happened at any particular Barn
25 events when he joined the university?

# CERTIFICATE OF REPORTER

STATE OF NORTH CAROLINA   )

COUNTY OF GASTON          )

I, JACKIE JOHNSON, the official before whom the foregoing deposition was taken, according to the emergency video notarization requirements contained in G.S. 10B-25, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me to the best of my ability and thereafter reduced to typewriting under my direction; that I am neither counsel for nor employed by any of the parties to the action in which this deposition was taken, and further, that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

*Jackie J Johnson*

JACKIE JOHNSON

MY COMMISSION EXPIRES:  August 30, 2021