# EXHIBIT 4

1        UNITED STATES DISTRICT COURT
     FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
2           No. 1:19-cv-00477-CCE-LPA

3

4   THE ESTATE OF NAJEE ALI BAKER,    )
    by and through his Ancillary      )
5   Administrator, Jemel Ali Dixon,   )
                                      )
6        Plaintiff,                   )
                                      )
7      vs.                            )
                                      )
8   WAKE FOREST UNIVERSITY, et al.,   )
                                      )
9        Defendants.                  )
    ----------------------------------

10

11

12

13

14

15           DEPOSITION OF JAMES GRAVELY
16              (Taken by Plaintiff)
17            East Bend, North Carolina
18            Friday, February 19, 2021
19

20

21

22

23

24            Reported in Stenotype by
                 Jana F. Collins
25   Transcript produced by computer-aided transcription

1    police there.  Now we did consider safety and that's

2    why we didn't treat them exactly the same and we did

3    have security there, but we thought that throwing a

4    bunch of police officers in there is not going to,

5    it's not going to help.  It could potentially make

6    it worse because you just you're treating them like

7    they're criminals.

8        Q    Wouldn't a way to make things equal is to

9    have police officers attend the, the on campus

10   fraternity events as well?

11       A    It's just not practical.  They would have to

12   hire 30 more officers, you know, to -- if you were

13   going to staff because there may be several parties

14   in one night and, and to try to staff every one of

15   those parties equally, it's just not practical.  You

16   can't, you can't hire that many officers and, and

17   keep a reasonable budget.

18       Q    Could you also not open the barn to parties

19   at all?

20       A    Well, the reason why the barn exists is for

21   the NPHC groups and they may not have enough members

22   on campus to do their fundraising so that was

23   created so they would have a place to go and why

24   would you exclude them?  They didn't have a lounge

25   like the other fraternities do.  Why make them feel

1  excluded because they don't have enough members

2  because the campus population wasn't diverse enough

3  to where they could have enough members?  It's

4  mainly a white campus.

5      Q    I'm going to stay on this issue, but I want

6  to give us a frame of reference.  It sounds like

7  after Dean Goldstein arrived, the event management

8  policies and plans for the barn were changed, were

9  changed.  Would you agree with that?

10      A    Yes.

11      Q    And would you agree that Dean Goldstein put

12  an emphasis on removing law enforcement from the

13  management of barn events?

14      A    Yes, we shouldn't have been managing the

15  events.

16      Q    And would you agree that Dean Goldstein put

17  an emphasis on the need for minimal officer presence

18  at the barn during barn events?

19      A    Yes.

20      Q    And in fact, it was one of his goals to

21  remove all officers from inside the barn during barn

22  events?

23      A    Yes.

24      Q    And would you agree that as a result of Dean

25  Goldstein's initiatives, the barn management plan

Case 1:19-cv-00477-CCE-LPA   Document 77-4   Filed 05/26/21   Page 4 of 17

1   that was in place on January 19, 2018 was to have
2   one single officer outside the barn in his patrol
3   car during the barn event?
4       A    Not just for that event but for all of them
5   and it was working.  It was working really well.
6   The violence reduced tremendously during that time.
7   The things that we're reading, these after action
8   reports where all this violence, all these fights
9   happened that was pre-Goldstein's plan.  And, and,
10  but after we implemented that and we would meet and
11  we would discuss where we can improve like the
12  lights being turned on and off.  We put a special
13  piece on that where you had to have that special
14  piece so there was all -- everything was done with a
15  conscious effort.  It was, it was thought about.  It
16  just wasn't haphazardly done and it was working.  It
17  was working really well.  I don't think that that
18  one officer being there is the cause of the shooting
19  because you could go to the gas station and get
20  shot.  There's bad people everywhere and it's tragic
21  and it's extremely unfortunate.  It's heartbreaking,
22  but I don't think that his plan is the reason why
23  this happened.
24      Q    Now I just want to fully understand Dean
25  Goldstein's plan.  Under his plan, is it true that

1  police officers who had previously staffed barn
2  events were replaced by student event resource
3  managers?
4      A    Not solely by themselves.  We had Rhino
5  involved.  We had ERMs.  We had the host
6  organization.  It's not like we just took everything
7  out of the event management.  We just put the people
8  who should be managing the event managing the event.
9  It shouldn't be managed by police officers.  We're
10  responsible for security and we're not responsible
11  for checking tickets or IDs and things like that.
12      Q    Let's look at a document so we can talk in
13  kind of concrete terms what the plan looked like
14  after it was implemented.  It's been previously
15  marked Exhibit 30.  I might also share my screen so
16  we can zoom in on things, but let me introduce it.
17  Exhibit 30 should be appearing on your end,
18  Lieutenant.
19      A    I see it.
20           (EXHIBIT 30 WAS MARKED FOR
21      IDENTIFICATION)
22      Q    It's Bate-stamped WFU 24 through 32.
23      A    I have it.
24      Q    Have you had a chance to review Exhibit 30?
25      A    I looked over it.  Yes, sir.

Veritext Legal Solutions
www.veritext.com                                    888-391-3376
Case 1:19-cv-00477-CCE-LPA   Document 77-4   Filed 05/26/21   Page 6 of 17

1      Q     Have you seen this document before?

2      A     I don't remember.

3      Q     Have you seen this, this -- an event

4   planning evaluation form like this before?

5      A     If I have, I don't remember.

6      Q     Okay.  So I want you to skip, if you would,

7   and I'm going to share my screen so we can all look

8   at it to WFU 31.  Let me share my screen because

9   I've rotated it so we can all see it a little bit

10  better.  Are you able to see my screen, Lieutenant

11  Gravely?

12     A     Yes.

13     Q     Tell me if you need me to zoom in or zoom

14  out or move, but does this diagram accurately depict

15  the staffing plan in place after Dean Goldstein

16  implemented the changes to that plan for the barn?

17     A     The plan changed several times.  When we

18  would find a hole, we would fix it, you know, or do

19  what we could to try to fix it.  So throughout his

20  time there working with the barn events things

21  rotated and moved and changed a lot.

22     Q     Okay.  Let's talk about this particular

23  setup to see if it's consistent with at least a plan

24  that was in place at sometime during your tenure as

25  event sergeant.  Do you see the key here, event

1    Q    And as a law enforcement officer, you would

2   agree that if you're on notice that fights can break

3   out at student social events you want to make sure

4   to have folks there who can respond aggressively and

5   appropriately?

6    A    Well, fights could break out on the fly.

7   That's happened.  Fights can break out downtown, but

8   you can't put police everywhere there's a potential

9   for a fight because there's not enough police

10  officers in existence.

11   Q    But you can put police officers at places

12  where the potential goes up because of the nature of

13  the event that's being held and the nature of the

14  event, right?

15            MS. PALVIA:  Objection.

16   A    It depends on the situation.

17   Q    Based on your experience and specifically

18  based on your experience on November 16, 2013 at

19  least as to that event, it was your view that more

20  manpower was needed at barn events to be able to

21  respond appropriately when fights broke out, right?

22   A    We were responsible for hosting the event

23  pretty much.  We managed the entire thing and if

24  that responsibility is going to be our sole

25  responsibility, yes, I believed that at the time.

1    But it was not just the fights.  It was for
2    everything, managing the event and, and after I seen
3    how, how good it worked, the implementation of
4    Goldstein's plan, it, it was great.  It, it didn't
5    require as many officers because they went so much
6    better.
7        Q    Under Goldstein's plan, were there any
8    officers inside the barn to respond to fights if
9    they broke out?
10       A    Not unless there was a reason for them to be
11   in there.  Their post is outside the barn.
12       Q    Under Goldstein's plan, were there any
13   officers along the roadway either during or after
14   the event to be on scene if fights broke out as
15   attendees left the event?
16            MS. PALVIA:  Objection.
17       A    Well, there were patrol officers on the
18   campus and on the roadway as part of the campus, but
19   they weren't assigned to be there, no.
20       Q    There were no officers assigned to be on the
21   roadway under Goldstein's plan?
22       A    No.
23       Q    Were there any officers under Goldstein's
24   plan to monitor the parking lot, lot W, during and
25   after barn events?

1    Q    Okay.  Now I want to ask about barn parties

2    hosted by NPHC organizations, okay?

3    A    Uh-huh.

4    Q    In your experience at Wake Forest, was it

5    common for NPHC events at the barn, for the

6    attendees of those events to comprise of a majority

7    of non-Wake Forest students?

8    A    Yeah.  They were usually students somewhere,

9    but they may not be Wake Forest students.

10   Q    And that was the typical case, right?  The

11   majority of attendees were non-Wake students?

12   A    Typically.

13   Q    And that distinguished barn parties from

14   lounge parties?

15   A    Yeah.  That's part of the reason why we had

16   security there to begin with.

17   Q    And that was because you recognized that

18   events with non-Wake Forest students could present

19   different and unique risks than events with just

20   Wake students?

21   A    No.  They're still college students, but

22   they're not our students.  So we would be there just

23   to oversee things.

24   Q    Since they're not Wake students, Wake hasn't

25   had a chance to vet those individuals like Wake can

1    danger because sometimes they serve alcohol at those

2    events.

3        Q    The roadway for the wellness center, does it

4    have a sidewalk along it?

5        A    Well, it's the welcome center, but there is

6    a sidewalk.

7        Q    After Goldstein, Dr. Goldstein implemented

8    the new plan for the barn, was there policies

9    related to students needing to show -- well, excuse

10   me, related to -- I'm going to ask that question

11   again.  Did Dean Goldstein's policies that he

12   implemented related to the barn have anything to do

13   with these events?

14       A    Yeah.  Well, I need to clarify something.

15   We keep referring to that as Dean Goldstein's

16   policies, but it was more a joint effort with many

17   different departments.  He was just spearheading the

18   effort.  So if I do refer to it as Dean Goldstein's

19   plan or whatever, it's just to identify which plan

20   we're talking about and it's not because it was

21   solely his plan.  But there was, you know, a lot of

22   different things that were contained inside that.

23       Q    And, and with part of the plan, was there a

24   change to an Event Brite system for ticketing?

25       A    Yes.  I mean, it went through a lot of

1    transformations, you know, and it would have to be

2    fluid.  Not every barn party was always treated the

3    same.

4        Q    And were you at any point made aware that

5    sometimes tickets -- students or attendees, excuse

6    me, would buy more than one ticket for a barn event?

7        A    I know at one point there were times where

8    an individual may buy them for a friend or whatever.

9        Q    And did you, were you involved in any of the

10   discussions aimed at addressing the situation where

11   individuals were buying more than one ticket through

12   Event Brite?

13       A    We had discussions on a lot of the host

14   organizations.  Their goal was to sell as many

15   tickets as possible to raise money for their, for

16   their organization.  And so there was a lot of

17   discussions about, you know, how many tickets could

18   be sold.  And, you know, I know that there were some

19   fraternities that were, like, if this person don't

20   show up well then, you know, can we sell that ticket

21   to someone else to earn more money.  And Dean

22   Goldstein was very specific about that saying, you

23   know, it's just like at the movies.  You buy a seat.

24   That seat is taken.  You can't resell that ticket.

25   And so that was to address overcapacity issues that

1  had been in the past before we started this effort
2  and it's, it was addressing those issues.
3      Q    Are you aware of any policies that were put
4  in place to prevent students from buying multiple
5  tickets through Event Brite?
6      A    I don't remember.
7      Q    At any time when you were working a barn
8  party, were you made aware that students without
9  valid college IDs were attempting to get into the
10 barn?
11     A    Yeah.  There were times when students, you
12 know, well, they weren't students because they
13 didn't have a college ID.  I don't know if they were
14 or not.  A lot of them claimed to be, but we needed
15 to try to make sure they were students and that was
16 before and after Goldstein.
17     Q    That was an ongoing issue based on your
18 experience?
19     A    Yes.  It reduced once we implemented the new
20 plan.  It took a little while in the beginning, but
21 then people started learning that, you know, if you
22 don't have a college ID, there's no point trying,
23 you know.  And if anybody ever slipped through or
24 whatever, I don't know.  But it seemed to be working
25 because the amount of people showing up without a

1    Q    Is this one of the news articles you

2    reviewed with Wake Forest's counsel?

3    A    Yes.

4    Q    And on the second page, would you agree that

5    there's a quote in the article that's attributed to

6    you?

7    A    Yeah, I see it.

8    Q    It reports that you reportedly said three

9    officers can't handle six fights?

10    A    Yes, I see it.

11    Q    I believe you testified earlier that if this

12    is the same document that you don't have a specific

13    recollection one way or the other of having made

14    that statement?

15    A    I know I attended almost all of the trust

16    talks functions.  I don't remember making that

17    statement.  Looking at the statement, it looks as

18    though I was discussing the party that we've already

19    discussed where the fights were inside and went

20    outside and that was before we implemented the new

21    plan at the barn and I would agree with that at that

22    time.  But after we implemented the new plan, I

23    wouldn't.  It was based on what we were doing versus

24    what we changed over to.

25    Q    So after the new plan, it was your view that

1    incident, go to the more prioritized incident.  And
2    then when you take care of the more dangerous
3    incident, you could readdress the incident you was
4    on.  So for them not being able to respond the
5    incident that they are currently on would have to be
6    an incident that was just as severe as a fight call.
7        Q    But the location of the other incident that
8    the officers were responding to impact the amount of
9    time it took for them to get to the barn?
10       A    It shouldn't impact it more than a minute or
11   two.
12       Q    And you already said but the nature of the
13   incident they were responding to could impact
14   whether those patrol officers could even respond at
15   all to the barn if it, if there was, if there was a
16   call for backup?
17       A    Those particular officers, but we still had
18   mutual aid with Winston-Salem PD as a resource to
19   call on too in case if that extremely rare situation
20   should happen.
21       Q    But there was no absolute guarantee that if
22   backup -- if an officer at the barn working an event
23   needed backup, backup would be there within one to
24   two minutes?
25       A    Look, if you want me to say that every

1   STATE OF NORTH CAROLINA

2   COUNTY OF FORSYTH

3                    REPORTER'S CERTIFICATE

4        I, Jana Collins, a Notary Public in and for

5   the State of North Carolina, do hereby certify that

6   there came before me on Friday, the 19th day of

7   February, 2021, the person hereinbefore named, who

8   was by me duly sworn to testify to the truth and

9   nothing but the truth of his knowledge concerning

10  the matters in controversy in this cause; that the

11  witness was thereupon examined under oath, the

12  examination reduced to typewriting under my

13  direction, and the deposition is a true record of

14  the testimony given by the witness.

15       I further certify that I am neither attorney

16  or counsel for, nor related to or employed by, any

17  attorney or counsel employed by the parties hereto

18  or financially interested in the action.

19       The witness, JAMES GRAVELY, was located in

20  Yadkin County, North Carolina and the reporter, JANA

21  COLLINS, was located in Forsyth County, North

22  Carolina during the emergency video notarization.

23       I signed this notarial certificate on the

24  1st day of March, 2021 according to the emergency

25  video notarization requirements contained in G.S.

1    10B-25.

2

3                    Jana Collins

4

5              _____

6              Jana Collins, Notary Public

7              Notary Number: 200733100028

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25