# EXHIBIT 5

1              IN THE UNITED STATES DISTRICT

2        FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

3                ~~~~~~~~~~~~~~~~~~~~

4                          `

5     THE ESTATE OF NAJEE ALI BAKER, by and through

6     his Ancillary Administrator, Jemel Ali Dixon,

7

8                  Plaintiff,

9

10        vs.          Case No.  1:19-cv-00477-CCE-LPA

11

12    WAKE FOREST UNIVERSITY, et al.,

13

14                  Defendants.

15                ~~~~~~~~~~~~~~~~~~~~

16                  Deposition of:

17              DEAN ADAM GOLDSTEIN, Ph.D.

18            (Appearing Remotely Via Zoom)

19

                   January 15, 2021

20                    9:35 a.m.

21                    Taken at:

22              3741 Ashland Drive

                Maiden, North Carolina

23

24           Joyce Lynn Shannon, RPR

25

1  know that we have organizations that have

2  dances without alcohol present that are not

3  without other things that you might associate

4  with a student party.

5       Q.    What do you mean by that?

6       A.    Typically when they're -- I mean

7  that events that may be sponsored by a student

8  organization either off campus or without the

9  university's knowledge that may involve

10  alcohol.

11       Q.    During your time at Florida State,

12  did Florida State make any on-campus venues

13  available to host parties in which non-Florida

14  State students were allowed to attend?

15       A.    I don't recall.  I did not oversee

16  that office that worked with student

17  organizations to control venues.

18       Q.    During your time at Florida State,

19  did you have any role in helping to develop

20  event management or security plans for

21  on-campus events involving student

22  organizations?

23       A.    The only involvement that I would

24  have had would be to have supported the Office

25  of Fraternity and Sorority Life in their work

1   with students in training around their events,

2   their activities.

3           Q.      What type of support did you

4   provide?

5           A.      It was not uncommon for me to be

6   invited as a speaker at the trainings to talk

7   about the roles and responsibilities of student

8   leaders, to talk about issues that are of

9   concern, like hazing, to provide a training on

10  hazing, to talk to groups around ethical

11  decision making or other topical issues.

12              It was not uncommon for me to talk

13  about the care that we hope our students will

14  be -- that we want our students to be

15  displaying towards each other, towards their

16  guests, to get help and about helping resources

17  on campus, like counseling, other support

18  resources.

19          Q.      During your time at Florida State

20  University, did you have a role in developing

21  event management or security plans for

22  on-campus events where there would be Police

23  present to help provide security for the

24  events?

25          A.      No.

1      A.    Chief Lawson.  I believe Sergeant

2   Fisher.  I don't recall.  I believe there were

3   other Police Officers, I just don't recall the

4   composition.

5      Q.    How long did you serve on the

6   committee?

7      A.    We met as a formal committee into

8   the fall semester.  At a certain point we

9   stopped meeting as a committee, but still

10  coordinated very closely, given the different

11  members that had been in the different offices,

12  the different offices that had been involved.

13     Q.    During the time on the committee,

14  did you develop new large event venue policies

15  that were put into place?

16     A.    During my time on the committee, it

17  became clear that we needed to evaluate the

18  events themselves and what was happening at

19  those events so that we could do what I was

20  asked to do, which was work with students and

21  the Police to develop a practice that worked

22  and kept people safe.

23     Q.    And did you end up developing a new

24  policy for large event venues at Wake Forest?

25     A.    It evolved with time.  And by that

1   I mean, we added certain features that were not

2   previously used, like electronic ticketing

3   services.

4           We started meeting with groups --

5   had a requirement that groups attend an event

6   planning meeting to develop an Event Management

7   Plan that would be reviewed by law enforcement

8   to determine how many Officers needed to be

9   present.

10          We started working with event

11  security, specifically the security that was

12  working our large athletic facilities.

13          And we hired a new student employee

14  position -- created a new student employee

15  position called Event Resource Managers for

16  the -- yeah.

17          So those were things that developed

18  with time as we moved through the semester and

19  even into the spring semester.

20      Q.   And you're saying "through the

21  semester."

22          Can you just remind us of the time

23  frame you're referring to?

24      A.   The semester began late August and

25  concluded before the holiday break, after

 1  Thanksgiving.

 2        Q.    So this is August, 2014, through

 3  the spring of 2015?

 4        A.    Yes.

 5        Q.    Okay.  And by the spring of 2015,

 6  was a new Large Event Management Policy in

 7  place?

 8        A.    Yes.  It was still evolving.  We

 9  met -- as I shared, the student groups met with

10  staff in the new Student Engagement Office to

11  do the event planning meetings.  They met with

12  everyone that -- we had a pre-event meeting,

13  which would include security, student group

14  hosts, Police, student Event Resource Managers.

15            And then after an event we would

16  schedule debriefs to understand what worked and

17  what didn't work, and what helped us further

18  evolve our practice.

19        Q.    And by the spring of 2015, had

20  there been changes in the policy that affected

21  the number of Law Enforcement Officers who

22  would work Barn events?

23        A.    I can't remember the exact timing,

24  but the number of Law Enforcement Officers

25  gradually decreased, yes.

Case 1:19-cv-00477-CCE-LPA   Document 77-5   Filed 05/26/21   Page 7 of 28

1          MR. KING:  Objection.

2      A.    There were 16 Officers at the first

3  event that I personally attended at The Barn

4  early in the fall semester.  And ultimately, as

5  we settled into practice -- ultimately we had

6  one Officer that was always at the facility and

7  nearby in case support was needed.

8      Q.    And ultimately the one Police

9  Officer at The Barn event, pursuant to the

10  policy that was developed, was not stationed

11  inside The Barn; is that right?

12      A.    So as students and guests were

13  arriving, they were outside the entrance of

14  The Barn.  They would often come inside during

15  an event.  We had frequent touch base points

16  with event security, the professional event

17  security and the student hosts and the ERMs.

18  So it wasn't a static position, but we wanted

19  to make sure that they were nearby just in case

20  there was ever any need for their assistance.

21      Q.    Now the event you attended where

22  there were 16 Police Officers present, were

23  some of the Officers stationed inside The Barn?

24      A.    Yes.

25      Q.    During the event?

1        A.    I can't recall.  I believe that
2   they were inside The Barn.  They were -- there
3   were three, different checkpoints for attendees
4   that had to stop and show their ID to get
5   further in, closer to the event.
6        Q.    And is it true that under the new
7   policy that was developed, that was reduced to
8   one, single checkpoint?
9        A.    No.  No.  Honestly, we created a
10  checkpoint for -- there was a line for
11  people -- if we still had tickets left to sell,
12  that people could purchase tickets.  And then
13  we had a checkpoint for people that had
14  purchased tickets, to show their ID and get a
15  wristband to go into the event.
16       Q.    During your time on the committee,
17  while you were evaluating various
18  recommendations for potential policy changes,
19  did you ask for a history of prior incidents
20  that had occurred at The Barn?
21       A.    I had -- yes.  I mean, not at
22  the -- I mean, I asked.  I specifically asked
23  were there any weapons, were there -- and was
24  there any reason to believe that weapons would
25  be present.  I knew that there were

1    altercations.  And I knew that there were other

2    issues with managing the capacity of The Barn

3    and gym.  Our NPHC, our African-American

4    fraternities that were using those facilities

5    for social functions are typically much smaller

6    than an Intra-Fraternity Council fraternity,

7    and they often didn't have the number of

8    members that they needed to secure a venue or

9    to make sure that people weren't getting in.

10                And The Barn had a back door.  It

11    had a side entrance for catering.  Those were

12    things that as we drilled down and tried to

13    understand the role of the host student

14    organization, the roles that ERM staff could

15    play to support an event and the group, and the

16    role of security, that helped us with the

17    management of the issues that had been

18    happening.

19         Q.    Did you ask for a report or a list

20    of prior incidents at The Barn for events

21    hosted by NPHCs that involved fights or

22    physical altercations?

23         A.    I don't recall.  I may have.  I

24    don't recall.

25         Q.    Did you interview any of the Police

1  Officers who had previously worked at The Barn

2  to ask for their assessment on the security and

3  staffing needs of The Barn?

4       A.   I had a lot of conversations.  I

5  don't know that they would be considered

6  interviews.  But Regina Lawson and I worked

7  very closely together.

8       Q.   Apart from Regina Lawson, did you

9  have any conversations with Wake Forest

10  Police Department Police or Security Officers

11  who had worked Barn events prior to your

12  arrival?

13       A.   I don't recall.

14       Q.   Were you ever made aware that prior

15  to your arrival at Wake Forest, Winston-Salem

16  Police Department would provide staffing for

17  Barn events?

18       A.   No, I was not.  I'm not aware of

19  that.

20       Q.   Were you made aware that on

21  occasion Winston-Salem Police Department

22  Officers would moonlight or contract to work

23  Barn events?

24       A.   No, I didn't know.  You'd have to

25  ask Chief Lawson that question about who was

1  information provided by the Police.  This was

2  not -- no, I didn't verify it.

3       Q.    When you sent Mr. Williams this

4  e-mail, was it your understanding that the

5  information you were providing him was

6  accurate?

7       A.    Yes.

8       Q.    Okay.  So, in other words, you

9  didn't put any information in here that you

10  knew was false or that you intended to deceive

11  anyone?

12       A.    No.

13       Q.    Okay.  In your e-mail, there's two

14  bullet points.

15            I want to talk about those, okay?

16       A.    Yes.

17       Q.    In the first bullet point you

18  write, and I'm going to paraphrase a little

19  bit, "My staff," and then "assumed

20  responsibility for student organization event

21  planning and management after my arrival."

22            Do you see where I'm reading?

23       A.    Yes.

24       Q.    And that statement you made in your

25  e-mail, is that a true statement?

1      A.    We were responsible for certainly

2  student organization event planning.

3  Management was always a shared responsibility.

4  But we became responsible for helping to shape

5  and develop protocols around event management

6  for student group events.

7      Q.    And it was your view when you wrote

8  this e-mail that that was a shift in

9  responsibility, in other words, after your

10  arrival it was your office and staff who had

11  assumed that responsibility, right?

12      A.    Yes, for working with student

13  groups, yeah.

14      Q.    And at the time you wrote this

15  e-mail, was it accurate that through your

16  office's work you had reduced the presence of

17  Police at NPHC events from 16 Officers to one?

18      A.    -- no, that wouldn't be a fully

19  accurate statement.

20      Q.    In what way wouldn't it be

21  accurate?

22      A.    That we did ask Police to focus on

23  safety and security, and that that resulted in

24  the reduction.  And I say we are successful

25  there.  And I'll just say to you that I

1  certainly wanted to see a reduction, but I'm

2  not sure why I characterized it in that way.

3      Q.    Okay.  Leaving apart the word

4  "successful," at the time you wrote this

5  e-mail, your office had, in fact, reduced the

6  presence of Police at NPHC events from 16

7  Officers to one?

8      A.    That's the part -- no, my office

9  did not do that.  I certainly had conversations

10  with Chief Lawson, but ultimately the number of

11  Officers and security present at an event was

12  Chief Lawson's and the Police's decision.

13      Q.    Okay.  Let me ask a separate, but

14  related question.

15            Was it true that at the time you

16  wrote in the e-mail that the presence of Police

17  at NPHC events had been reduced from 16

18  Officers to one?

19      A.    That's what the document says,

20  so --

21      Q.    So is that a yes?

22      A.    I think the document speaks for

23  itself.

24      Q.    Well, I'm not asking for what the

25  document says.

Case 1:19-cv-00477-CCE-LPA   Document 77-5   Filed 05/26/21   Page 14 of 28

1          I'm asking if it were true at the

2    time you wrote in the e-mail that the presence

3    of the Police at NPHC events had been reduced

4    from 16 Officers to one.

5          A.    Yes, at NPHC events, the number of

6    Officers reduced to one.

7          Q.    And the term "NPHC events," that's

8    synonymous with Barn events, right?

9               MR. KING:  Objection.

10         A.    No.  "NPHC" refers to our

11   African-American fraternities and sororities.

12         Q.    Well, in this e-mail when you write

13   "NPHC events," are you referring to any other

14   events other than events hosted by NPHC at

15   The Barn?

16         A.    No.

17         Q.    So the reduction that you describe

18   in your e-mail relates to Barn events hosted by

19   NPHC groups?

20         A.    Yes.

21         Q.    How was the decision made to reduce

22   the number of Officers for Barn events from 16

23   to one?

24         A.    You'd have to ask Chief Lawson that

25   question.

1        Q.    Why would I have to ask Chief
2    Lawson that question?
3        A.    The Police were responsible for
4    determining how many Officers needed to be
5    present at different events on campus.
6        Q.    So the Police were responsible in
7    making the decision to reduce the number of
8    Officers at Barn events from 16 to one?
9        A.    Again, you'd have to talk to Chief
10   Lawson.
11       Q.    Well, I'm asking because I'm
12   interested in whether your office had any role
13   in the decision to reduce the number of
14   Officers at Barn events from 16 to one.
15       A.    The role my office had was in
16   managing the events and making changes to how
17   we were managing events.  Ultimately that
18   resulted in an Event Management Plan that was
19   given to the Police to evaluate and determine
20   how many Officers were present.
21       Q.    And at the time you wrote this
22   e-mail to Mr. Williams, had the Police
23   evaluated and approved an Event Management Plan
24   that reduced the presence of the Police at Barn
25   events from 16 Officers to one?

Case 1:19-cv-00477-CCE-LPA   Document 77-5   Filed 05/26/21   Page 16 of 28

1          A.     Yes.

2          Q.     In your second bullet point you

3     discuss the changes that were made that

4     "enabled us to remove Police from event

5     management responsibilities."

6               Do you see that bullet point?

7          A.     Is there a number you're referring

8     to?

9          Q.     So in that same e-mail there's two

10    bullet points, right?

11         A.     Yes.

12         Q.     You're looking at the first one.

13    I'm looking at the second one.  The second one

14    reads, "The changes we made that enabled us to

15    remove Police from event responsibilities are,"

16    with six items; do you see that?

17         A.     Yes.  Thank you.

18         Q.     Is that a full and complete list of

19    the changes that were made to remove Police

20    from event management responsibilities?

21               MR. KING:  Objection.

22         A.     No.  That is the list of

23    initiatives that my office put in place for

24    event management to support the management of

25    student organization events.  And it's not a

1    complete list.

2          Q.     What's missing from that list?

3          A.     Electronic ticketing.

4          Q.     Is there anything else that's

5    missing from that list?

6          A.     Regarding the initiatives of my

7    office, no.

8          Q.     Okay.  And if we include electronic

9    ticketing to the list of initiatives here, is

10   that a complete list of initiatives of your

11   office that "enabled us to remove Police from

12   event management responsibilities"?

13             MR. KING:  Objection.

14         A.     My office didn't remove Police.  My

15   office developed resources for managing events.

16         Q.     And you yet you used the phrase

17   "removed the Police from event management

18   responsibilities" in your e-mail, right?

19         A.     Yes.  I did.  And that's poor

20   wording on my part.

21         Q.     And when you engaged in that poor

22   wording, you understood that it potentially

23   could be made available for public consumption,

24   right?

25             MR. KING:  Objection.

1          A.     Yes.

2          Q.     And did you regard the report as an

3     important document you were working on?

4          A.     Yes.

5          Q.     And did you discuss the language

6     that I just read to you with other members of

7     the subgroup that were evaluating the Moss

8     recommendations as to event management

9     practices?

10         A.     We had discussion.  I don't know

11    that I discussed this specific language.  There

12    was significant distrust with our Police and

13    their handling of our African-American

14    students, and the large presence at our student

15    group events was not easing tension.

16         Q.     Did anyone on the Accountability

17    Task Force or the subgroup you were working on

18    raise concerns that the following sentence was

19    inaccurate -- I just want to read the

20    sentence -- "The committee believed that

21    pursuing recommendations in the Moss Report

22    would increase Law Enforcement Officer staff

23    and use of undesired crowd control techniques

24    at student-sponsored events."

25         A.     Well, this is the part that I'm

1  disagreeing with as I look back at my writing.

2        Q.    Okay.

3        A.    The Williams Moss Report

4  recommended that we review our large event

5  venue guidelines, which we did.  It also

6  recommended that we institute equitable

7  practices, which we did.  So I may have been

8  reacting, looking back to the climate at the

9  time that I was writing this report, but I

10  don't -- I just don't agree with the statement

11  that I made back then.

12        Q.    Okay.  Now, when you say you did

13  introduce equitable practices for event

14  management, are you referring to equitable

15  practices between Barn events and lounge

16  events?

17        A.    It took us a long time to get, but

18  yes.

19        Q.    You would agree, right, that one of

20  the ways that you reached those equitable

21  practices was to reduce Police presence at

22  The Barn, rather than increase Police presence

23  at lounge events?

24        A.    I wanted to increase Police

25  presence at lounge events.

1      Q.    Would you agree that one of the

2   ways you achieved equity between lounge events

3   and Barn events was reducing Police presence at

4   Barn events?

5      A.    No.  We were evaluating both lounge

6   events and Barn events, and the specific

7   facilities, the nature of the events, and

8   making decisions based on events that were

9   planned and our experience at managing those

10  events with students.

11           And the way that we got there was

12  in large part through the event planning

13  meetings, the pre-event meetings and the use of

14  electronic ticketing and the ERM program.

15     Q.    But you're not disagreeing with me,

16  are you, that the university also significantly

17  reduced the Police presence at Barn events?

18     A.    The Police presence at Barn events

19  was reduced.

20     Q.    And you're not disagreeing with me,

21  are you, that prior to the implementation of

22  the new Barn protocols, Barn events were

23  heavily policed, whereas afterwards they were

24  only staffed with one Police Officer?

25     A.    At the point of my arrival --

1            MR. KING:  Objection.

2       A.    -- there were a lot of Police

3  Officers present at The Barn.  As we worked

4  with event practices, the number decreased.

5       Q.    You said you wanted to increase

6  Police presence at lounge events.

7            Did that ever happen?

8       A.    We increased the presence where

9  lounge parties were at, yes.

10       Q.    And did you increase Law

11  Enforcement Officer staffing for lounge events?

12       A.    In the same way that a Law

13  Enforcement Officer was around The Barn, and

14  they if we needed -- if the event hosts or the

15  ERMs needed assistance, there were Police in

16  the area where lounge parties were held.

17       Q.    In the area, but not inside the

18  lounge parties themselves?

19       A.    Correct.

20       Q.    Police, like with Barn parties, for

21  lounge parties were placed in a reactive,

22  rather than proactive position?

23            MR. KING:  Objection.

24       A.    They were present.

25       Q.    You can answer.

1      A.    They were present if there was a
2  safety concern.
3      Q.    I want you to look back at that
4  same paragraph in the report, if you would.
5  The following sentence I read to you, it says,
6  "It was determined that this approach would not
7  ease tension or reduce risk of harm, physical,
8  emotional, financial and reputational in the
9  community."
10           Do you see that?
11     A.    Yes.
12     Q.    Did the subgroup or committee you
13  were on reach a determination that following
14  the Moss Report recommendations as to event
15  management would not ease tension or reduce
16  risk of harm in the committee?
17     A.    Again, I made this statement in
18  error.  I'm looking back at this.  The Moss
19  Report did not recommend reducing Police
20  presence.  They recommended evaluating event
21  management guidelines and instituting equitable
22  practices.
23     Q.    So when Wake Forest decided to
24  reduce Police presence at The Barn, it was your
25  understanding that that was not something that

1   the Moss Report had recommended doing?

2           MR. KING:  Objection.

3       A.      The Moss Report recommended

4   evaluating the practices, the large event venue

5   practices, and to institute equitable practices

6   across campus.  And we did that.

7       Q.      Well, I guess I'm struggling with,

8   then, the indication in this section of the

9   Task Force Report that the Task Force reached

10  the determination not to follow the Williams

11  Moss recommendations on event management

12  practices.

13      A.      Yeah.  Again, I'm looking at that

14  and believing that I mischaracterized that

15  section.  I mischaracterized that decision, to

16  include that information.  It just -- as I look

17  back, it doesn't really represent what -- I

18  didn't represent our situation well.  And the

19  Williams Moss Report didn't evaluate event

20  management practices.  It made recommendations

21  that we do that work, and we did.

22      Q.      And no one on your subcommittee, as

23  far as you recall, told you that the way you

24  were representing things in the sentences I

25  just read was inaccurate?

Case 1:19-cv-00477-CCE-LPA  Document 77-5  Filed 05/26/21  Page 24 of 28

1        A.      No, I don't recall hearing that.

2        Q.      And no one on the Task Force, the

3    greater Task Force, told you that they

4    disagreed with how you were representing things

5    in this section of the Task Force Report?

6        A.      I don't recall hearing that.

7        Q.      And it's your testimony that

8    Williams and Moss didn't make any

9    recommendations with regard to the level of

10   policing to be applied to lounge parties and

11   parties at The Barn?

12               MR. KING:   Objection.

13       A.      The Williams Moss Report was

14   evaluating our Police Department and whether or

15   not their practices were biased or prejudiced

16   against our students, specifically with our

17   African-American students.   There were comments

18   and recommendations in the report about event

19   management practices.   But they were not

20   commissioned to make recommendations about

21   levels -- or about event management practices.

22   They were still recommendations and comments.

23       Q.      And I get that the recommendations

24   were just recommendations, but you're not

25   disagreeing, are you that the Moss Report

1  states, "We recommend that the administration

2  review this procedure to make sure that all

3  student events are policed in an equal manner"?

4          MR. KING:  Objection.  The document

5  says what it says.

6      Q.    Did I get an answer, Dean

7  Goldstein?

8      A.    The document does speak for itself.

9      Q.    And I just want to make sure you

10  don't disagree with me that the document says

11  what it says.

12      A.    The document speaks for itself.

13      Q.    Okay.

14          MR. KING:  Jonathon, when we get to

15  a point, let's take five minutes.

16          MR. FAZZOLA:  I was going to say,

17  I'm almost done.  Let's take five minutes.

18          MR. KING:  Okay.  Thanks.

19          (Recess taken.)

20                  -   -   -

21          MR. FAZZOLA:  I have a video I'm

22  going to be showing Dean Goldstein.  I've

23  already introduced it as an Exhibit through

24  Exhibit Share, and I'm just showing the video

25  through screen share.

1                REPORTER'S CERTIFICATE

2    The State of Ohio,    )

3                              SS:

4    County of Cuyahoga.    )

5

6            I, Joyce Lynn Shannon, RPR, a

7    Notary Public within and for the State of Ohio,

8    duly commissioned and qualified, do hereby

9    certify that the within named witness, DEAN

10   ADAM GOLDSTEIN, Ph.D., was by me first duly

11   sworn to testify the truth, the whole truth and

12   nothing but the truth in the cause aforesaid;

13   that the testimony then given by the

14   above-referenced witness was by me reduced to

15   stenotypy in the presence of said witness;

16   afterwards transcribed, and that the foregoing

17   is a true and correct transcription of the

18   testimony so given by the above-referenced

19   witness.

20           I do further certify that this

21   deposition was taken at the time and place in

22   the foregoing caption specified and was

23   completed without adjournment.

24

25

1            I do further certify that I am not

2    a relative, counsel or attorney for either

3    party, or otherwise interested in the event of

4    this action.

5            IN WITNESS WHEREOF, I have hereunto

6    set my hand and affixed my seal of office at

7    Cleveland, Ohio, on this 24th day of

8    January, 2021.

9

10

11

12

13

14            Joyce Lynn Shannon, RPR, Notary

15            Public within and for the State of

16            Ohio

17

18    My commission expires December 21, 2025.

19

20

21

22

23

24

25

Case 1:19-cv-00477-CCE-LPA   Document 77-5   Filed 05/26/21   Page 28 of 28