# EXHIBIT 6

```
 1            IN THE UNITED STATES DISTRICT
 2      FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
 3               ~~~~~~~~~~~~~~~~~~~~
 4
 5   THE ESTATE OF NAJEE ALI BAKER, by and through
 6   his Ancillary Administrator, Jemel Ali Dixon,
 7
 8                Plaintiff,
 9
10       vs.            Case No.  1:19-cv-00477-CCE-LPA
11
12   WAKE FOREST UNIVERSITY, et al.,
13
14                Defendants.
15               ~~~~~~~~~~~~~~~~~~~~
16                 Deposition of:
17              CHIEF REGINA LAWSON
18        (Appearing Remotely Via Zoom)
19
                  January 13, 2021
20                    9:34 a.m.
21                    Taken at:
22                3741 Ashland Drive
                Maiden, North Carolina
23
24             Joyce Lynn Shannon, RPR
25
```

1  The Barn?
2       A.    Yes, sir.
3       Q.    And a lot of these e-mails are from
4  Harold Holmes.
5             Who was Harold Holmes?
6       A.    At that particular time he was our
7  Dean of Students.
8       Q.    At that particular time did he have
9  a role on the Planning Team that you described
10 earlier?
11      A.    Yes, sir.
12      Q.    What was his role?
13      A.    He convened the group.  It was more
14 of a Working Group.  I'm not sure of the exact
15 title of the group at that time.
16      Q.    As far as you understood, what were
17 the goals of the Working Group?
18      A.    Really part of the continuation of
19 developing procedures for the facility, as well
20 as this particular case, for Greek parties
21 inside the facility, hosted in the facility.
22      Q.    Was one of the goals of the Working
23 Group to help develop policies and guidelines
24 to help make those Barn events, particularly
25 those hosted by Greek organizations, safe?

1     A.    Yes, sir.
2     Q.    And at the time you were having
3  these discussions, is it true that there was a
4  concern that the events were not being managed
5  or handled safely?
6     A.    I think that is more the matter of
7  the event management processes had not yet been
8  fully developed, and had to be revised to -- to
9  better accommodate of the attendees and put
10 management structure into place.
11    Q.    And would you agree that one of the
12 goals was to come up with a policy, as you say,
13 that helps -- that recognizes -- well, I'm
14 going to ask you a better question.
15          Can you turn to I think it's the
16 third page of the e-mail chain, Bates stamped
17 3558?
18          Up at the top there's a date on
19 Monday, November 26, 2012.
20    A.    Yes, sir.
21    Q.    Okay.  And this is an e-mail from
22 Dean Holmes; do you see that?
23    A.    Yes, sir.
24    Q.    And he is setting forth, as far as
25 I understand, things that he would like the

1  that.
2       A.   Yes, sir.
3       Q.   Do you recognize the document
4  that's been marked as Exhibit 2?
5       A.   No, sir, I don't.
6       Q.   Is it safe to assume, then, that
7  you had no role, as far as you remember, in
8  preparing this document?
9       A.   No, sir, not to my recollection.
10      Q.   On Slide 3 or Page 3 of the
11 Exhibit, there's a photograph of a structure
12 with some text.  Let me know when you're there.
13      A.   Yes, sir.
14      Q.   Do you recognize the structure
15 that's depicted in this photograph?
16      A.   Yes, sir, I do.
17      Q.   What is that structure?
18      A.   That's the Wake Forest University
19 Barn.
20      Q.   On this slide there are a couple
21 sentences.  And one of them says, "Previously
22 management of Barn parties were the
23 responsibility of the Police Department."
24           Do you see where I'm reading?
25      A.   Yes, sir, I do.

1  Q. Do you agree that at one point in
2  time Barn parties were the responsibility --
3  the management of Barn parties were the
4  responsibility of Wake Forest Police
5  Department?
6  A. Sir, I can't say that I agree that
7  it was our responsibility. I can say that we
8  found ourselves managing events because we
9  didn't have structure in place to manage the
10  events at that particular venue because there
11  was no building manager or coordinator.
12  Q. This slide goes on to say, "Through
13  teamwork and many conversations involving all
14  stakeholders, the management of Barn parties
15  was placed on the host organization."
16  Do you see where I was reading
17  there?
18  A. Yes, I do, sir.
19  Q. Do you agree that at some point in
20  time the management of Barn parties became the
21  responsibility of the organizations hosting the
22  events at The Barn?
23  A. Sir, I'd have to say I'm confused
24  about this statement, and I'm not sure the
25  source of this document. I would say host

1 organizations have a role, but I'm not sure
2 "management was placed on the host
3 organizations" is an accurate statement.
4     Q.    What would be accurate to say in
5 terms of who was responsible for managing Barn
6 parties after the development of the policy we
7 were discussing where the presence of Law
8 Enforcement Officers was reduced from sixteen
9 to one?
10            MR. KING:  Objection.
11     A.    I can't say exactly the time frame,
12 but the Office of Student Engagement became the
13 oversight managers of all social events at
14 The Barn.
15     Q.    Why don't you go ahead a few
16 slides, if you would, to the one captioned
17 "Barn Party Procedures Involving WFU Police"?
18     A.    Yes, sir.
19     Q.    Now, I haven't said it yet, but you
20 understand that this civil case in which you're
21 appearing to testify arises out of the shooting
22 death of Najee Baker on January 18 and
23 January 19, 2018?
24     A.    Yes, sir, I do.
25     Q.    So what I'm interested in knowing

1 didn't you?
2         MR. KING: Objection.
3     A. I agreed with Mr. Hickman that it
4 was irresponsible?
5     Q. And you thought there should be
6 more Police present?
7         MR. KING: I'm sorry, were you
8 asking for a clarification or were you
9 repeating the question, Chief?
10         THE WITNESS: I was repeating the
11 question.
12     Q. Did you agree with Mr. Hickman that
13 it was irresponsible to host a 500-person party
14 with the staff present of six Rhino Security
15 and one Wake Forest University Police Officer?
16     A. No, sir, I did not.
17     Q. But you thought there should be
18 more Police at The Barn Events; didn't you?
19         MR. KING: Objection.
20     A. Sir, I had confidence in the event
21 management procedures that had been developed.
22     Q. But you didn't recommend that
23 Police presence be reduced to just one Police
24 Officer, right?
25     A. Given the fact that we had

1  additional Officers on patrol with rapid
2  response times, we agreed to try one Officer.
3      Q.    You agreed to try it, but that
4  wasn't your recommendation; am I right about
5  that?
6      A.    I was willing to implement it and
7  evaluate its effectiveness.
8      Q.    But again, that was not your
9  recommendation, was it?
10     A.    No, sir, that was not my
11 recommendation.
12     Q.    That decision came from the Dean of
13 Students Office, right?
14         MR. KING:  Objection.
15     A.    That was a result of the ongoing
16 Working Group revising the event management
17 procedures.
18     Q.    But the Dean of Students Office was
19 the author of the current Event Management
20 Policy in place at the time Mr. Hickman sent
21 his e-mail; wasn't it?
22         MR. KING:  Objection.
23     A.    Yes, sir, to the best of my
24 recollection.
25     Q.    And that's why Ms. McCauley-Davis

Veritext Legal Solutions
www.veritext.com    888-391-3376
Case 1:19-cv-00477-CCE-LPA  Document 77-6  Filed 05/26/21  Page 9 of 13

1 told Mr. Hickman that before there were any
2 major policy shifts, the Dean of Students would
3 need to be brought into the conversation,
4 right?
5     A.   Yes, sir.  Based on my
6 interpretation of this e-mail, yes.
7     Q.   And that's because the Dean of
8 Students Office was the one in charge of event
9 management for The Barn?
10     A.   Yes, sir, to the best of my
11 recollection.  Based on this document, yes.
12     Q.   And the Dean of Students Office
13 were the ones making the final decisions about
14 how many Officers would work Barn events?
15         MR. KING:  Objection.
16     A.   Again, sir, it was a collaborative
17 approach working through a combination of the
18 hybrid model of security and Police.
19     Q.   It was a collaborative approach,
20 but the Dean of Students Office had the final
21 say; didn't they?
22         MR. KING:  Objection.
23     A.   So we agreed to use this model and
24 evaluate it.
25     Q.   And it's true, right, that the Dean

1  of Students Office was the final decision maker
2  on whether or not to use the model?
3              MR. KING:  Objection.
4       A.    Yes, sir, to the best of my
5  understanding.
6              MR. KING:  Is this a good spot?
7              MR. FAZZOLA:  Yes, yes.  Let's take
8  a break.
9              (Recess taken.)
10                    - - -
11             THE WITNESS:  Yes, if I could, sir,
12 I'd just like to clarify that the discussion
13 we're having about who recommended the one
14 Officer approach, I think I said this earlier,
15 it was a collaborative decision between myself
16 and the Dean's office, Dean of Students, Adam
17 Goldstein, that you've referenced, but it also
18 required the approval of our Vice President of
19 Campus Life.  So I just wanted to clarify that.
20      Q.    And I appreciate that
21 clarification.  Thank you.  And we're hopefully
22 getting close to being done.  But if there's
23 any point in time where you want to clarify
24 something you previously said because you think
25 of it, please do that.

1  REPORTER'S CERTIFICATE
2       I, Joyce Lynn Shannon, RPR, do hereby
3  certify that CHIEF REGINA LAWSON, whose
4  testimony appears in the foregoing transcript,
5  was duly sworn or affirmed by me on the 13th
6  day of January, 2021, prior to the taking of
7  the foregoing deposition;
8             That said proceedings were taken by
9  me to the best of my ability and transcribed
10 under my supervision and direction;
11            That the parties were present as
12 stated and that I am not of counsel for,
13 related to, or in the employment of any of the
14 parties to this action, and nor am I
15 financially or otherwise interested in the
16 outcome of this action.
17
18
19
20
21
22
23
24
25

1    I do further certify that the foregoing
2  pages constitute a true and accurate transcript
3  of the proceedings.
4            This the 21st day of January, 2021.
5
                *Joyce Lynn Shannon*
6
7            Joyce Lynn Shannon, RPR,
8            Notary Public in and for the
9            State of North Carolina.
10
11  My Commission Expires August 17, 2025.
12
13
14
15
16
17
18
19
20
21
22
23
24
25