# EXHIBIT 16

1       IN THE UNITED STATES DISTRICT COURT
      FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
2          1:19-cv-00477-CCE-LPA
3  -------------------------------------
4  THE ESTATE OF NAJEE ALI BAKER,
  by and through his Ancillary
5  Administrator, Jemel Ali Dixon,
6     Plaintiff,
  v.
7  WAKE FOREST UNIVERSITY, a North
  Carolina non-profit corporation
8  and institution of higher education,
  et al.,
9
     Defendants.
10  -------------------------------------
11        VIDEO CONFERENCE VIA ZOOM
12     VIDEO DEPOSITION OF GEORGE L. KIRKHAM
13          April 2, 2021
14           10:53 a.m.
15       Palm Beach Gardens, Florida
16
17
18
19
20
21
22
23
24  Reported by:  Audra M. Smith, RPR, FCRR
25  Video by:    David Cooper

Case 1:19-cv-00477-CCE-LPA  Document 77-16  Filed 05/26/21  Page 2 of 93

1   you long-winded answers and things that are

2   elliptical, please don't hesitate to tell me to

3   bring it back and stop me and say, Look, you're not

4   responding to the question.

5       Q    I will do that.  My mother is a college

6   professor, and she's never given a one-word answer

7   in her life, so I'm familiar with what you're

8   saying.

9            Am I correct in assuming that you're

10  familiar with the security approaches that are used

11  at different colleges?

12      A    Well, bearing in mind that there are huge

13  numbers of colleges throughout the nation.  As a --

14  retired now, but as a professor at FSU for 20 years,

15  I have pretty good familiarity with the practices of

16  colleges and universities, and of course we have

17  some specialized information here with regard to

18  this incident in terms of the measures that other --

19  I think something like ten other colleges were

20  taking in the general area.

21      Q    Right.  And we'll get to that in a few

22  minutes, but if I wanted to ask you, Dr. Kirkham,

23  how do they do things at X college, other than Wake

24  Forest, what do you have personal knowledge of --

25  the one that immediately comes to mind is Florida

1  State.  Are you familiar with large event management

2  and security at Florida State?

3      A    Bearing in mind I'm many years removed

4  from the university.  And even when I was there, as

5  I say in my report, I worked as a city police

6  officer on a part-time basis as part of my research.

7  I never was involved in the management of, you know,

8  large scale entertainment events.

9          The closest contact I've had to that would

10 be over the years cases that relate to large

11 entertainment events, whether they're at Disney or a

12 rock concert or some other venue.

13     Q    Okay.  What I'm really trying to get to

14 here is, are there any colleges or universities that

15 you have personal knowledge or familiarity with the

16 way they do large event or security so that I can

17 say, Dr. Kirkham, how do they do it at that college?

18     A    No.  Again, you know, there's a vast

19 number of colleges.  Almost everyday, watching the

20 news or something, I hear about a new college I

21 didn't know existed.  So, no, there's such an

22 enormous number of them that I couldn't profess

23 any -- unless it just happened to be a school I've

24 had contact with, but I would say no.

25     Q    And this is a good example of us talking

1  past each other.  I'm not trying to get an

2  understanding as to whether or not you're familiar

3  with how security or large event management works at

4  every college.  What I'm trying to understand is:

5  Do you have personal knowledge about how large event

6  management and security is handled at any college?

7       A    No, I really don't.  The only context for

8  me that I can relate to with respect to that

9  question would be other kinds of large management

10  events in other contexts, other venues that are not

11  college or university-related.

12       Q    Okay.  And so what are some large event or

13  large event venues that you are familiar with how

14  they manage and handle security?

15       A    Well, large -- I mentioned rock concerts.

16  I had some of those.

17       Q    Can you be specific?  I'm really looking

18  for something in the past five years that you can

19  say, you know, Bob, I understand how they did it at,

20  you know, the Who concert in 2016.  Give me

21  specifics.

22       A    A private club, for example.  I have of

23  one particular -- well, actually, a couple of

24  instances.  One is currently in litigation in Belle

25  Glade, Florida where there was a very large venue

1    with very little -- virtually no security, a history
2    of problems, and an individual was severely beaten.
3    That's a current case.
4              And I'm thinking of another one that was
5    something similar to that at a private country club.
6    It involved college students, a large number of
7    college students who rented this venue, and that
8    resulted in a homicide by firearm in a parking area.
9    That's been a year or so ago.
10             So there are a lot of the things like that
11   over the years.  I'm sure other cases that just
12   don't come to mind right now.
13        Q    Okay.  And let me circle back to the
14   colleges and universities to make sure we're on the
15   same page.  Am I correct in understanding that you
16   can't testify to how security or large event
17   management is handled at any colleges or
18   universities today?
19             MR. FAZZOLA:  Object to form.
20        A    I could not testify as to a specific
21   college's protocol -- specific college protocol for
22   handling events.  I can represent to you that there
23   are widely accepted, standardized procedures for
24   large entertainment events, material put out by
25   OSHA, material put out by the United States

1    Department of Justice, by the American Society of

2    Industrial Security.  There's a lot of -- a lot of

3    material.  In fact, one is called Planning Large

4    Entertainment Events, Office of Homeland Security.

5            There's a lot of -- a lot of procedural

6    material out there.  It's all pretty standard in

7    terms of you could plug it into any number of

8    different contexts, and that's the way it's

9    designed.

10   BY MR. KING:

11       Q    Okay.  And let me give you an example.

12   What I had in mind was -- or originally I was going

13   to ask you if you were familiar with how large

14   events are managed and security is handled at

15   Florida State football games, Florida State

16   basketball games, Florida State concerts.  Is that

17   something you've got personal knowledge of?

18       A    Well, only in the sense of wearing two

19   hats during my 20 years or 18 of my 20 years at

20   FSU -- being also a fully sworn police officer on a

21   part-time basis -- I would provide the -- be

22   assigned to provide security at football games, for

23   example.  Working inside the stadium or parking

24   areas.  But I would -- that doesn't -- that did not

25   give me any specific knowledge about how university

1  police worked; their overall plan for allocating

2  security.

3      Q    Okay.  How long ago were you a police

4  officer?

5      A    The last time I tendered my resignation in

6  19- -- I think August of 1991.

7      Q    Thirty years ago this August, if I'm doing

8  the math right?

9      A    Yeah, yeah.

10     Q    You think law enforcement has changed in

11  the last 30 years?

12     A    Oh, of course.  And one of the -- one of

13  the tasks of my assistants is to -- particularly

14  Mr. Gregg, is to keep me apprized of all the very,

15  very rapid changes in technology and procedures and

16  equipment.  Every now and then, someone comes up

17  with a new piece of equipment that I've not had a

18  case dealing with.  So I try to keep abreast of

19  those many changes -- and they are many -- that

20  relate to everything from training to procedures,

21  just a lot of things, technology.

22     Q    Okay.  And have you ever been retained to

23  advise a college or university about how to improve

24  their security or event management?

25     A    No, on that point.  I am -- obviously, I'm

Case 1:19-cv-00477-CCE-LPA   Document 77-16   Filed 05/26/21   Page 8 of 93

1  a criminologist, but I'm a criminologist who
2  everything is so specialized these days, like a
3  doctor who does gynecology but not obstetrics.  I'm
4  sort of that way.  I do litigation-related
5  evaluations and have for many years.  But I don't --
6  I could have -- I have the knowledge to, but I do
7  not do things like Mr. Moss and Mr. Williams with
8  Developmental Associates.  They're both former
9  chiefs of police.  They come in and give hands-on
10  evaluations and make recommendations.  And there are
11  groups, International Association of Chiefs of
12  Police, and Police Executive Research Forum.  They
13  do the same kind of thing.  I've just have never
14  done that type of work.  I've been approached to do
15  it, but I've never done it.
16      Q    Okay.  And what I'm trying to avoid is
17  frankly being surprised by you telling me later
18  that, you know, I was hired by Duke University to
19  look at their security protocols or something like
20  that, and my understanding is that, the answer to my
21  question as to whether or not you've ever been
22  retained by a university to evaluate or improve the
23  large event management or security, the answer is
24  no.  Is that correct?
25      A    That is correct.

1    Q    Okay.  Thank you.  Back to the really

2  basics.  What does criminology mean?

3    A    Basically, criminology is the scientific

4  study of the causes of crime and delinquencies.  I

5  includes our three-part system of courts,

6  corrections and law enforcement.  It also embraces

7  the subject of private security, which has become,

8  as you suggested, a complex field.

9          There are about two private security

10  officers for every one public police officer.  So

11  it's a very large field.  There's a lot of

12  consulting going on, and a lot of the publication

13  going on in terms of the dos and don'ts for security

14  as a subfield of criminology.

15          So I'm a criminologist specialized in, you

16  know, areas such as courts or corrections or law

17  enforcement or private security or a combination of

18  those things.

19    Q    Have you ever worked for a university

20  police force?

21    A    No, I never have.

22    Q    Have you ever had management or

23  supervisory level responsibilities for a police

24  force or on a police force?

25    A    No.

Case 1:19-cv-00477-CCE-LPA  Document 77-16  Filed 05/26/21  Page 10 of 93

1    it safer.  A whole lot of things that Jeff [sic]

2    developed that are pertinent to a case like this.

3            And, indeed, CPTED, I will point out -- I

4    think did in the report -- as being adopted by the

5    Centers for Disease Control and just all kinds of

6    professional organizations as -- as the most widely

7    accepted model, I think.

8        Q    Okay.  And if you were asked or given the

9    task of determining whether or not a security

10   approach or methodology properly complied with

11   CPTED, my assumption is that sort of gather up all

12   the relevant data, you apply your expertise to the

13   data and your knowledge of CPTED, and then that

14   leads you to a particular conclusion; is that fair?

15       A    There's a sequence that we use in -- with

16   every case, for example, and the very first one is

17   pretty obvious, and that is the history of a venue.

18   What we do is what's called risk assessment, and

19   that involves looking at, whether it's a large

20   entertainment event or something else you're trying

21   to deal with, what's been going on?

22            I mean, I've had a robbery/shooting at a

23   convenient store we became involved in yesterday in

24   evaluating.  The first thing I want to know, I'll

25   tell my statistician or my people, Let's gather the

Case 1:19-cv-00477-CCE-LPA   Document 77-16   Filed 05/26/21   Page 11 of 93

1    data.  I want to see what the history of the place

2    is like?  Let's get it for the -- in the case of

3    like the convenience store robbery, let's get CADs,

4    computer-assisted dispatch records, every time they

5    roll a car out there for anything, police car, let's

6    get CADs, let's get Part 1 FBI records for the place

7    and for the contiguous one-mile area around that.

8    So we can take a picture, and our statistician can

9    render that pictorially and we can analyze it and go

10   through it.

11            So square one is --

12            (Videographer's Zoom audio broadcasting a

13   conversation.)

14       A    I'm sorry?

15       Q    Somebody's talking.

16            THE VIDEOGRAPHER:  He's in Palm Beach

17       Gardens.

18            MR. FAZZOLA:  Videographer?

19            MR. KING:  Mr. Videographer, I think your

20       audio is on.

21            THE VIDEOGRAPHER:  My apologies.

22            MR. KING:  That's okay.

23   BY MR. KING:

24       Q    So Dr. Kirkham, going back to CPTED for a

25   second.  And again, you anticipated my next

1   question.  My understanding under CPTED is that

2   you -- the first step is a risk assessment, correct?

3        A    Correct.  Based on things that have

4   happened that are significant and the timeline

5   they've occurred on, that's one of the first things

6   you do.

7        Q    Okay.  And my assumption is that you do a

8   risk assessment first because you can't design a

9   security system unless you know what you're trying

10  to prevent; is that fair?

11       A    Excellent point.  You have to what -- to

12  know what type of security measures -- personnel,

13  equipment, other things, procedures -- the type and

14  the amount of security you need, you derive that

15  from an analysis of what you have, how well it's

16  been working or not working.

17       Q    Okay.  And if you're evaluating whether or

18  not a system complies with CPTED or is adequate

19  under CPTED, my assumption is that the first thing

20  you do is kind of do your own risk assessment and

21  say, What are these people trying to prevent?

22            Is that accurate?

23       A    Right, that's a fair statement.  What --

24  in this particular venue, whether it's a school or a

25  bank or whatever it is, what are the problems that

1    we now have or might have in the future and what are

2    the reasonably suggested steps by virtue of what we

3    have in the way of professional standards to take to

4    ameliorate the situation.

5        Q    Okay.  And am I correct when you do a risk

6    assessment, it's not simply a matter of saying how

7    many times were the police called or how many crimes

8    there were, but the type of crime.  So in other

9    words, if you've got a venue where there have been

10   100 crimes but 99 of them -- well, strike all that.

11   I'm rambling.  Let me start over again.

12            Am I correct that in doing a risk

13   assessment, one of the things you look at is the

14   nature of the prior crimes?

15       A    Well, you do look at the nature of it with

16   the caveat that there are -- we normally do a

17   dichotomy, we say crimes against persons, crimes

18   against property, for example.  But there are many

19   things that are lesser events that we call

20   precursors and we're concerned about those, too.

21   For example, loitering or prowling and suspicious

22   persons, intoxicated individuals hanging out on a

23   property.  I'm going back to my analogy to the

24   convenience store robbery or apartment complex.  But

25   a lot of things that are precursors.  So we want to

1  a view, are locks up to snuff.  They'll go through

2  everything.  So that's what I'm comparing it

3  against.

4      Q    Okay.  And did you do a risk assessment

5  for Wake Forest and The Barn?

6      A    No, I didn't conduct any risk assessment

7  as a criminologist.  Again, that's the type of work

8  that I don't do.  I know very good criminologists

9  that do that.  They will come in and do a risk

10 assessment.  Again, firms like, I'm sure Lawson

11 Williams, probably do those kind of things.  Say,

12 Look, this is what's going on, this is what you've

13 been doing.  This is what we recommend that you do

14 to improve things.

15     Q    Okay.  And did you consult with somebody

16 that specializes in risk assessment for this

17 engagement?

18     A    No.  Instead, I relied on my background

19 and familiarity with CPTED, with the standard

20 professional literature in terms of what is -- what

21 are the kinds of things that are normally done, what

22 are the problems that are very clear.  Sometimes --

23 you know, sometimes there are things that are

24 problematic that you don't see readily.

25              But here, one of the good things about

1  this case is, the issues are very -- are very clear

2  in terms of the kinds of problems.  Sometimes

3  things -- something can happen just spontaneously

4  with no warning at all.  But there was a history

5  here of problems that needed to be gotten on top of.

6      Q    Well -- and I'm a little confused about

7  the degree to which you did a risk assessment.  Did

8  you yourself look at the history of problems at The

9  Barn?

10      A    Yeah.  Maybe if you put it this way, what

11  I'm doing is -- when you say "risk assessment," what

12  I'm doing vicariously as a criminologist, is I'm

13  looking at what the problems were as I can identify

14  them from the record, and the steps that were taken,

15  and were they reasonable or not.

16      Q    Okay.  So did you look at the history of

17  problems at The Barn?

18      A    I did.

19      Q    Okay.

20      A    And the security measures that were being

21  used in relation to them over a long period of time

22  from -- you know, it was built in a 8,000 square

23  foot structure, built in 2010, and you can look

24  along -- I believe data from '12, '13, '14, '15,

25  '16, '17, '18, the new system going into effect in

1    information if I felt I needed it.

2    BY MR. KING:

3         Q    Okay.  Are you familiar with IACLEA, the

4    International Association of Campus Law Enforcement

5    Administrators?

6         A    No, that is not an organization that I've

7    had contact with.

8         Q    Okay.  Do you know anything about IACLEA's

9    certification process?

10        A    No.

11        Q    Do you know what standard a police force

12   has to satisfy in order to be certified under

13   IACLEA?

14        A    No.  Again, I'm familiar with a lot of the

15   other certification bodies but not IACLEA.

16        Q    Do you know if the Wake Forest Police

17   force had been certified by IACLEA?

18        A    I do not know what their certification

19   status was.

20        Q    Are you familiar with the concept of

21   over-policing?

22        A    It's a term that comes up frequently in

23   the context of this case.  Yes, I'm familiar with

24   the concept.

25        Q    And what is your understanding of what

Case 1:19-cv-00477-CCE-LPA   Document 77-16   Filed 05/26/21   Page 17 of 93

1   over-policing is?

2        A    Well, basically it would be providing more

3   police resources in an area or for an event than

4   were reasonably necessary.  A saturation -- a

5   saturation of policing.  Usually, that's related to

6   a particular need.

7             You see, this is maybe a good time to make

8   this point.  What drives the presence of particular

9   security and police resources is the history of the

10  venue, and that relates not only to numbers of

11  officers but to a lot of other things as well.

12       Q    Okay.  In your experience as a

13  criminologist, can over-policing have a potentially

14  negative effect on security?

15       A    Frankly, in a half century, over-policing

16  is not something that I've had occasion to deal with

17  that I can recall at all, really, over the years.

18            I'm reminded that -- Dr. Martin Luther

19  King said that his greatest complaint about the

20  police was not excessive force or police brutality,

21  it was under-policing.  "Under-policing."

22            Under-policing is a very relevant term.

23  Over-policing, not really.

24       Q    Well, are you familiar with situations in

25  which having more armed police officers in a

Case 1:19-cv-00477-CCE-LPA   Document 77-16   Filed 05/26/21   Page 18 of 93

1    predominantly African-American event can actually

2    make security and behavior worse?

3        A    No, I would not agree with that either, as

4    a criminologist or as a former officer who worked a

5    high crime, inner city, all black project.  I would

6    agree that -- as Lawson Williams pointed out -- that

7    there can be a perception, a misperception of

8    prejudice or discriminatory behavior because of

9    numbers of police there.

10            When that kind of thing happens, it's

11   time to -- as we did in my department, to do some

12   walking and talking, have regular meetings, and make

13   people -- or in this case the students -- aware

14   that, Look, we're not -- we're not trying to

15   hard-time you or disrupt your events or anything.

16   We're trying to keep you safe.

17            And to not do that -- to not deploy the

18   appropriately indicated resources would be -- and I

19   know there's no intent of racism in this case, but

20   it would de facto have exactly that effect; you'd be

21   denying -- you'd be denying young people, who in

22   this case were predominantly black, equal protection

23   of the law and security that was available

24   throughout the campus.

25            So you really -- you may have a PR problem

Case 1:19-cv-00477-CCE-LPA  Document 77-16  Filed 05/26/21  Page 19 of 93

1    if people believe they're being over-policed.  You

2    have to explain, Look, this is -- this is why we're

3    doing this because we have very large capacity

4    crowds.  We got all kinds of problems associated

5    with those, have for a long time, and these are

6    public events.  These are not like going through an

7    airport terminal.  There are certain things you have

8    to expect.  It's not a private location like going

9    into a bathroom stall or something.

10            So you really can't take that approach.  I

11   know that was done here, and I think it was a gross

12   mistake.

13        Q    Let me back up to a general issue.  And

14   this may seem obvious, but I want to ask it anyway.

15   Am I correct the accuracy of your opinions depends

16   upon the accuracy and completeness of the data you

17   received and the accuracy and completeness of your

18   analysis?

19        A    Right.  The totality of things that I

20   reviewed in connection with this case against the

21   backdrop of my familiarity with relevant

22   professional standards and procedures, that's

23   correct.

24        Q    And I think expert testimony, in my

25   simple-minded way, is sort of like baking a cake.

1    Q    Well, but you don't know what data exists

2  as to what happened at every Barn party, do you?

3          MR. FAZZOLA:  Object to form.

4    A    I'm sorry?

5  BY MR. KING:

6    Q    You don't know the universe of data that

7  exists for every Barn party, do you?

8          MR. FAZZOLA:  Objection.

9    A    No.  Again, you know, I didn't feel it was

10  necessary to -- I think I had enough predicate for

11  the opinions I expressed.

12  BY MR. KING:

13    Q    So let me go back to my question.  I'm

14  going to read it from the transcript here:  Do you

15  know whether behavior, misbehavior, or criminality

16  got better or worse after the hybrid approach was

17  instituted?  Do you know the answer to that

18  question?

19          MR. FAZZOLA:  Object to form.

20    A    Yeah, I'm not -- I'm not certain.  I can

21  try to mathematize it as far as what things remain

22  static, what things got worse, because in my view,

23  it was an ongoing, dangerous circumstance.

24  BY MR. KING:

25    Q    So to make sure I understand, my question

Case 1:19-cv-00477-CCE-LPA   Document 77-16   Filed 05/26/21   Page 21 of 93

1    is:  Do you know whether behavior, misbehavior, or

2    criminality got better or worse after the hybrid

3    approach was instituted?

4            Am I correct that your answer is, no, you

5    do not know?

6        A    I don't know quantitatively, no.  I

7    haven't tried to quantitate it.

8            MR. KING:  Okay.  Let's take five minutes.

9            THE WITNESS:  Okay.

10            THE VIDEOGRAPHER:  The time is

11        approximately 12:23 p.m.  We're now off the

12        record.

13            (A recess was taken from 12:23 p.m. to

14    12:33 p.m.)

15            THE VIDEOGRAPHER:  The time is

16        approximately 12:33:50 p.m.  We're now on the

17        record.

18    BY MR. KING:

19        Q    Dr. Kirkham, am I correct that in

20    analyzing the adequacy of a security approach, you

21    have to look at all the different components of the

22    security approach, so you have to consider how many

23    police officers there are, where they're stationed,

24    their training, nonpolice security, training for

25    nonpolice security, training for nonsecurity

Case 1:19-cv-00477-CCE-LPA   Document 77-16   Filed 05/26/21   Page 22 of 93

1   determination what you should do.

2       Q    You don't know whether the hybrid approach

3   made behavior better or worse, do you?

4            MR. FAZZOLA:  Object to form.

5       A    I don't personally know what the impact in

6   any given situation was of the hybrid approach.  I

7   know that the fights continued, the problems

8   continued, which is what I would expect.

9            I'm remembering in 2016, they had -- and

10  this is kind of a common thing that occurred after

11  the -- Dr. Goldstein's changes, they had a series of

12  fights, and there was a meeting.  I remember

13  Mr. Hickman saying, It's crazy to have 500-plus

14  people in an event like that with so few -- six

15  security and one police officer sitting outside in a

16  car.  And I would certainly agree with that.

17           So there are some structural problems here

18  that are difficult for me to understand why they

19  were doing -- and why they didn't do certain things.

20  BY MR. KING:

21      Q    Okay.  Let me go back to my question.

22  Given the fact that you have not reviewed the data

23  for every event before and after the hybrid approach

24  was implemented, am I correct in understanding that

25  you do not know whether the hybrid approach made

Case 1:19-cv-00477-CCE-LPA   Document 77-16   Filed 05/26/21   Page 23 of 93

 1   behavior better or worse?

 2          MR. FAZZOLA:  Object to form.

 3      A    No.  I have not conducted that kind of

 4   microscopic evaluation to determine if individual

 5   behavior, as best we can measure it, was better or

 6   worse because of the structural dangers, that what

 7   existed both before and after were posing.

 8   BY MR. KING:

 9      Q    And you didn't request additional data so

10   you could determine whether or not the hybrid

11   approach made things better or worse, did you?

12      A    I did not.  And one of the reasons I did

13   not was that I didn't believe that -- until and

14   unless you eliminated some foreseeably dangerous

15   conditions -- and we both alluded to some of them as

16   we talked along here today -- until you did that,

17   the dangers were going to remain.  You know, and so

18   that's why I did not dive deeper into

19   particularities of the property.

20      Q    Given the fact that you need to look at

21   the totality of the circumstances to judge a

22   particular security system, am I correct that when

23   you're comparing two security systems, it's more

24   than a matter of simply counting how many police

25   officers were there?

Case 1:19-cv-00477-CCE-LPA  Document 77-16  Filed 05/26/21  Page 24 of 93

 1  and do bag checks.

 2      Q    And again, we're going to look at all of

 3  that.  My question is:  What evidence are you aware

 4  of that there was actually a gun, an unauthorized

 5  gun in The Barn?

 6          And you have mentioned Ms. Johnson's

 7  testimony, which I don't think you quite have right,

 8  but it will speak for itself.  Are you aware of any

 9  evidence other than what her -- what she testified

10  to?

11      A    Just as I've said that his -- the fact

12  that there was nothing to prevent him from taking a

13  gun inside, and that he does reach into his

14  waistband strangely.

15      Q    Did you see him touching a gun?

16      A    No, you don't see any gun there, but as a

17  police officer, when I see someone, you know,

18  reaching into -- depending on the context, reaching

19  into their waistband, I get a little nervous, or

20  used to.

21      Q    Does policing and security at a campus

22  present a different set of challenges than any other

23  locations?

24      A    In different locations assuredly, yeah.

25  And this goes back to your very good question about

1    the venue.

2        Q    And I want to make sure that we are on the

3    same page.  My question was:  Does policing and

4    security -- I'm sorry.  Does policing and security

5    at a campus, a college campus present other

6    challenges and issues than you have at other

7    locations?

8        A    Of course.

9        Q    I was gratified to see you cite the

10   assassination attempt on President Reagan as an

11   example of crimes that are difficult or impossible

12   to prevent, because that's the example I've been

13   using from the beginning.  And so this may be a

14   softball question, but am I correct in understanding

15   that you cannot stop every random act of violence?

16       A    Your point's well taken.  You cannot stop

17   every random act of violence; however, what you sure

18   can do is do everything you can to dissuade most

19   potential perpetrators of violence.

20            Now, with respect to President Reagan,

21   you'll note in my report I said that there are

22   certain individuals who are involved in expressive

23   violence that are in such a state of mental illness,

24   rage that they -- that even the Secret Service and

25   DC Police all over the place were not going to stop

Case 1:19-cv-00477-CCE-LPA   Document 77-16   Filed 05/26/21   Page 26 of 93

1    BY MR. KING:

2        Q    I apologize if this is repetitive, but did

3    you do your own risk assessment as part of your

4    engagement in this matter?

5        A    No, I did not do a formal risk assessment,

6    and you won't see that reflected in my -- I'm

7    suggesting to you that a basic risk assessment would

8    flag immediately on certain, well-known hazards.

9    There are a bunch of hazards in -- from square one

10   on; some of them existed -- a number of them existed

11   well before Mr. Goldstein, Dr. Goldstein arrived on

12   campus, and they were exacerbated after he put this

13   system in effect.

14       Q    I believe you said you did not do a formal

15   risk assessment.  Did you do a risk assessment of

16   any sort?

17              MR. FAZZOLA:  Object to form.

18       A    No.  I have said that a risk assessment

19   should have been done.  I have -- what I have done

20   is to attempt to identify what were foreseeable

21   hazards, things that pose obvious hazards to this

22   specific venue:  Overcrowded, large numbers of young

23   people, alcohol coming in, no ability to control the

24   entrée of people in there, minimal presence of

25   police.

1          I've attempted to identify the variables,

2    and I've done that in my report, I think, pretty

3    exhaustively, that were hazardous, that were

4    dangerous.

5    BY MR. KING:

6          Q    Okay.  My question was:  Did you do a risk

7    assessment of any sort?

8          A    Implicitly -- I don't want to be -- I'm

9    not trying to be evasive.  Implicitly what I did was

10   a hazard or risk assessment.  These are all

11   dangerous variables that need to be corrected.  So

12   that's kind of what you do in a risk assessment.

13   You may -- a CPTED, crime prevention officer, may

14   have a checklist to go and check one, two, three,

15   four, I haven't done that, but I've done what's

16   tantamount to the same thing.

17         Q    Was there anything that would have

18   prevented you from doing an actual risk assessment?

19         A    Well, that would be something that someone

20   who was -- who has been retained by them to come in,

21   like the firm they were working with, Developmental

22   Associates or another firm that can do -- that does

23   police consulting, they would do something like

24   that.  I don't do that type of work.  Everything I

25   do is litigation-related.

Case 1:19-cv-00477-CCE-LPA  Document 77-16  Filed 05/26/21  Page 28 of 93

1    either the first system or the second system.

2    BY MR. KING:

3        Q    Okay.  Do you think you were better

4    situated to assist the risks present at The Barn

5    than the Winston-Salem Police were?

6        A    I believe that I was in terms of the

7    totality of the circumstances.

8        Q    In the history of The Barn, had a weapon

9    ever been used prior to the shooting of Mr. Baker?

10       A    No weapon had ever been used.  There are

11   situations where officers were apprehensive about

12   weapons.  I remember one particularly, Officer

13   Gravely saw after one of these fights, many fights,

14   saw people rushing toward the door and he said in

15   his deposition "I was worried that there might be a

16   gun."

17            There is an allegation of a student that

18   says that they had a gun pointed at them somewhere

19   in the record.

20            The point of it is, this all goes back to

21   wanding and use of a magnetometer.  The screening

22   for -- you don't want weapons coming in there.

23       Q    My question was:  In the history of The

24   Barn, had a weapon ever been used prior to the

25   shooting of Mr. Baker?

Case 1:19-cv-00477-CCE-LPA   Document 77-16   Filed 05/26/21   Page 29 of 93

1      A      Not to my knowledge.  This is the first

2   shooting.

3      Q      In the 75 years that Wake Forest

4   University has been in Winston-Salem, has there ever

5   been a homicide on campus before the shooting of

6   Mr. Baker?

7      A      This is the first homicide to my

8   knowledge.

9      Q      In the 75 years Wake Forest University has

10  been in Winston-Salem, had a gun ever been used in

11  the commission of a crime on the Wake Forest campus?

12     A      I'm not aware of any such occurrence.

13     Q      And how far is -- well, you've never been

14  on the Wake Forest campus, correct?

15     A      No, I have not.

16     Q      Do you know -- I'm sorry.  If you were

17  doing a risk assessment, is one of the things you

18  want to do is understand the physical environment in

19  which the venue is located?

20     A      The type of evaluations I do as a

21  criminologist, it's -- there are -- sometimes there

22  are -- there are spacial aspects and physical

23  aspects of a location that one of us will -- I will

24  go or I will send Mr. Gregg in to do a -- you know,

25  take photography and do very detailed information.

1    I did not feel the need to do that in this case.

2         Q    How far is The Barn from university police

3    headquarters?

4         A    I can only say that, by the testimony of,

5    I think, Gravely, said "We can be there -- one of

6    our officers can be there in two minutes."  I don't

7    know.  There were three officers on patrol.  I

8    couldn't -- I can't tell you, nor would I be

9    concerned with the spacial realities of where the

10   police department is in relation To the Barn.

11        Q    The question is:  Do you know how far The

12   Barn is away from the university police

13   headquarters?

14        A    No.

15        Q    Do you know how far away university police

16   officers were at the time of the shooting?

17        A    I don't know.  There were three officers

18   on patrol.  We know about Bottoms and Felts who

19   summoned there.  I don't know -- of other officers

20   that were out there, I don't know what their

21   positions were, no.

22        Q    Do you know how long it took the

23   Winston-Salem Police to respond to the shooting?

24        A    Again, I don't recall that.  I also

25   don't -- I know that there were no officers as had

Case 1:19-cv-00477-CCE-LPA   Document 77-16   Filed 05/26/21   Page 31 of 93

 1   cross-checking, when people would present themselves
 2   at the gate, to come in.  We know from -- again,
 3   this is the veracity of the deponent, Mr. Wille,
 4   Lucas Wille says that they -- half the people didn't
 5   have any student ID, but they let them in any way
 6   because there were -- you'd have like 300 people
 7   piled up out there.
 8              I mean, also -- and this is another, you
 9   know, nail in the coffin figuratively, Dr. Penny
10   Rue, the vice president says, Gee, you know, there
11   are a lot of fights at campus events, and we would
12   sometimes -- we would double our venue.  If students
13   in there liked what they saw, they'd get on social
14   media, start texting and emailing, and we'd have
15   twice as many people in an hour.  That's not very
16   safe, and there's no control of that.  There's just
17   a break-down of access control.
18       Q    Okay.  I'm asking a very narrow issue, and
19   that's about keeping people off campus without
20   showing an ID.  Did Wake Forest have a duty to keep
21   people off campus unless they showed an ID?
22              MR. FAZZOLA:  Objection.
23       A    I'm not -- I'm not in a position to say.
24   There may be other events going on on campus that
25   people want to come on campus to look it over,

1   that's a totally different subject.  I'm not
2   suggesting that people should not be allowed on the
3   campus.  We're talking about -- I thought we were
4   talking about the events surrounding this particular
5   venue and this event.
6   BY MR. KING:
7        Q    Well, let me ask the question again so
8   that we're on the same page:  Is it your opinion
9   that Wake Forest had a duty to keep people off
10  campus unless the person showed an ID?
11            MR. FAZZOLA:  Object to form.
12       A    No, I think people should be able to come
13  on the campus, most any campus, with the exception
14  of restricted areas, sure.
15  BY MR. KING:
16       Q    Are you aware of any campus that seals off
17  the campus and only allows people to enter if they
18  show an ID?
19       A    No, I'm not aware of any campus.  I'm
20  aware of the fact that Wake Forest, and probably
21  lots of other campuses follow the same thing, when
22  it gets to be nighttime, people coming to campus for
23  events late at night, that they ramp up their ID
24  requirement.
25       Q    And we're going to talk about the ID

Case 1:19-cv-00477-CCE-LPA   Document 77-16   Filed 05/26/21   Page 33 of 93

1   practices.  Right now I'm trying to understand what

2   you consider Wake Forest duty to be.  So am I

3   correct that you do not believe Wake Forest had a

4   duty to keep people off campus unless they showed an

5   ID?

6           MR. FAZZOLA:  Objection.

7       A   Generally speaking, no.  People should be

8   able to come on campus.  If I'm up there in the

9   area, I might want to go in there and look at the

10  campus.  I mean, you know, you shouldn't try to

11  treat it as a fortress.  It's very different than

12  certain events.

13  BY MR. KING:

14      Q   Wake Forest was not required to keep

15  people off campus without an ID, correct?

16      A   I don't believe so.

17          MR. FAZZOLA:  Object to form.

18  BY MR. KING:

19      Q   I think you mentioned that Wake Forest had

20  a policy, I think you said they had a written policy

21  in your report.  You say that they had a formal

22  policy about showing IDs at the gate.  Is that your

23  understanding?

24      A   That was -- that was one of the policies

25  they had was to -- the gate was one of the means of

Case 1:19-cv-00477-CCE-LPA   Document 77-16   Filed 05/26/21   Page 34 of 93

1          MR. FAZZOLA:  Objection.

2      A    They got little ID tags, I believe.

3  BY MR. KING:

4      Q    Okay.  Describe for me the fencing that is

5  around the Wake Forest campus.

6      A    I could not give you a description of the

7  fencing around the Wake Forest campus.

8      Q    Is it your testimony that Wake Forest had

9  an obligation to encase the campus in fencing in

10  order to control who entered the campus?

11          MR. FAZZOLA:  Objection to form.

12      A    Now I'm trying to recall some specifics

13  from the record about -- I know they had problems

14  with people cutting through woods and getting on to

15  the campus through other means, and I don't know

16  what those were.  I will tell you that perimeter

17  control is -- access control are very important

18  principles of crime prevention through environmental

19  designs, CPTED, and you should -- you should -- you

20  know, we're not talking about a strip shopping

21  center here or a mall.  You should seek to control

22  ingress through fences, through perimeter control

23  where you can.

24  BY MR. KING:

25      Q    Okay.  So again, my question is:  Is it

Case 1:19-cv-00477-CCE-LPA   Document 77-16   Filed 05/26/21   Page 35 of 93

1    your testimony that Wake Forest had an obligation to

2    encase the campus in fencing to control who entered

3    the campus?

4              My understanding is that you're saying

5    yes?

6         A    Yes.  They should have a reasonably secure

7    perimeter where they may do that with vigilance or

8    they may do that with cameras.  There may be areas

9    that are open but still under surveillance.  That's

10   really up to them.

11             And I'm not here as an expert on the Wake

12   Forest campus and its idiosyncratic layout.

13        Q    Can you walk on to the FSU campus?

14        A    Pardon me?

15        Q    Can you walk on to the Florida State

16   campus?

17        A    You can.

18        Q    Can you walk on to Duke University's

19   campus at 10:00 p.m. at night?

20        A    At 10:00 o'clock at night, again, I've

21   been gone from any campus for many, many years, I

22   don't know what the ingress control is at night,

23   what points -- and what are -- what are volatile

24   concerns.  Have they had attacks of women walking to

25   and from places on the campus at night?  Have they

Case 1:19-cv-00477-CCE-LPA   Document 77-16   Filed 05/26/21   Page 36 of 93

1   the need for it.

2   BY MR. KING:

3       Q    Are criminal records, including pending

4   charges, public records in Florida?

5       A    What about records in Florida?

6       Q    Are criminal records, including pending

7   charges, public records in Florida?

8       A    Yes.  Under our Florida Sunshine Law, yes,

9   I believe those are accessible except for juveniles.

10      Q    Are criminal records, including pending

11  charges, public record in North Carolina?

12           MR. FAZZOLA:  Objection to form.

13      A    I can't speak to North Carolina law.

14  BY MR. KING:

15      Q    Did Wake Forest have a duty to do a

16  criminal background check on every person who wanted

17  to come on campus?

18      A    No, that would obviously be onerous and

19  burdensome and beyond the pale of anything that's

20  reasonable.  I think the standard is what are

21  reasonable campus administration would do or would

22  not do.

23      Q    You've never been in campus security or

24  campus administration, correct?

25      A    That's correct.

Case 1:19-cv-00477-CCE-LPA  Document 77-16  Filed 05/26/21  Page 37 of 93

1          MR. FAZZOLA:  Objection.

2    BY MR. KING:

3          Q     Okay.  Do you know of any college that

4    requires criminal background checks before people

5    enter campus?

6          A     To walk on the campus, no.

7          Q     How about to drive on campus?

8          A     To drive on campus, no.

9          Q     You're aware, I assume that there are

10   private residences that can only be accessed through

11   the Wake Forest campus gates?

12         A     I'm not familiar with layout out of

13   private residences and the gates.  Again, I've tried

14   to make that clear.  I do not understand -- I've

15   never been to Wake Forest campus.  My -- I'm looking

16   at it really with a -- metaphorically with a rifle

17   rather than a shotgun or a very narrow focus.

18         Q     Well, did you at least request a map of

19   the Wake Forest campus as part of your undertaking

20   in this case?

21         A     I've seen diagrams of the relevant

22   portions of it.  The road, for example, the parking

23   lots that were adjacent to where the incident

24   occurred or close to it, where The Barn is located.

25   I've seen some -- yeah, I've seen some Google Earth,

Case 1:19-cv-00477-CCE-LPA   Document 77-16   Filed 05/26/21   Page 38 of 93

1    that kind of thing, but I'm satisfied I've seen

2    enough on that.  I don't need any more

3    particularity.

4         Q    Did Wake Forest have a duty to prevent

5    people from entering campus who were visiting the

6    private residences unless the guests had IDs?

7              MR. FAZZOLA:  Objection.

8         A    No.  I mean, people -- if there are

9    private residences that can only be accessed through

10   the campus, I would defer to whatever system they

11   choose to use.

12   BY MR. KING:

13        Q    Is it your opinion that Wake Forest had a

14   duty to, on the evening of January 19, 2018, bar

15   people from campus who were intoxicated?

16             MR. FAZZOLA:  Objection.

17        A    I think to the extent that officers were

18   able to determine -- again, I'm drawing this

19   specifically to the point of people -- attendees at

20   an event like The Barn, yes, to keep -- they did

21   have an affirmative duty to keep obviously impaired

22   people off the campus, and I would point out police

23   have special training for the recognition of the

24   indicia of intoxication that lay people, including

25   students assigned to duties, would not know.

Case 1:19-cv-00477-CCE-LPA   Document 77-16   Filed 05/26/21   Page 39 of 93

1  BY MR. KING:

2      Q    Am I correct that one of your criticisms

3  of Wake Forest is inadequate lighting at The Barn

4  and around The Barn?

5      A    Yes.

6      Q    I think you mentioned before that there is

7  a standard that's applied, and I'm afraid I may have

8  cut you off, and I apologize.

9      A    I was using the highly respected or

10 authoritative source of the Engineering Illumination

11 [sic] Society of North America.  They promulgate the

12 standards of luminance, and they boil down to so

13 many candlepower, source candlepower for different

14 locations.  But the long and short of it is, I ought

15 to be able to pretty well read a newspaper or a

16 business card most places on a campus, which you

17 look for, and there's a lot of this inhibitor -- or

18 dark spots of which there are many from the material

19 I've seen on this campus.

20          And there are recurrent complaints from

21 people like the sheriff of the county, and other

22 officers who have talked about darkness -- darkness

23 inside and outside and, those are really bad

24 elements.

25      Q    What is the recognized standard for

1    illumination inside a place like Barn?

2         A    I couldn't tell you without recourse to

3    the -- some of the manual data on it.  There are

4    different for open parking lots, sidewalks,

5    residences.  But the idea is you're supposed to

6    see -- X number of feet, you're supposed to be able

7    to recognize facial recognition at a certain

8    distance.

9              But suffice to say that -- I mean, I

10   looked, for example, at the video, the interior

11   Barn.  Way -- way too dark.  I mean, you can't --

12   there's no way, even if you had officers well

13   trained, properly posted inside there or you had

14   camera operations, you wouldn't be able to see much

15   of anything.

16        Q    I'm going to ask you the question again:

17   What is a recognized standard for illumination for a

18   place inside The Barn?

19        A    I can't tell you what the specific -- and

20   there will be a -- Durham County or whatever it is,

21   there will be a county ordinance as far as luminance

22   at different locations.  I couldn't tell you what

23   those are.

24        Q    And did you bother to look at what the

25   standard was for The Barn?

Case 1:19-cv-00477-CCE-LPA   Document 77-16   Filed 05/26/21   Page 41 of 93

1          A     No, I did not.

2          Q     Did you bother to look at whether or not

3     there were any local regulations or ordinances about

4     lighting in a place like The Barn?

5                MR. FAZZOLA:  Objection.

6          A     No.  Again, I'm not a luminance expert.

7     I've not done that, I don't do illumination tests.

8     I work with people that do that type of thing, but I

9     didn't see a need to do anything like that or hire

10    anybody to do anything like that.

11    BY MR. KING:

12         Q     What is the recognized standard for

13    illumination on the roadway to The Barn?

14                MR. FAZZOLA:  Form.

15         A     I couldn't tell you what that is either.

16    That's a technical question beyond the ambit of my

17    expertise.

18    BY MR. KING:

19         Q     Well, according to your material, you have

20    access to -- I'm going to quote here -- crime

21    prevention/private security specialist, conduct

22    lighting measurements with calibrated instruments

23    and to diagram the spacial distribution of

24    illumination.

25                Does that sound familiar?

Case 1:19-cv-00477-CCE-LPA  Document 77-16  Filed 05/26/21  Page 42 of 93

1      A    Yes.  I've used those type of individuals

2    frequently and sometimes at large event activities

3    where parking lots and roadways were dark.

4      Q    Did you use one in this situation?

5      A    No, I did not.  I did not feel the need to

6    do it in this case.

7      Q    And I heard you reference Sheriff

8    Birkhead's comments about inadequate lighting, do

9    you recall that?

10     A    I do.  He commented lighting was

11   inadequate inside and outside.

12     Q    And that was in the spring of 2014,

13   correct?

14     A    Right.

15     Q    Do you know what the actual level of

16   lighting was in The Barn on January 19th and 20th,

17   2018?

18     A    Only from -- I couldn't give you a

19   technical luminance number.  I don't know what it

20   would be.  But I could tell you it was from a

21   security standpoint it was way too dark.  And there

22   are recurrent statements in the record about how

23   they would -- they would say, Hey, you know, you got

24   to turn the lights up.  Are they'd turn it up, and

25   they'd turn it back down again, so it was constantly

1    self defeating.

2        Q    Do you know what the actual level of

3    lighting was outside The Barn on January 19th and

4    20th, 2018?

5            MR. FAZZOLA:  Objection.

6        A    No, I don't know the technical candlepower

7    that was out there at that time, except to the eye

8    it was very, very dark.

9    BY MR. KING:

10       Q    And you were doing -- and you were judging

11   that based upon what you saw in the video; is that

12   correct?

13       A    Videos, yes, material I've seen.  It's

14   just -- there was a lot of pockets of darkness that

15   would be conducive to criminal events, not just

16   violent crime but vehicle breaking and enterings,

17   any number -- purse snatches, any much of things.

18       Q    Do you know how watching a video or the

19   way a video is recorded affects the perceived

20   darkness of the image, do you have expertise in

21   that?

22           MR. FAZZOLA:  Objection to form.

23       A    No.  Again, I know there can be a

24   differential from what is seen by the eye and what

25   the camera captures in the photography or

1  videography.  But no, it's beyond the area of my

2  expertise.

3  BY MR. KING:

4      Q    Okay.  But you have access to someone who

5  it is their expertise, right?

6      A    I have access to people I can and do hire

7  to conduct luminance evaluations of property.

8      Q    Did you ever say to plaintiff's counsel, I

9  want to go on to the Wake Forest campus and see The

10  Barn for myself?

11          MR. FAZZOLA:  Objection to form.

12      A    No.  I will do site visitations or send my

13  chief assistant, who's also a private investigator,

14  a licensed private investigator to do such things if

15  I see it's necessary.  But with modern photography

16  and videography and all the other material you have,

17  it very often -- sometimes it is, but not in this

18  case.

19  BY MR. KING:

20      Q    Well, do you have the expertise to judge

21  the adequacy of lighting by looking at a video?

22      A    I could look at the -- I can look at the

23  video and get an idea of what -- I look at lots of

24  videos of bar events, for example, where it's too

25  dark.  You couldn't see.  If you had police

1  personnel or security people, you couldn't see

2  what's going on.

3      Q    Do you have the expertise to judge the

4  adequacy of the lighting if the Barn by looking at

5  the videos?

6          MR. FAZZOLA:  Object to form.

7      A    Other than to say as a criminologist, that

8  it is -- it's too dark.  Now, I couldn't break it

9  for you into technical lumen standards.

10  BY MR. KING:

11     Q    Well, you could have if you sent your

12  person on campus, couldn't you?

13          MR. FAZZOLA:  Objection.

14     A    I could have -- I could have suggested

15  that they hire someone to conduct a lighting

16  evaluation.  You'd have to know, you know, what

17  subsequent remedial measures had been taken since

18  the night of the 19th and the 20th to know, you

19  know, what you're looking at now in relation to what

20  you were looking at then, inside and outside.

21  BY MR. KING:

22     Q    Well, we'll come back to that in just a

23  minute.

24          Was there anything that prevented you from

25  retaining a person who actually has expertise in

1  lighting to do an evaluation of the lighting at The

2  Barn?

3       A    No.

4       Q    Now, we talked before about the fact that

5  Sheriff Birkhead's comments about the lighting were

6  in spring of 2014, correct?

7       A    Right.  And other officials, other police

8  officials had made similar comments about the

9  lighting.

10      Q    I don't mean to be rude.  I'm happy to be

11 here all weekend.  My question right now is about

12 Sheriff Birkhead; that was the spring of 2014,

13 correct?

14      A    Right.  He made a comment.

15      Q    Okay.  Do you know what measures were

16 taken subsequent to that to address his concerns

17 about lighting?

18      A    I do not.

19      Q    Did you ask plaintiff's counsel to find

20 out what changes were made to the lighting?

21           MR. FAZZOLA:  Objection.

22      A    No, because I had seen reiteration of the

23 same concerns at different points in the record

24 after Sheriff Birkhead said there were concerns

25 about lighting expressed by other people.

Case 1:19-cv-00477-CCE-LPA   Document 77-16   Filed 05/26/21   Page 47 of 93

1  BY MR. KING:

2      Q    Was there anything that prevented you from

3  taking 30 seconds to send an email to Mr. Fazzola to

4  say, Please ask them for documents about the changes

5  in lighting at The Barn?

6          MR. FAZZOLA:  Objection.

7      A    Nothing prevented me from doing that.  I

8  would have done it if it felt it was necessary.

9  BY MR. KING:

10     Q    But you didn't feel it was necessary

11 because you felt like you've got the expertise to

12 judge the adequacy of the lighting by looking at

13 videos; is that correct?

14         MR. FAZZOLA:  Objection.

15     A    Not just in this case, but I have looked

16 at hundreds and hundreds of videos of different

17 structures, and I have a -- as a criminologist and a

18 former police officer, I have -- I know what dark

19 is.

20 BY MR. KING:

21     Q    Okay.  Again, I'm talking about this case,

22 you didn't feel it was necessary to request more

23 information about remedial measures regarding

24 lighting because you felt like you had the expertise

25 to judge the adequacy of the lighting by looking

Case 1:19-cv-00477-CCE-LPA   Document 77-16   Filed 05/26/21   Page 48 of 93

1    only at videos; is that correct?

2            MR. FAZZOLA:  Objection.

3        A    That's correct.

4    BY MR. KING:

5        Q    Okay.  Do you know what the Engineering

6    Illumination Society of North America's standard was

7    for the area in which Najee Baker was shot?

8        A    No, you'd have to measure it and juxtapose

9    it with the Illuminating Engineering Society of

10   North America's standards.

11       Q    And again, that's not something you

12   requested, correct?

13       A    That's correct.

14       Q    Is it your opinion that the police

15   officers assigned to The Barn for the party were not

16   adequately trained?

17       A    Yes.

18       Q    Are you familiar with all of the training

19   the Wake Forest police officers received?

20           MR. FAZZOLA:  Objection.

21       A    Not all the training, but I derived the

22   understanding that they did not receive training in

23   crisis intervention, conflict management, body

24   language, all these things that I referred to in my

25   report.  I've seen nothing to indicate that they had

1    received that kind of training.

2    BY MR. KING:

3        Q    Okay.  Well, did you say to plaintiff's

4    counsel, Mr. Fazzola, will you please ask the

5    university to provide the training that was given to

6    each of the police officers?

7                MR. FAZZOLA:  Objection.

8        A    No, I did not request individual training

9    records for police officers, but I am operating on

10   the assumption that there was not conflict

11   management training.  I'm a former crisis

12   intervention officer in the police department.

13   BY MR. KING:

14       Q    Was there anything that prevented you from

15   taking 30 seconds to send an email to Mr. Fazzola or

16   Mr. Fierberg and say, Please request the training

17   records for all the university police officers?

18               MR. FAZZOLA:  Objection.

19       A    No, I could have requested it.

20   BY MR. KING:

21       Q    Is it your opinion that Wake Forest had a

22   duty to employ metal detectors at The Barn on the

23   night of the shooting?

24               MR. FAZZOLA:  Objection.

25       A    Yes, under the circumstances.

1      A      I think I mentioned that Sergeant Gravely

2   on one occasion has expressed concern about an event

3   where people were running out and thought somebody

4   might have a firearm.

5      Q      But to your knowledge, there's no evidence

6   of there -- in the history of The Barn was ever an

7   authorized firearm; is that correct?

8              MR. FAZZOLA:  Objection.

9      A      They had -- they had no history of

10  locating firearms; however, I note that there are

11  other universities that do use -- in the survey of

12  ten universities that was conducted, that do use

13  wanding, as well as bag checks, to deal with

14  foreseeable problems like people bringing in

15  alcohol, which they were doing as well.

16  BY MR. KING:

17     Q      Okay.  Did you yourself do a survey of

18  whether universities use metal detectors or wands

19  for large events?

20     A      I didn't do a survey, but I noted the

21  survey of other universities in this case, a number

22  which did use -- some did and some didn't, but some

23  had metal detectors.

24     Q      Okay.  And trust me, we're going to come

25  to that.  My question is:  Did you independently

1    conduct any research to determine whether colleges

2    and universities used metal detectors and under what

3    circumstances?

4         A    No, I have not.  I have not investigated.

5         Q    Is it your opinion that Wake Forest had a

6    duty to search every vehicle that entered campus to

7    look for weapons?

8         A    No.  That would be improper.  I'm sure it

9    would be a Fourth Amendment violation to try to do

10   something like that, and it's not appropriate police

11   conduct.  It's very different than requiring a

12   student ID for everybody in the vehicle coming in as

13   a condition of being able to come on the campus late

14   at night.

15        Q    So I want to go back to the metal detector

16   issue.  I understand that you're relying in part

17   upon the survey of ten colleges and universities.

18   Are you relying on anything other than that in

19   expressing the opinion that Wake Forest had a duty

20   to use metal detectors at The Barn?

21             MR. FAZZOLA:  Objection.

22        A    Not other than amplifying the context that

23   we're talking about; a very large venue with a

24   history of fights -- major fights and troubled

25   events, having to call for police backup repeatedly.

1    little airline bottles and knocking them back, you

2    deal with that.

3         Q    Are you aware of any evidence that anybody

4    brought alcohol into The Barn on the night of the

5    shooting?

6              MR. FAZZOLA:  Objection.

7         A    That -- I have no specific evidence of it

8    happening on that night.  Again, it's something

9    that's happened many times before.

10   BY MR. KING:

11        Q    Does FSU conduct bag searches for large

12   events to look for alcohol?

13        A    I'm sorry?

14        Q    Does FSU do bag checks to look for alcohol

15   at large events?

16        A    I've been gone from the university as a

17   faculty member since 1991.  I have no idea what

18   they're doing right now.

19        Q    Do you have any idea what any colleges and

20   universities are doing regarding bag checks for

21   alcohol?

22        A    No, not beyond the ten universities that

23   were surveyed in connection with this matter.

24        Q    Okay.  And when you say "surveyed," not

25   surveyed by you, surveyed by somebody at Wake

Case 1:19-cv-00477-CCE-LPA   Document 77-16   Filed 05/26/21   Page 53 of 93

1  Forest, correct?

2      A    That's correct.

3      Q    Okay.  And my understanding is you did

4  nothing to confirm that survey information, correct?

5          MR. FAZZOLA:  Objection.

6      A    That's correct.  And I would point out

7  it's a good thing that they did reach out to other

8  universities and try to find out what they were

9  doing, with staffing and other things.

10  BY MR. KING:

11     Q    Did Wake Forest have a duty to arrest

12  anyone who was involved in a fight at The Barn?

13     A    This is an important point.  They had a

14  duty to act affirmatively if it was -- as a police

15  officer, I'm sure the law is the same up there in

16  North Carolina as it is here in Florida, most

17  states, if you witness a misdemeanor committed, a

18  simple assault, for example, committed and you can

19  make an arrest, you have a duty -- you have a duty

20  to either make an arrest or physically remove the

21  person from the premises in this case and escort

22  them off the campus.  There should have been a

23  policy.  I don't think there was a policy.  There

24  should have been a policy to walk the person out,

25  police officer take -- remember, we only got one

1  officer working out front and others have to be

2  summoned.  But to take that person out.  And tempers

3  often run high in these situations, and tell them,

4  get a trespass warning, however that's done

5  mechanically in -- on campus in North Carolina, have

6  them issue a trespass warning.  If they come back

7  within 30 days, 60 days, whatever it may be or they

8  come back that night, they're subject to arrest.

9  Walk them out to their car, see them leave off the

10 campus.

11     Q    Can you name the colleges that have that

12 policy?

13     A    I have no idea.  We have thousands of

14 colleges.  I have no idea.

15     Q    Can you name one that has that policy?

16          MR. FAZZOLA:  Objection.

17     A    No, I cannot.

18 BY MR. KING:

19     Q    Did you make any effort to determine

20 whether any university or college has this policy

21 that you said Wake Forest had a duty to have?

22     A    No.  And I did -- maybe -- given the

23 tentative question, it may be a good time to mention

24 that, what I'm focused on here is if Wake Forest

25 were the only college in the United States of

1  America, we had no exemplars to compare it to, how

2  reasonable were the things that they were doing in

3  terms of given what they knew there in terms of the

4  problems they had.  It's not -- any more than it's a

5  basis to say, Well, these automobile manufacturers

6  have defective brakes or whatever as compared with

7  what our brakes are like.  We're looking

8  specifically at those standards, other standards

9  relate to it from the field generally.  We're not

10  trying to go far afield to talk about other

11  colleges.

12       Q    Are you saying that what other colleges

13  and universities do in their event management is

14  irrelevant to the reasonableness of what Wake Forest

15  did?

16            MR. FAZZOLA:  Objection.

17       A    Not at all.  There are things -- I

18  commended Wake Forest University for reaching out

19  and trying to find out what other colleges were

20  doing.  Do they wand, do they bag check, do they --

21  how many officers do they use on duty.  Those are

22  things that are fine to do, but I don't think

23  there's necessarily anything to do beyond that.

24  BY MR. KING:

25       Q    So am I correct in understanding you

 1  believe that it is relevant in judging the

 2  reasonableness of Wake Forest's event management and

 3  security to look at what other universities do?

 4      A    It is relevant to get guidance in terms of

 5  what other schools are doing.

 6      Q    And did you do that?

 7      A    Huh?

 8      Q    Did you do that?

 9      A    I didn't do that, no.  But they did.

10      Q    Well, again, we're going to talk about

11  that in just a minute.  My question at this point

12  is, my understanding is that you think in judging

13  what Wake Forest did, is relevant to look at what

14  other universities did.  I'm trying to understand

15  why you made no effort to find out what other

16  colleges and universities were doing in terms of

17  security and event management?

18      A    I didn't view it as necessary.  I believe

19  that what was necessary and was indicated would be

20  to -- given what they knew, with system one, what we

21  call system one and system two, would be to hire

22  some consultants on the sort they had on with

23  Developmental Associates to do an exhaustive

24  evaluation of what are the problems and what do we

25  need concretely:  How many officers, how many

1   cameras, where placed, what about lighting, mercury

2   vapor, sodium vapor, where placed.  All those things

3   a consulting group would have done.  They're all

4   over the place.  Very competent, these are two

5   chiefs of police, and Developmental Associates could

6   have been of assistance or any number of others.

7        Q    Why didn't you make any effort to find out

8   what other colleges and universities were doing in

9   terms of event management and security?

10       A    With all due respect, counsel, I tried to

11  answer that question.  I said I focused on

12  this particular -- I'm looking at this particular

13  university against the backdrop of CPTED procedures

14  commonly used crime prevention deterrent measures.

15  That's the method that I'm using.

16       Q    But you don't know what CPTED policies and

17  procedures are used at universities, do you?

18            MR. FAZZOLA:  Objection.

19       A    CPTED policies and procedures are widely

20  used at universities on things like access control,

21  presence of authoritative figures, police

22  specifically to deter events, lighting, all those

23  things, and there are school references in the CPTED

24  material on that.

25            But I mean, how many -- rhetorically, how

Case 1:19-cv-00477-CCE-LPA   Document 77-16   Filed 05/26/21   Page 58 of 93

1    many colleges would you want me to survey?  Ten,

2    100?  A thousand?  I mean, I think we're way afield

3    of what your concerns here.

4    BY MR. KING:

5         Q    I'm respectfully going to have to disagree

6    with you on that.

7              Does any university of college have a

8    policy of arresting every person who was in a

9    fistfight?

10             MR. FAZZOLA:  Objection.

11        A    Who was involved in a fight?

12   BY MR. KING:

13        Q    Yes, sir.

14        A    No, no.

15        Q    Does any university, to your knowledge,

16   have a policy of escorting off campus any person

17   that was involved in a fight?

18             MR. FAZZOLA:  Objection.

19        A    Again, you're going to the question of

20   what individual universities -- mine, my former

21   university or any other one, I don't know other than

22   to say that they -- if they -- any college, any

23   university, whether it's Harvard or Podunk

24   University, anywhere, if they have a venue, they

25   have an event, and they witness a fight that they

1  should foresee can have a volatile carryover,

2  someone could be injured and they have a basis for,

3  say, this person is involved in criminal or

4  potentially dangerous activity, they either need to

5  get that person off campus, and they have the

6  authority, everywhere I've ever seen to do that in

7  any structure, any business structure.

8  BY MR. KING:

9      Q    Okay.

10     A    Give them a warning, walk them out.

11          And you recall this person was only

12  walked -- only walked a short way.  No one -- no one

13  escorted the shooter and his two companions to their

14  vehicle to get them off the campus.

15     Q    I'm reading back here your answer, it

16  says:  They have the authority everywhere I've seen

17  to do that.

18          Can you name any college that does that?

19          MR. FAZZOLA:  Objection.

20     A    I'm referring to a myriad of businesses

21  I've seen.  I would assume under North Carolina law

22  that they would have -- normally it's the owner of a

23  business.  Well, I would assume a campus

24  representative, anyone could say I want a trespass

25  warning issued.  And we have a -- they should have a

Case 1:19-cv-00477-CCE-LPA   Document 77-16   Filed 05/26/21   Page 60 of 93

1   policy that these events have been so troublesome

2   for so long, so many years, they should have a

3   specific policy that says, People who are involved

4   in a fight will be trespassed and removed from the

5   campus and barred from the campus for a period of

6   time.  Be told, If you come back tonight, you'll be

7   arrested for trespass.

8   BY MR. KING:

9       Q    And I'm sorry, I do plan to move on.  Can

10  you name any university that has that policy?

11          MR. FAZZOLA:  Objection.

12      A    No, not aware; never looked into anything

13  like that.

14  BY MR. KING:

15      Q    Did Wake Forest have a duty to -- well,

16  let me ask a different question.

17          Is it your understanding that the police

18  did not witness who started the fistfight at The

19  Barn?

20      A    That's correct.

21      Q    What should the police have done regarding

22  the fight participants if they didn't see who

23  started it?

24      A    First thing -- and there was no policy in

25  this regard.  No one knew who had the authority to

1  BY MR. KING:

2       Q    Do you know what Winston-Salem Police

3  Department's policy is regarding where they station

4  police officers at large events?

5       A    No, I do not.

6       Q    Do you know what the policy is for any

7  college or university regarding where they station

8  police officers?

9            MR. FAZZOLA:  Objection.

10      A    It would be -- it would be idiosyncratic,

11  I would assume, to the particular campus, its size.

12  You know, I was on a 32,000 student campus.  This is

13  a 5,000 student campus.  There would be a lot of

14  variables that would come into it.  But one that

15  damn sure doesn't come into it is racial ethnicity,

16  it's got nothing to do with it at all.  It's the

17  history of the venue.  Where are we having the fires

18  figuratively.  That's where we need to concentrate

19  our resources and to try to tamp this thing down.

20  BY MR. KING:

21      Q    Again my question was:  Do you know what

22  the policy is for any college or university

23  regarding where they station police officers at

24  large events?

25      A    No, I do not.

Case 1:19-cv-00477-CCE-LPA  Document 77-16  Filed 05/26/21  Page 62 of 93

1      Q    Do you know what the policy is for any
2  large event in terms of where they station police
3  officers?
4      A    Again, in my experience with many large
5  events throughout my career, it depends on the
6  nature of the venue, the circumstances, whether it's
7  a rough area of town, bars where they had a lot of
8  fights and shootings in the parking lot, things like
9  that, or if it's a Disney type, a Universal Studios
10  event where they have excellent private security,
11  very little police presence.  It depends on the
12  venue and the circumstances.
13      Q    Yeah.  So what's the -- what's the
14  neighborhood like around the Wake Forest University?
15      A    I couldn't tell you about the -- I know
16  that Wake Forest, I understand, is a pretty upscale
17  university.  I don't -- I would imagine there's a
18  normal residential area around it.  I have no reason
19  to believe it's in a slum area or, you know, a high
20  crime area.
21      Q    Am I correct in understanding that --
22  putting aside your assumptions, you in fact, don't
23  know anything about the area surrounding Wake
24  Forest?
25           MR. FAZZOLA:  Objection.

Case 1:19-cv-00477-CCE-LPA   Document 77-16   Filed 05/26/21   Page 63 of 93

1      A     No, I don't.  I've never been to Wake

2   Forest University, as I said before, and I don't --

3   I'm not familiar with the contiguous area.

4              MR. KING:  Okay.  Tanisha, we are going to

5         now go to, I think it will be Exhibit 124,

6         which is Dr. Kirkham's report, please.

7              (Exhibit Number 124 was identified.)

8              MR. FAZZOLA:  Hey, Bob, before you start

9         asking questions, can we take a quick bathroom

10        break?

11             MR. KING:  Absolute, let's take five.

12             THE VIDEOGRAPHER:  The time is

13        approximately 3:22:05 p.m.  We are now off the

14        record.

15             (A recess was taken from 3:22 p.m. to

16   to 3:28 p.m.

17             THE VIDEOGRAPHER:  The time is

18        approximately 3:29:10 p.m.  We're on the

19        record.

20   BY MR. KING:

21      Q     Dr. Kirkham, do you know whether Wake

22   Forest actually had a plan in place that it normally

23   used so that private security would usher people out

24   when guests -- when parties were over?

25      A     My understanding, the role of private

1     A     I saw nothing to that effect.  I don't

2  know.

3     Q     Did you request from plaintiff's counsel

4  that they obtain that for you?

5     A     I did not.

6     Q     Do you know what the candle foot power was

7  of the lights outside The Barn on the evening of the

8  shooting were?

9     A     I don't.

10          MR. KING:  Tanisha, I think we are going

11       to do 124, which will be Dr. Kirkham's report.

12       Let's get that in, and then I'll want to do

13       125, his bills right after that.

14          MS. PALVIA:  Sure.  I introduced on

15       Exhibit Share 124 which will be the report.

16       Would you like me to share my screen, Bob?

17          MR. KING:  Yes, if you would.  Initially

18       I'll have Dr. Kirkham identify it for us.  I

19       appreciate that.

20  BY MR. KING:

21     Q     Dr. Kirkham, I want to make sure I got

22  this right.  Federal Rule of Civil Procedure

23  26(a)(2) requires that a party produce an expert

24  report for any experts, and I'm quoting here,

25  "retained or specially employed to provide expert

1    testimony in the case," and the report is required

2    to provide the following, quote, "unless otherwise

3    stipulated or ordered by the court, a party's

4    disclosure must be accompanied by a written report

5    prepared and signed by the witness.  The report must

6    contain complete statements of all opinions the

7    witness will express and the basis for and reasons

8    for them, the facts or data considered by the

9    witness in forming them, and any exhibits that will

10   be used for summarizing or supporting them."

11          So apologies for the court reporter for

12   the long reading I just did there.  I just want to

13   make sure that Exhibit 124, which Tanisha has just

14   put on the screen, contains a complete statement of

15   all the opinions you will express and the basis and

16   reasons for them; is that correct?

17        A    Well, it does.  You note at the beginning,

18   sort of the caveat that I reserve the right to

19   supplement or amend my report upon receipt of

20   additional information.  I've already alluded to the

21   fact that I do not have -- not the fault of anyone,

22   this just was taken apparently -- Kyandra

23   Johnson's -- Kyandra Johnson's deposition.  That's

24   important with respect to some of my conclusions.

25

1 BY MR. KING:

2     Q   Okay.  And are you aware that the deadline

3 has passed for plaintiff to provide their expert

4 report?

5     A   I realize that they had to be in by a

6 certain date, and I proffered to them in a timely

7 manner.  But I'm just saying that I -- if discovery

8 isn't open, I -- obviously if I can't -- if I cannot

9 opine any further based on information I have not

10 yet received, I only anecdotally understand about

11 it, I can't do that then.

12     Q   Do you currently have any unfinished work

13 other than that deposition; in other words.  Are you

14 still working on something for this case?

15     A   No, I am not.  I don't -- just one second.

16     Q   Yes, sir.

17     A   Let me get my own copy of it.  No, I think

18 the report is comprehensive in its present form.

19     Q   Okay.  And going back to Rule 26, I read

20 the part where it says "the report must contain a

21 complete statement of all opinions the witness will

22 express and the basis for and reasons for them."

23 Stop right there.

24     My understanding is that that is correct

25 that the report contains all opinions that you will

1  express and the basis for them?

2       A    Yes.

3       Q    Okay.  The report is also required under

4  Rule 26 to provide, quote, "the facts or data

5  considered by the witness in forming the opinions."

6            Does your report contain that?

7       A    Yes, an exhaustive list of everything I

8  reviewed.

9       Q    Okay.  And then it also -- under Rule 26,

10  "the report is required to contain any exhibits that

11  will be used for summarizing or supporting them."

12           Does your report contain that?

13      A    I have not appended any exhibits to my

14  report, nor do I plan to.

15      Q    Okay.  So before we get into the report, I

16  want to ask you about your bill.

17           MR. KING:  Tanisha, can you put that up,

18      please?

19           MS. PALVIA:  Sure.

20           The bill has been introduced in Exhibit

21      Share as Exhibit 125, and I'm sharing my screen

22      now so everyone can see it.  Let me know if you

23      do not see it.

24           (Exhibit Number 125 was identified.)

25           MR. KING:  That's good, thank you.

1  2 or $3,000.  Know shortly when he -- he'll

2  summarize it for us.

3       Q    Okay.  That is helpful, Thank you.

4            MR. KING:  So Tanisha, let's go back to

5       the report, please.

6  BY MR. KING:

7       Q    I'd like to go to page 6, please.  Last

8  full paragraph.  You see the last sentence in the

9  last full paragraph, where it says:  My role as

10 professor and police officer -- I'm going to prove

11 that I failed Latin, too -- qua researcher spanned

12 18 years of my 20 years as a faculty member at the

13 Florida State University College of Criminology and

14 Criminal Justice.

15           Do you see that?

16      A    Yes.

17      Q    What does that mean "police officer qua

18 researcher"?

19      A    Police officer -- what I clumsily mean

20 inartfully expressing -- is I was a police

21 officer -- first person in the country to do this.

22 I was a pilot ethnographic criminologist who was

23 doing qualitative participant observation researcher

24 -- research, and that is by taking the role --

25 actually taking the role of the acting unit, kind of

Case 1:19-cv-00477-CCE-LPA  Document 77-16  Filed 05/26/21  Page 69 of 93

1  stuff that Margaret Mead did in Samoa and
2  anthropologists have been doing for a long time,
3  going into a culture or a subculture and mingle with
4  them, take on their folkways and their mannerisms,
5  except that I was the first person with the
6  encouragement of law enforcement officers who were
7  my students and the willingness of my dean and the
8  sheriff of Jacksonville at the time to step into the
9  literal role.  I was a fully sworn officer six
10 months, full-time initially, and then for the
11 remaining 18 years or 17 and a half years of that
12 time, I worked as a fully sworn officer on a
13 part-time position.  The streets were my laboratory
14 in terms of being able to put on a uniform, check
15 out a patrol car.  And I worked in different areas,
16 but I spent a lot of time working the area of the
17 campus, a lot of time working crisis intervention,
18 but it was a rare opportunity, and the first time
19 that it had been done.
20      Q    So in -- and I had to step away from the
21 computer because I was having a wi-fi issue.  But
22 when were you a full-time police officer, when was
23 that?
24      A    It was -- when I first did this, after I
25 finished the academy, I -- my first stint was in

Case 1:19-cv-00477-CCE-LPA   Document 77-16   Filed 05/26/21   Page 70 of 93

1    Jacksonville, Florida, which is combined

2    police/sheriff's department consolidated city

3    system.  Would have been in 1973 from June to

4    December.

5         Q    Okay.  And have you --

6         A    I'm sorry.  Yeah.  That's right.  1973

7    from June to December.

8         Q    Okay.  And have you acted as a full-time

9    police officer at any other time?

10        A    The only other time would have been under

11   a grant from the U.S. Department of Justice.  I had

12   the opportunity to work as an undercover agent with

13   the Broward County Sheriff's Department Organized

14   Crime Unit part of a federal strike force for three

15   months.  Got my mugshot on the wall in here

16   somewhere. I can tell you it was like '76, '77.

17        Q    Okay.  So am I correct the last time you

18   served as a full-time police officer was sometime in

19   the 1970s?

20        A    Right.  Right.  Everything after that was

21   part-time -- fully sworn, but part-time mostly on

22   weekends.

23        Q    Okay.  I'm sorry.  And when you --

24             (Simultaneous talking.)

25        Q    Yeah, I'm sorry.  The -- so am I correct

1  in understanding that whenever you were acting as a

2  police officer, you were also a professor and you

3  were doing research in the field essentially?

4        A    Right.  But just to emphasize that I was,

5  you know -- it would be indistinguishable from any

6  other police officer in terms of my uniform and

7  badge and equipment that I carried, and I would work

8  a regular beat or a backup car, and my chief let me

9  start a crisis intervention unit, which we never had

10  before, and I worked with a two-officer car in that

11  because of the nature of calls.  We were always

12  handling critical event calls for about five years,

13  so it was -- but I was -- I was there as a

14  researcher, but I was also doing a regular job of a

15  police officer.

16        Q    Okay.  All right.  Let's go to the next

17  page, very top --

18        A    Seven?

19        Q    Yes, sir.  Page 7.

20        A    Yes, I'm with you.

21        Q    At the very top, it says:  The fatal

22  shooting of FSU defensive tackle Pablo Lopez during

23  my tenure as a faculty member was eerily similar in

24  a number of ways to the killing of Najee Baker.

25  Like Baker, Lopez was shot to death by a complete

1          (Off the record from 4:05 to 4:13 p.m.)

2          THE VIDEOGRAPHER:  The time is

3     approximately 4:13:41 p.m.  We're now on the

4     record.

5  BY MR. KING:

6     Q    So now we're looking at Exhibit 124, which

7  is your report, Dr. Kirkham.  On page 14, the last

8  line -- and I apologize, some of this is going to be

9  repetitive because I think we've covered it

10 previously, but I just want to make sure we covered

11 it all.

12    A    All right.

13    Q    The very last line says:  Najee Baker's

14 killer and his two companions would not have been

15 allowed to enter the property on the night of the

16 murder if Wake Forest Security Officer Jolly had

17 followed the university's policy of checking student

18 IDs of all occupants of vehicles seeking to enter

19 the campus.

20         Did I read that correctly?

21    A    You did.

22    Q    Again, I'm sorry if this is repetitive,

23 was Wake Forest required to have a policy regulating

24 who entered campus?

25         MR. FAZZOLA:  Object to form.

1        A        Wake Forest certainly was entitled to

2    develop its on policies, but they certainly should

3    have been -- if we're talking specifically about The

4    Barn, they should have been focused on controlling

5    unwanted ingress of people who were -- I mean, the

6    event purportedly, all the events at The Barn were

7    basically for Wake Forest University students and

8    other students in the area, other universities and

9    not for the public-at-large, and the concern here --

10   and I see this in many other cases, not related to

11   universities where, you know, every -- when you put

12   things out on social media, everybody and his

13   brother shows up, and that's what you're trying to

14   control in terms of sheer volume of people at a

15   large event like that, and, you know, the vehicles

16   getting inundated with people.

17            So they should have -- they needed some

18   system for controlling -- I know we talked a lot

19   about, I couldn't point you to where that policy

20   was, but I read considerable materials that led me

21   to conclude they did have such policy, and the

22   actions of Officer Jolly would seem to be in

23   conformance of that policy, at least a portion of it

24   until he just started opening up the gate and

25   letting people through.  So it's important that they

1 control ingress.

2 BY MR. KING:

3     Q    Okay.  And when you say "it's important to

4 control ingress," is that just for driving on campus

5 or for also walking on campus?

6     A    It's also true -- and again, we're talking

7 about it's 10:00 o'clock at night.  On any

8 particular night, we got a big event going on at the

9 barn, 570 capacity when they're ticketed, the

10 student -- the people allowed on there.  We got to

11 be really focused on all of these things, adequate

12 exterior patrol, adequate police presence inside,

13 adequate cameras, adequate lighting.  And also in

14 answer to your question, controlling the entrance to

15 people on foot as well.  People want to enter the

16 venue, Where's your student ID?

17     Q    And again, I'm not talking about The Barn,

18 I'm talking about this portion of your report where

19 you're talking about actually coming on campus.  Did

20 Wake Forest have a duty to limit access onto campus

21 after 10:00 o'clock at night?

22     MR. FAZZOLA:  Object to form.

23     A    I can't speak to anything like that

24 beyond the -- maybe I inartfully worded this to make

25 it confusing, but it was not my intent.  I'm

1    speaking specifically with regard to events at The
2    Barn venue, the policies that they had, both with
3    regard to pedestrians, and vehicles needed to be
4    really, really tight and utilized cross checking to
5    be sure you got people with student IDs on those
6    nights.

7              I have no opinion on the university
8    policies beyond that as far as when else they should
9    have controlled ingress for other things, I don't
10   have an opinion on that.
11   BY MR. KING:
12        Q    Okay.  Well, if -- is it your opinion that
13   Wake Forest had a duty, because it was a Barn party
14   going on, to limit access after 10:00 o'clock at
15   night to anybody who wanted to enter campus?
16             MR. FAZZOLA:  Objection.
17        A    No.  Again, their duty was very
18   specifically rifle rather than shotgun
19   metaphorically.  Their concern and duty should have
20   been to deal with the foreseeable hazard at that
21   particular location.
22             If you got -- again, I know I mentioned
23   this before, but it's worth repeating, Dr. Penny
24   Rue, the vice president, saying we may double our
25   venue in one hour when people start emailing, they

1  get there, it's a great party, everybody wants to
2  come.  We got problems then.  We got trouble them.
3  We got to keep the lid on or we're going to have too
4  many people and some people we really don't want on
5  there that are not students that have no legitimate
6  purpose or presence.  That's what I'm trying to
7  drill down on.
8  BY MR. KING:
9      Q    Okay.  And I don't want to -- I don't want
10  to limit you in your answer, Dr. Kirkham, but it's
11  4:15 on Good Friday, so I'm hoping we can focus on
12  the specific question I'm asking.  Right now, I'm
13  not talking about getting into The Barn, I'm talking
14  about getting in campus, okay?  Are we on the same
15  page?
16      A    We are.  And I think, with all due
17  respect, Bob, I think we're talking apples and
18  oranges here.  I'm not concerned -- my focus is on
19  The Barn, with the foreseeability of people coming
20  into The Barn, and that's why I'm concerned with
21  the -- both the pedestrian and vehicular entrée.
22      Q    Okay.  So do you -- again, we're going to
23  put the entry into The Barn on the shelf for just a
24  minute.
25          Are you expressing an opinion as to

Case 1:19-cv-00477-CCE-LPA  Document 77-16  Filed 05/26/21  Page 77 of 93

1  whether or not Wake Forest had a duty to limit

2  access onto campus after 10:00 o'clock at night?

3      A    No.  I don't -- and I don't have the

4  predicate for, in this file, to speak to things

5  other than The Barn.  I don't know.

6      Q    Okay.  Thank you for that.  The top -- the

7  next sentence on page 15 says:  Video footage shows

8  Jolly putting out a sign indicating one entrance was

9  closed and subsequently waving arriving cars through

10  the other entrance without checking IDs of everyone

11  in each vehicle.

12          Did I read that correctly?

13      A    You did.

14      Q    Okay.  And I apologize to the dead horse

15  I'm going to beat, but am I correct in understanding

16  that where you referred to a policy regarding access

17  through the gate, am I correct in understanding you

18  are not expressing an opinion on that?

19          MR. FAZZOLA:  Objection.

20      A    I am expressing an opinion with regard --

21  again, to be sure I'm responding to your question --

22  about celling vehicular and pedestrian access on

23  Barn event nights.

24  BY MR. KING:

25      Q    Okay.  Okay.  So that's where I'm getting

Case 1:19-cv-00477-CCE-LPA   Document 77-16   Filed 05/26/21   Page 78 of 93

1  people with student IDs?

2      A    Yes, pursuant to what I understood was

3  their policy.

4      Q    Have you seen any document that says this

5  is the policy for entry into The Barn?

6          MR. FAZZOLA:  Object to form.

7      A    You know, I am certain that I have read

8  that somewhere, but I -- at this hour, I'm not sure

9  where it was.

10  BY MR. KING:

11      Q    Okay.  And the difficulty I got, as I

12  think I mentioned before, you got a whole lot of

13  opinions in here without any citations at all.  So

14  it is -- if it is your opinion that Wake Forest had

15  a duty to limit access to The Barn on the evening of

16  the shooting to people with student IDs, can you

17  point me to anything that supports that question?

18          MR. FAZZOLA:  Object to form.

19      A    With all due respect I know you've been

20  trying to elicit that from me, and I would tell you

21  if I knew, but I don't know.

22  BY MR. KING:

23      Q    Okay.  So we are at the bottom of page 15.

24  If the student event hosts that night had been

25  required to provide a list of all registered guests

1    to Wake Forest University Police Department prior to

2    the event as had been Wake Forest policy for at

3    least some period in the past for on campus events

4    for off campus guests, as Wake Forest knew or should

5    have known was a standard policy and practice of

6    other colleges and universities in the area for on

7    campus parties open to off campus guests, Austin and

8    Smith would have been barred from entering since

9    their names would not have been on the authorized

10   listed invitees.

11           Did I read that correctly?

12       A    You did.

13       Q    Did Wake Forest have a duty to only allow

14   people on campus on the evening of the party if

15   their name was on a list given to people operating

16   the gate?

17       A    With respect to access to The Barn, yeah.

18   You had to be -- that was the purpose of the pre

19   submitted list to the police department.

20       Q    Okay.  And my understanding is that your

21   basis for saying that Wake Forest had a duty to

22   limit access to The Barn to people with student IDs

23   is that you believe that was in a policy that Wake

24   Forest had?

25           MR. FAZZOLA:  Object to form.

1      A    Yes.  Either a written or de facto policy
2    that they had been following.
3    BY MR. KING:
4      Q    Are you aware of whether any other -- or
5    any colleges and universities limit access to on
6    campus parties to people who present student IDs?
7      A    Again, you'd have to relate that to the --
8    if it was some real problematical spot.  I mean,
9    understand, I'm not throwing rocks at the idea of
10   having a facility like The Barn, which -- and I
11   understand the black students didn't have the
12   resources or enough of them to enable them to have
13   regular sorority lounges and so forth, fraternity
14   lounges.  It's a fine idea, but you got to -- when
15   you're having these kind of problems, you got to
16   have appropriate security to protect people in
17   there.
18   BY MR. KING:
19     Q    Okay.  My question is:  Can you name for
20   me any college or university that limits entry to
21   parties to people who present student IDs?
22     A    No --
23          MR. FAZZOLA:  Object to form.
24     A    -- never looked into it.
25

1    BY MR. KING:

2        Q    In that same sentence that I just read

3    you, you refer to a standard policy and practice of

4    other colleges and universities.  What are you

5    referring to there?

6        A    I don't -- I'm trying to figure out if it

7    had any reference to the survey.  I don't think the

8    survey of the ten schools dealt with that.  It may

9    have come from somewhere else.  It's common for --

10   it's common for facilities to have a pre submitted

11   authorized list of attendees.  I've seen that in --

12   well, I'm thinking of another case where there

13   was -- at least one that I can think of right now,

14   where there's a required guest list to be submitted

15   prior to the -- prior to the event.

16       Q    My question is:  Did Wake Forest have a

17   duty to limit access to people on a list that was

18   generated before the party?

19       A    No.  They could have decided not to do

20   that, but everything you do or don't do you got to

21   consider the safety of it.

22       Q    I understand.  At this point I'm trying to

23   understand if your opinion is that Wake Forest had a

24   duty to limit access to The Barn to people on

25   presold tickets, and am I correct in understanding

1    A     You read it absolutely correctly.

2    Q     Okay.  What sort of analysis did Wake

3 Forest undertake before instituting the hybrid

4 approach?

5    A     You know, that's an excellent question.

6 As closely as I can tell, this was an arbitrary,

7 capricious and foreseeably dangerous act that they

8 accepted from -- and I'm sure Dr. Goldstein has many

9 other redeeming qualities, but he knows as much

10 about security and crime prevention as I know about

11 microbiology or astronomy.  He knows nothing at all

12 about it, and they just accepted it on his word and

13 by fiat, accepting it, they said, Hey, we are going

14 to go to a -- we're going to save money and we're

15 cutting it, and we're going the make -- black

16 students won't be offended by the presence of

17 police, so we're going to get rid of this protective

18 measure.  We're going to police -- limit the police

19 to one.  I mean, I've never seen anything in my

20 entire career like this:  Let's cut the police in a

21 dangerous situation.  Let's reduce them.

22          Over-policing is something -- I heard you

23 use the word earlier.  It's really never been part

24 of my professional vocabulary.

25    Q     Dr. Kirkham, I really don't want to cut

1          Do you know what experience Dr. Goldstein

2    had with large event management?

3        A    No, I don't.

4        Q    Do you know where Dr. Goldstein was before

5    he came to Wake Forest?

6        A    He was at my university, Florida State.

7        Q    Okay.  And are you aware he was involved

8    to a great deal with large event management while he

9    was at G state?

10          MR. FAZZOLA:  Objection.

11       A    I've seen that in his -- his article

12   references to event management.  That's one of the

13   things.

14   BY MR. KING:

15       Q    Do you have any experience with large

16   event management?

17       A    No, but I have had quite a bit of

18   experience in crime prevention.

19       Q    Does the person who runs large events at

20   FSU have law enforcement experience?

21          MR. FAZZOLA:  Objection.

22       A    Again, I have no idea as to who is in

23   charge of large event management at FSU, let alone

24   their experience.

25

Case 1:19-cv-00477-CCE-LPA   Document 77-16   Filed 05/26/21   Page 84 of 93

1   think that's reflected in the comments of different
2   police personnel, people like Fisher and Gravely and
3   people like Hickman from Rhino.  These were not
4   things that suddenly stopped, and it was
5   foreseeable -- I know I told you a number of times
6   that they would be exacerbated by the lack of police
7   presence both inside and outside.  Just -- and in
8   the parking areas and on and on.
9       Q    So is it your opinion that if
10  African-Americans feel like they're being
11  over-policed, the way to deal with that is to
12  explain to them that it's for their own good?
13              MR. FAZZOLA:  Objection.
14      A    Essentially you're talking about a
15  misperception borne of stereotyping, and what you
16  don't do -- I've been in that situation as a ghetto
17  police officer, you sit down with the people
18  involved and you talk to them.  You become a name to
19  them.  I'm George Kirkham.  See my name on my badge
20  here?  You know, and you don't -- what you don't do
21  is withdraw protection from them.
22              That -- as I say, that would have the
23  perverse effect of even though you didn't intend it
24  to be racist, ironically it would be racist.  You'd
25  be depriving a racial minority of the right to

1  protection simply because they're a minority.
2  BY MR. KING:
3      Q    And that's based on your experience as
4  police officer 40 something years ago?
5           MR. FAZZOLA:   Objection.
6      A    Yes.   I think that, and my interaction
7  with blacks over the years as a police officer as
8  well.
9           There's a legitimate reason for black
10  people to feel that they suffer disproportionate
11  discrimination.  No question about that.  But this
12  is a situation where you can talk to people, you can
13  explain to them, We're out here to protect you.  And
14  you can do it in an inoffensive way.  There are some
15  bad cops that may send the wrong message, but the
16  appearance of police officers -- and if you want to
17  -- look, if you want to have fewer officers out
18  there, you can use camera, you can use video, modern
19  video cameras to a central station.  Have some
20  officers out that are able to respond quickly and
21  you got to respond quickly.  But you don't -- to
22  say -- to capitulate to a misperception -- now, the
23  Developmental Associates said, Yeah, there's some
24  perception of improper treatment or over-policing.
25           The way you respond to that is to sit down

1    with the people involved, the fraternities, the
2    sororities, the Pan-Hellenic council people and
3    explain to them, What we're doing, it's absurd to
4    say, well, you know what, we got to have the same
5    police for everybody.  It's -- the amount of
6    security and police is venue driven, driven by the
7    problems in the venue, not by the color of anyone's
8    skin.
9    BY MR. KING:
10        Q    Do you feel like you've got expertise in
11   explaining to African-Americans the fact that the
12   increase police is for their own good?
13             MR. FAZZOLA:  Objection.
14        A    Well, yes, I mean, I've authored an award
15   winning training series of pro bono I did under
16   government funding years ago on problems with
17   police, problems of racism and discrimination, and
18   I'm as aware as a white person can be of the reality
19   of discrimination.  But you -- but it is
20   counterproductive to say, you know, we are going
21   to -- and this is just purely a brain child of
22   Goldstein in his head, he thinks, he feels, he has a
23   hunch that this is the way it is, instead of just
24   simply trying to institute measures that are safe
25   and they're inoffensive and then to explain to

1   people, explain to students, yeah, these are
2   intelligent young people.  This is the reason we're
3   doing this.  We can't have the lights down this low,
4   can't do it, and we've got to have these other
5   measures we're talking about, otherwise we can't
6   hold these events because they're too damn
7   dangerous.
8   BY MR. KING:
9       Q   Have you been involved in that sort of
10  conversation with any minorities since the 1970s?
11          MR. FAZZOLA:  Objection.
12      A   As a police officer for 18 years as part
13  of my research, I dealt -- I worked with minority
14  neighborhoods and responded to every kind of any
15  minority call, and I've had to deal with that as
16  every police officer does.
17  BY MR. KING:
18      Q   Let's go to page 20.
19      A   Twenty, okay.
20      Q   I won't read this on the record, but if
21  you would take a minute to look at the two full
22  paragraphs there and let me know when you're done.
23      A   The top and the middle paragraph or the
24  bottom?
25      Q   Yes, sir.  I'm sorry.  The one that starts

Case 1:19-cv-00477-CCE-LPA   Document 77-16   Filed 05/26/21   Page 88 of 93

1    that?

2              Over the last ten years, how does your

3    representation break down plaintiff versus defendant

4    percentage-wise?

5         A    Well, it depends on the type of case.  In

6    premises liability, it's 50/50.  In police cases,

7    it's probably up around 70 plaintiff, 30 percent

8    defense.

9         Q    Do you know what being tendered to the

10   court means?

11        A    I do tender to the court as an expert

12   witness.

13        Q    Okay.  Have you ever been tendered to the

14   court and the court refused to accept your opinions

15   or refused to accept you as an expert?

16        A    The only -- can I only recall in a

17   thousand -- a couple thousand cases over 40 some

18   years, a couple of instances where -- see, the only

19   way I know, as a nonlawyer, if I'm not going to be

20   allowed to testify, if the judge says "You may not

21   testify, doctor," that's only happened a couple

22   times.

23             I will tell you I have had a -- because

24   it's in recent memory -- a couple years ago where a

25   visiting judge in Austin, Texas in response to a

1  Daubert motion granted it, and other federal judges
2  in the same venue in the same two-year period had
3  qualified me as an expert in the use of force.  I
4  thought it was an ad hominem attack, but it was what
5  it was, so it's a very rare occurrence.
6      Q    Have you ever had a court refuse to accept
7  your testimony because they found that it was not
8  based on sufficient facts or data?
9          MR. FAZZOLA:  Objection.
10     A    No.  Again, I don't follow case law, but
11 the only way I know unless the lawyer tells me
12 something -- it should be very rare -- is if I'm
13 sitting in there and the judge says you can't
14 testify because you're not an expert on K-9s, for
15 example; you're a use of force expert.
16 BY MR. KING:
17     Q    Has that happened?
18     A    It happened once in New Mexico in
19 Albuquerque.  I understand where the judge was
20 coming from.  A barricaded suspect had come out, his
21 hands up, and they put the dog on him.  And I
22 said -- I said -- the court said:  You're not --
23 Dr. Kirkham, you're not an expert on K-9s?
24         And I said, No, Your Honor.  I barely know
25 one end of the dog from the other, but I'm an expert

1   on use of force, and I know where the continuum of

2   force where a K-9 belongs and what they're used for

3   and what they're not used for.

4            That being said, the judge would not let

5   me testify in that case.

6       Q    Other than that case, are you aware of any

7   other situations in which your testimony was not

8   accepted by the court because it was not based on

9   sufficient facts or data?

10      A    Well, the one I just describing you, would

11  you call that insufficient facts and data?  I'm

12  trying to respond to that.  That's the only one I

13  can recall.  The only one I can recall at this hour.

14      Q    Okay.  I've got seven notebooks with your

15  reports in them, so I'll figure it out myself.

16      A    Okay.

17      Q    Have you ever been retained -- have you

18  ever had a situation in which you were retained by

19  the plaintiff and you did not find any fault in what

20  the defendant did?

21      A    Yes.  I've had a number of, for example,

22  police cases like that where -- I'm thinking of one

23  particularly with an attorney I worked with for 30

24  years, and even after a long woodshedding by him, I

25  had to tell him it was a good shoot.  I would have

Case 1:19-cv-00477-CCE-LPA   Document 77-16   Filed 05/26/21   Page 91 of 93

1    shot too.  I had a number of cases like that over

2    the years.  And I -- you know, my feeling is I

3    just -- you know, all you have in my line of work is

4    your reputation for objectivity and veracity, and I

5    just call them as I see them.  I'm not an advocate.

6    Though I understand experts are used in advocacy,

7    but sometimes I have bad news for plaintiffs and bad

8    news for defendants.

9         Q    Have you ever been involved in either

10   designing campus security or advising a college on

11   improving campus security?

12        A    No, I have not.

13        Q    Let's do this.  Let's take about a

14   ten-minute break.  I'm going to look at what I got

15   and we'll try to wrap it up real quick.

16        A    Okay.

17             THE VIDEOGRAPHER:  The time is

18        approximately 5:45:45 p.m.  We are now off the

19        record.

20             (A recess was taken from 5:45 p.m. to 5:57

21        p.m.)

22             THE VIDEOGRAPHER:  The time is

23        approximately 5:57:14 p.m.  We are now on the

24        record.

25

1      STATE OF NORTH CAROLINA )

2      COUNTY OF FORSYTH     )

3                REPORTER'S CERTIFICATE

4             I, Audra Smith, Registered Professional Reporter

5      in and for the above county and state, do hereby certify that

6      the deposition of the person hereinbefore named was taken

7      before me at the time and place hereinbefore set forth; that

8      the witness was by me first duly sworn to testify to the

9      truth, the whole truth and nothing but the truth; that

10     thereupon the foregoing questions were asked and the foregoing

11     answers made by the witness which were duly recorded by me by

12     means of stenotype; which is reduced to written form under my

13     direction and supervision, and that this is, to the best of my

14     knowledge and belief, a true and correct transcript.

15           I further certify that I am neither of counsel to

16     either party nor interested in the events of this case.

17           IN WITNESS WHEREOF, I have hereto set my hand

18     this 16th day of April, 2021.

19     Audra Smith

20

21

22

23     Audra Smith, RPR, FCRR

24

25     Notary Number:  201329000033