# EXHIBIT 17

1

 **The Florida State University**
Tallahassee, Florida 32306-1127

*College of Criminology and Criminal Justice*

March 06, 2021

Mr. Jonathon Fazzola
Attorney at Law
Fierberg National Law Group, PLLC
161 East Front Street, Suite 200
Traverse City, MI   49684

RE:  *Estate of Najee Ali Baker v. Wake Forest University, et al.*

Dear Mr. Fazzola:

Pursuant to your request, I would like at this time to submit the following report relative to the above styled action. It is my understanding that discovery in this matter is ongoing. I, therefore, reserve the right to amend or supplement this report upon receipt of additional relevant material.

My analysis thus far is predicated upon examination of the following material:

(1)  PLEADINGS:

  (a) Complaint;

  (b) Answer to Complaint by Defendant Wake Forest University; and

  (c)  Answer to Complaint by Defendant Rhino Sports & Entertainment Services, LLC.

(2)  DISCOVERY:

**Exhibit
124**

Case 1:19-cv-00477-CCE-LPA   Document 77-17   Filed 05/26/21   Page 2 of 54

Deposition transcripts and exhibits:

| Transcript | Corporal Robert Fisher, Wake Forest University Police Department |
|---|---|
| Exhibit 8 | Email: Social event policy meeting follow-up |
| Exhibit 9 | Email: Summary of Saturday night events |
| Exhibit 10 | Email: Multiple serious incidents at party barn Saturday night |
| Exhibit 11 | Email: 2012-02828 (w/ attachment re: 11/18/2012 incident) |
| Exhibit 12 | Email: 12-2828 supplement (w/ attachment re: 11/18/2012 incident) |
| Exhibit 13 | Email: Statements Barn event |
| Exhibit 14 | Email: Barn event/party |
| Exhibit 15 | Email: Morning update |
| Exhibit 16 | Email: Affray |
| Exhibit 17 | Email: Barn party event management evaluation |
| Exhibit 18 | Email: FYI |
| Exhibit 19 | Email: Statement 11-17-2013 |
| Exhibit 20 | Email: Barn event evaluation |
| Exhibit 21 | Email: Barn party plans |
| Exhibit 22 | Email: FYI Barn party |
| Exhibit 23 | Email: Barn events |
| Exhibit 24 | Email: Barn party staffing level |
| Exhibit 25 | Email: Barn cost proposal |
| Exhibit 26 | Email: Barn training PowerPoint |
| Exhibit 27 | Email: Barn security |
| Exhibit 28 | Email: Barn assignments |
| Exhibit 29 | Email: Plan for tonight Quad and |
| | |
| Transcript | Officer Michael Bottoms, Wake Forest University Police Department |
| Exhibit 30 | Event planning documents |
| Exhibit 31 | Email from Robert Fisher to Daniel Kiger, et al., w/ attached Event Action Plan, Oct. 9, 2013 |
| Exhibit 32 | Email from Robert Fisher to Michael Bottoms w/ Attached Event Action Plan, Nov. 13, 2013 |
| Exhibit 33 | Email from James Gravely to Robert Fisher, et al., Jan. 26, 2014 |
| Exhibit 34 | Video Clip: WFU2127 |
| Exhibit 35 | Video Clip: WFU2132 |
| Exhibit 36 | Video Clip: WFU16615 |
| Exhibit 37 | Video Clip: WFU16616 |
| Exhibit 38 | Video Clip: WFU16617 |
| Exhibit 39 | Email from Michael Bottoms to "Sworn Officers"; Supplement (WFU6613), Jan. 20, 2018 |
| Exhibit 40 | Incident/Investigation Report (WFU2134-2142) |
| | |

| Transcript | Brett Hickman, President & CEO of Rhino Sports & Entertainment |
|---|---|
| Exhibit 1 | Emails from February 2016 |
| Exhibit 2 | Wake Forest Police Resources Coming Together PowerPoint |
| Exhibit 3 | Emails dated 1/26/17 |
| Exhibit 4 | Email dated 2/11/17 |
| Exhibit 5 | Email dated 12/11/17 (w/ WFU Staffing Guidelines attachment) |
| Exhibit 6 | Invoice dated 1/19/18 |
| Exhibit 7 | Email dated 7/30/18 |
| | |
| Transcript | Asst. Chief Natoshia Miles, Winston-Salem State University Police Department |
| Exhibit 41 | Subpoena to Testify at Deposition |
| Exhibit 42 | Protective Order |
| Exhibit 43 | Natoshia Miles Biography |
| Exhibit 44 | Lawson email to Watson dated 4/7/14 (WFU3936-3937) |
| Exhibit 45 | Fisher email to Daniel cc Lawson dated 4/7/47 (WFU12452-6) |
| Exhibit 46 | WFU's Leading Through Challenges & Opportunities PowerPoint Presentation (WFU16621) |
| Exhibit 47 | Barn email invitation (WFU9830) |
| Exhibit 48 | WFU Police Dispatch 2/12/17 (WFU11475-7) |
| Exhibit 49 | Email from Miles to Lawson re Arrests of Possible WFU Students (WFU13837-13847) |
| Exhibit 50 | Body camera footage (WFU16611) |
| Exhibit 51 | Body camera footage (WFU16613) |
| | |
| Transcript | Chief Regina Lawson, Wake Forest University Police Department |
| Exhibit 52 | Email w/ WFU Large Venue Social Mgmt Committee (WFU4980-5018) |
| Exhibit 53 | Email w/ MPHC Incident Summary (WFU4927-4928) |
| Exhibit 54 | 11/15/13 Alpha Phi Alpha Barn Event Mgmt. Evaluation (WFU13371-13373) |
| Exhibit 55 | Email w/ WFU Executive Summary Report (WFU6769-6774) |
| Exhibit 56 | Lawson & Birkhead email re Police Advisory Board ideas (WFU4403-4404) |
| Exhibit 57 | Goldstein to Lawson Email re Upcoming Student Organization Events (WFU6910-6912) |
| Exhibit 58 | Hirst email to Goldstein re Delta Sigma Theta party (WFI3808-3810) |
| Exhibit 59 | 11/19/14 Town Hall II Meeting Outline (WFU2102-2105) |
| Exhibit 60 | Hickman 3/8/16 email to Lawson re Rhino Security (WFU176-177) |
| Exhibit 61 | WFU 2016-2017 Division of Campus Life Mid Year PowerPoint (WFU17479) |
| Exhibit 62 | Miles email to Lawson re Arrests of Possible WFU Students (WFU13837-13847) |
| Exhibit 63 | Text Messages w/ Chief Finney (WFU16821-16823) |

| | |
|---|---|
| Transcript | Dr. Adam Goldstein, Dean of Wake Forest University |
| Exhibit 1 | Emails from February 2016 |
| Exhibit 19 | Email: Statement 11-17-2013 |
| Exhibit 64 | 2/23/15 Email to Hirst re Guidelines to Review (WFU7013-7014) |
| Exhibit 65 | 2/22/16 Email from Matthew re ERM program (WFU7863-7865) |
| Exhibit 66 | 2/20/16 Email from Wilkinson re Question about Barn and Lounge protocols (WFU7874-7875) |
| Exhibit 67 | Outline for ERM Presentation (WFU10455-10460) |
| Exhibit 68 | Event Resource Mgmt Staff Training 2017 PowerPoint (WFU8929-8973) |
| Exhibit 69 | June 2015 Police Accountability Task force Report, Moss Report, ,and William Moss PATF Updates(WFU1611-1664) |
| | |
| Transcript | Officer Dana Felts, Wake Forest University Police Department |
| Exhibit 71 | WFUPD Initial Operational Incident Discussion Reference Jan 20th (WFU18072-18075) |
| Exhibit 72 | Meeting Notes (WFU18298-18311) |
| | |
| Transcript | Dr. Penny Rue, Vice President for Campus Life, Wake Forest University |
| Exhibit 73 | E-mail from Regina Lawson to Penny Rue  8/2/13 (WFU10764-10767) |
| Exhibit 74 | E-mail from Penny Rue to Regina Lawson  3/30/14 (WFU12994-12995) |
| Exhibit 75 | E-mail from Regina Lawson to Marie Teague  4/16/14 (WFU4281-4283) |
| Exhibit 76 | E-mail from Regina Lawson to Penny Rue  11/16/13 (WFU9816-9818) |
| Exhibit 77 | E-mail from Regina Lawson to various recipients  11/17/13 (WFU9814-9815) |
| Exhibit 78 | E-mail from Penny Rue to Regina Lawson  6/24/15 (WFU5659-5661) |
| | |
| Transcript | Sergeant James Gravely, Wake Forest University Police Department |
| Exhibit 10 | E-mail dated 11/18/12 from Daniel Kiger |
| Exhibit 30 | Event planning documents |
| Exhibit 33 | E-mail dated 1/26/14 from James Gravely |
| Exhibit 50 | Body camera footage |
| Exhibit 54 | E-mails dated 11/17/13 with attachment |
| Exhibit 60 | E-mails dated March 2016 |
| Exhibit 63 | Text messages dated 1/20/18 |
| Exhibit 71 | WFUPD Initial Operational Incident Discussion Reference Jan 20 |
| Exhibit 79 | Series of e-mails from 2014 and 2013 with attachment |
| Exhibit 80 | PowerPoint presentation |
| Exhibit 81 | E-mails dated February 2016 |
| Exhibit 82 | Text messages dated 2/11/17 |

| Exhibit 83 | E-mails dated 2/15/17 |
| Exhibit 84 | Newspaper article |
| Exhibit 85 | Text messages dated 1/20/18 |
| Exhibit 86 | Text messages dated January 2018 |

(3)  Interrogatory Responses & Document Production:

    a.  Plaintiff's Objections and Responses to Defendant Wake Forest University's 1st Set of Interrogatories;

    b.  Plaintiff's 1st Supplemental Objections and Responses to Defendant Wake Forest University's First Set of Interrogatories;

    c.  Plaintiff's document production bearing the bates BAKER00001-BAKER000625;

    d.  Defendant Rhino Sports & Entertainment Services' Response to Plaintiff's 1st Requests for Production;

    e.  Defendant Rhino Sports & Entertainment Services' document production, which was produced as three exhibits – A, B, and C, respectively;

    f.  Defendant Wake Forest University's Responses to Plaintiff's 1st Set of Requests for Admission;

    g.  Defendant Wake Forest University's Responses to Plaintiff's 1st Set Interrogatories;

    h.  Defendant Wake Forest University's Responses to Plaintiff's Second Set of Requests for Production of Documents;

    i.  Defendant Wake Forest University's Response to Plaintiff's Second Set of Interrogatories;

    j.  Defendant Wake Forest University's Amended Response to Plaintiff's Second Set of Interrogatories; and

    k.  Defendant Wake Forest University's document and video production bearing the bates WFU_0000001 - 0018334.

        i.  Including documents produced by Winston-Salem State University in response to a subpoena *duces tecum* issued by Wake Forest University and bearing the bates Winston-SalemState-0000001 – Winston-SalemState-0018384.

I have been a criminologist for over a half century. During that period of time, I have been qualified as an expert witness for both plaintiffs and defendants in nearly every state in the nation in litigation involving law enforcement, crime prevention and security issues. I provided testimony as

an expert witness in *Tuttle v. Oklahoma City*, a case which was subsequently heard on appeal by the United States Supreme Court.

As a criminologist, I have served as a lecturer, trainer and consultant to over fifty (50) law enforcement agencies at the federal, state and local level. I have also authored extensive training material for police on a wide variety of subjects, including managing potential conflict and crisis situations. I have received numerous awards for contributions to the law enforcement profession: these include the 2nd Annual J. Edgar Hoover Award; the 26th Annual Freedom's Foundation at Valley Forge Award; an award from the Ohio Association of Chiefs of Police; and one from the Toronto Metropolitan Police. I am a recipient of the Distinguished Service Award of the Reserve Law Enforcement Officers Association of America. I also received a letter of commendation for my article "*A Professor's Street Lessons*" from FBI Director Clarence M. Kelley during his tenure at the Bureau. The FBI advises that the article in question has been requested and read by more law enforcement officers throughout the world than any other article published by the FBI Law Enforcement Bulletin during its eighty-eight (88) year history.

During my long career in the field of criminology, I have had an opportunity to examine violent crime in many different contexts—including university settings. In addition to being familiar with extensive scientific literature on violence and its prevention, I have also interacted personally with the perpetrators of violence on many occasions as a municipal law enforcement officer, as well as a prison and probation counselor.

I was the first university professor to conduct ethnographic *participant observation* research on crime and the police by attending and graduating from a police academy—after which I became a fully-sworn uniformed patrol officer (see, e.g., CBS '60 Minutes,' "*Ivory Tower Cop,*" 1976; also, Newsweek, "*School of Hard Knocks,*" November 19, 1973). My role as professor and police officer *qua* researcher spanned eighteen (18) of my twenty (20) years as a faculty member at the Florida State University College of Criminology and Criminal Justice.

During that period of time, I found myself repeatedly alarmed by the many violent victimizations of students that occurred on our campus, some of

which involved gun violence. The fatal shooting of FSU defensive tackle Pablo Lopez during my tenure as a faculty member was eerily similar in a number of respects to the killing of Najee Baker. Like Baker, Lopez was shot to death by a *complete stranger* while attending a late-night fraternity sponsored event on campus. His killer, like Baker's, was not a university student and had no legitimate reason for being on university property at the time. Following a brief encounter and argument, Lopez's assailant—like Najee Baker's—walked to his nearby vehicle and retrieved a gun with which he shot and killed Pablo Lopez. The Lopez and Baker murders are consistent with national data showing that **59%** of campus shooters were interlopers who were not associated in any way with the universities where the attack took place.

Research conducted by the U.S. Department of Justice reveals that (with the exception of rape/sexual assault), college students are most often violently victimized by someone they did not know (see Baum, K., "*Violent Victimization of College Students*," 1995-2002), USDOJ, Bureau of Justice Statistics, January 2005). This is consistent with my personal experience interacting with university students as a law enforcement officer and criminology professor on a campus with 32,000 students over a period of many years.

The Lopez shooting on my campus and the Baker shooting at Wake Forest are also consistent with data showing that the largest category of campus shootings (**38%**) occur in the context of a **dispute** of some kind between individuals. Both of these shootings took place in Southern states (Florida and North Carolina, respectively). It is noteworthy that **64%** of college campus shootings occurred in one of the Southern states (Cannon, loc. cit.) This reality is ostensibly related to the fact that gun availability has historically been greatest in the South: see, e.g., Rock, A *"College Campus Shooting Statistics You Should Know,"* Campus Safety, January 15, 2019).

The awareness that protective measures are in effect at a given college campus constitutes a significant deterrent to potentially violent intruders. As Langman observes, *"Shooters have to be stopped before they can get to the school with weapons,"* (Langman, R., Why Kids Kill: Inside the Minds of School Shooters, NY: Macmillan, 2009); see also Association for Student Conduct Administration (ASCA): "Assessing Threats on Campus" 2007; also,

The Handbook for School Safety and Security: "*Best Practices and Procedures"*, Butterworth-Heinemann, 2014).

The risk of student related disturbances and violence increases at late night events, especially those that involve a large number of attendees (Smith, S. & Lu, D., "*An Overlooked Danger: School Shootings After Hours,"* New York Times, January 6, 2020). It is imperative that every college and university administration carefully monitor security related problems at such campus events; as well as maintain close liaison with law enforcement professionals for purposes of making indicated adjustments in crime prevention and safety procedures.

An extensive study conducted in 2016 by the New York City Crime Commission confirms that the problem of college campus shootings continues to spiral out of control:

> *To analyze shooting trends at U.S. colleges, the Crime Commission reviewed 190 incidents at 142 colleges from the 2001-2002 school year through the 2015- 2016 school year in which at least one person was intentionally shot (excluding the shooter) on the campus of a two- or four-year college, as well as incidents that occurred within two miles of a college campus, and [where] at least one student was shot. Not only have the number of shooting incidents increased, but the number of casualties during those incidents has increased significantly as well since the fall of 2001 (Cannon, A., "Aiming at Students: The College Gun Violence Epidemic" Citizens Crime Commission of New York, Inc. 2016).*

The aforementioned study found that campus gun casualties ***increased*** by **241%** during the fifteen (**15**) year period it examined--leading NY City Crime Commission President Richard Aborn to characterize the nation's gun violence problem as an *'**epidemic**'* (see Ax, J. "*Shootings at U.S. Colleges*: *Deadlier & More Frequent,"* U.S. News & World Report, October 3, 2016). Significantly, the Centers for Disease Control & Prevention states: "*Firearm violence is a serious public health problem that impacts the health and safety of Americ*ans" (CDC, May 22, 2020). More specifically, research by the CDC on firearms related deaths in school settings reveals that ***95%*** of

school related youth homicides were caused by guns ("*School-Associated Violent Death Study*," <u>CDC</u>, October 24, 2019).

As a nation we have reached a point where today's college-aged Americans can't remember a time when school gun violence wasn't widely feared by most university students. (see, e.g., Fetters, A., "*College is Different for the School-Shooting Generation*," <u>The Atlantic</u>, November 11, 2018). Since 2001, a total of **437** people have been shot at 190 U.S. colleges and universities. Some of these shootings involved multiple victims (e.g., 32 lives were lost at Virginia Tech), while others claimed single lives. The common denominator of this ongoing national carnage has been what criminologists call "***expressive violence***." (see, e.g., Miethe, T. & Drass, K., *"Exploring the Social Context of Instrumental and Expressive Homicides,"* <u>Journal of Quantitative Criminology</u>, March 1999, p. 1-21). Explosive emotions such as raw anger and rage, coupled with the presence of a firearm, represent the primary cause of campus gun violence. The question inevitably arises as to the extent to which *such acts o*f homicidal *expressive violence* can be reasonably anticipated and successfully prevented.

Approximately sixteen months after Najee Baker was fatally shot to death at Wake-Forest University in Winston-Salem, a 22-year-old man named Trystan Terrell walked into the Kennedy building on the UNC Charlotte campus on the last day of Spring Semester. After entering one of the classrooms, he abruptly drew a handgun and began firing indiscriminately without uttering a word—killing two students and wounding four others (Karimi, F., "*Why UNC Charlotte? Why My Classroom*?" <u>CNN</u>, June 1, 2019). The television headline '**BREAKING NEWS—ACTIVE SHOOTER' ON COLLEGE CAMPUS**' has become all too familiar to people throughout the nation in recent years. The U.S. Department of Homeland Security defines an '*active shooter'* as: "*An individual engaged in killing or attempting to kill people in a confined or populated area; in most cases, active shooters use firearms and there is no particular method to their selection of victims" (USDHS, 2020).*

There are basically **two types** of people who commit killings on college campuses: The first type consists of ***active shooters***. These individuals are emotionally disturbed *determined aggressors* who have historically proved to be largely undeterrable. There is virtually nothing in the current

armamentarium of law enforcement that makes it possible to anticipate and prevent the vast majority of *active shooters* from translating their homicidal intent into reality. That grim fact remains true regardless of whether the decision to inflict gun violence on others is something that occurs in the mind of an emotionally disturbed person with relative spontaneity; or is the product of extensive advance planning and deliberation. The central problem with '**active shooters'** on a college or university campus is the **rapidity and unpredictability** with which their lethal actions usually occur: *"Active shooting situations are quick, measured in seconds, rather than minutes or hours,"* (Greenberg, S., "*Active Shooters on College Campuses,*" Cambridge University Press, April 8, 2013). The data indicate with respect to *active shooter*s, there are seldom any precursor events or advance warning signs of the impending tragedy.

The nearly successful assassination of President Ronald Reagan illustrates the futility of attempting to deter most '*active shooters*' through the use of conventional crime prevention measures. Even the visible presence of a phalanx of heavily armed Secret Service agents and uniformed D.C. police officers surrounding Ronald Reagan did not prevent John Hinkley from seriously wounding and nearly killing the 40th President of the United States.

The inability of even the best law enforcement and security resources to stop '*active shooters'* is revealed in the title of a training video jointly produced by the FBI and the U.S. Department of Homeland Security in 2017 entitled '**RUN, HIDE, FIGHT: SURVIVING AN ACTIVE SHOOTER SITUATION.'** The title really says it all. Those are the three dismal options available to most university students who have the misfortune to be in the field of fire of an '*active shooter*.' Many colleges and universities now have sophisticated integrated warning systems that quickly alert students and faculty to the presence of an '*active shooter'* on campus (see. e.g., Roe, R., "*Integrating Mass Notification Systems to Provide the Greatest Reach,*" Campus Safety, March 13, 2020). However, even such measures together with carefully preplanned rapid police deployment often prove to be too little, too late because of the spontaneous nature of most *active shooter* situations.

The 18th century English philosopher Jeremy Bentham believed most
human beings are rationally motivated by the pursuit of pleasure and the
avoidance of pain—something he sought to describe by means of what he
called "a felicific calculus." (for information regarding offenders as rational
actors, see, e.g., Zey, M., "*Rational Choice Theory*," International
Encyclopedia of the Social and Behavioral Sciences, 2d Edition, 2015).
Most conventional deterrent measures are predicated on the assumption
that the majority of criminals are motivated by pleasure and repelled by the
prospect of pain (e.g., arrest and confinement in jail or prison).

**The second type of campus shooting** involves individuals who are normally
***rational actors*** but become caught up in the thrall of intense emotions
(e.g., anger, revenge or jealousy) under circumstances which generate
strong feelings of animosity toward a specific person or persons. Such
intense feelings coupled with the ready availability of a firearm may lead
such an individual to suddenly inflict homicidal violence on another person
during or after an altercation of some kind—as occurred in the case at
hand. While Jakier Shanique Austin arrived at the Wake Forest campus that
night in a vehicle containing firearms, there is nothing in the material I have
examined to suggest he came to WFU with a preformed homicidal intent to
shoot anyone. To the contrary, all indications are his motivation in coming
to the campus on the night he killed Najee Baker was to attend the
entertainment event being held at The Barn.

It is my considered professional opinion to a reasonable degree of scientific
certainty Najee Baker's killer could have been **deterred** from the
commission of this murder by the proper utilization of readily available
crime prevention and security measures commonly referred to by the
acronym "**CPTED**" (Crime Prevention Through Environmental Design). Some
of these widely used CPTED measures, such as **access control**, were actually
in place at Wake Forest University on the night of the murder. Tragically
and inexcusably, however, they were not effectively utilized—despite the
long history of violent events at The Barn.

The CPTED system was developed during the seventies by my late FSU
colleague of many years, Dr. C. Ray Jeffery. From the standpoint of school
safety, CPTED involves a number of critical elements: e.g., conducting a '*risk
assessment*' to determine the history of prior security problems at any

given location; effectively limiting access to school property; improving visibility at school related events; and maximizing the presence of clearly identifiable authority figures. All of these deterrent measures are relevant to the case at hand. The CPTED model is used today by thousands of law enforcement community crime prevention and school security programs throughout the U.S. and other countries as well (see, Jeffery, C., Crime Prevention Through Environmental Design, NY: Sage, 1977). CPTED has also been endorsed by the Centers for Disease Control and Prevention's (CDC) Division of Violence Prevention as an explicit set of measures for effectively reducing the risk of school related violence (see, e.g., Using Environmental Design to Prevent School Violence, (CDC, April 2, 2020); see also Carter, S., Surrounded by Safety: A Crime Prevention Through Environmental Handbook for Youth, Youth Crime Watch of America: Miami, 2001).

As previously indicated, the first step in planning for a large-scale entertainment event in any context is to conduct a **risk assessment** to determine what (if any) security related problems have been associated with prior activities at the venue in question (see, e.g., Connors, E., "*Planning and Managing Security for Major Special Events,*"U.S. Department of Justice, Office of Community Oriented Policing Services, March, 2007; see also Jany, E., "*Securing Special Events,*" Security Management, Feb 23, 2018; & Margolis, G., "*Safety Planning for Major Events,*" Security, February 9, 2018).

Long before the murder of Najee Baker on the night of Saturday, January 20, 2018, **The Barn** at Wake Forest University had a well-documented history of violent incidents and disturbances requiring intervention by officers of the Wake Forest University Police Department (WFUPD), as well as the Winston-Salem Police Department (WSPD). Some of the disturbances that occurred during entertainment events at The Barn were so disorderly that police had to shut them down.

Historically, student parties at The Barn were overseen and monitored by between three and up to nine law enforcement officers from WFUPD and WSPD, as well as by privately contracted security officers. Despite the presence of this contingent of police and security personnel during entertainment events at The Barn, disturbances and fights continued to occur at The Barn, as well as outside The Barn, in the roadway leading from

The Barn, and in the nearest parking lots. Some of them were serious enough to necessitate additional assistance from WSPD. One melee involving six separate fights resulted in an urgent call for backup assistance from Winston-Salem police when the officers and security personnel on duty at The Barn were unable to control the situation.

The longstanding security problems at The Barn should have led the Wake Forest university administration to the realization they posed an **ongoing safety hazard to attendees at entertainment events being held there.** Although it was reasonable for Wake Forest University to seek to identify solutions to the continuing security problems at The Barn, it would clearly be counterproductive in that process to reduce the existing police presence to a **single police officer**. Doing so would foreseeably increase the danger to both the lone police officer, as well as to attendees at events. This would be particularly true in situations where disturbances or fights developed at The Barn and/or its immediate surroundings.

Special training in ***conflict management*** and ***crisis intervention*** tactics has been available for many years and should have been provided to all officers assigned to entertainment events at The Barn. Being able to quickly spot the start of a physical disturbance, promptly intervene and escort the disputants **off the property** without having to use force is an indispensable skill set for officers assigned to such locations (for examples of police training material for de-escalating conflict situations, see, e.g., Kirkham, G. & White, J., Police Non-Verbal Communication: A Training Series, Florida State University and the Tallahassee Police Department, Freestyle, 1990); see also Thompson, G., Verbal Judo: The Gentle Art of Persuasion, NY: Morrow, 2013).

A police uniform conveys power and authority. People—including criminals—are far more likely to obey orders emanating from someone in a police uniform than instructions coming from a private security guard (see, e.g., Johnson, R., "*The Psychological Influence of the Police Uniform*," Police One, August 11, 2017). Immediately after identifying Jakier Austin and Malik Smith as being involved in a fight, both non-students along with their other underage companion, Jadakiss Hall, should have been **escorted to their vehicle by a police officer** with the admonition that if they returned to the campus that night they would be arrested. Instead, the interlopers were

permitted to exit The Barn, and walk unsupervised and unimpeded down
the roadway leading to the parking lot.

It is common for late night disputes at locations such as bars and
entertainment events to reignite in parking areas with resulting violence.
(see, e.g., Scott, M. & Dedel, K., Assaults in and Around Bars (U.S.
Department of Justice, 2nd Edition, August 16, 2006). The fact that the Wake
Forest administration had irresponsibly slashed the police presence for late
night entertainment events at The Barn from up to **nine** officers to only **one**
resulted in not having manpower to promptly break up the fight which
occurred at The Barn on the night of January 19-20, 2018 or identify the
individuals involved in the fight. Having only a single police officer on duty
at The Barn – WFUPD Officer Michael Bottoms – made it impossible for that
person to simultaneously manage the ensuing problems inside the building
as well as make certain that Austin, Smith and their companion, Hall, were
promptly removed from the campus. Wake Forest University put WFUPD
Officer Bottoms in this impossible, and dangerous, situation without
training him on his responsibilities as an officer working Barn events, even
though the event on January 19-20, 2018 was the first Barn event he had
worked by himself. (see WFUPD Officer Bottom's depo, December 3, 2020,
p. 20, WFU Sgt. Gravely's depo, February 19, 2021, p. 148).

The poor lighting outside The Barn had been complained about repeatedly
by numerous law enforcement authorities, including Durham County Sheriff
Birkhead. The deterrent effect of lighting on crime is well established in the
literature (see, e.g., Keisler, M., "*Preventing Crime Through Good Lighting
Design.*"QSR Magazine, October 2018). The poor visibility surrounding the
exterior of The Barn on the night of the murder, coupled with the apparent
absence of highly visible police patrolling the road leading to The Barn and
adjacent parking areas would have **unquestionably emboldened** Austin and
Smith to obtain firearms from their car with the intent of ambushing the
victim when he walked from the abruptly terminated party to his car.
(on the importance of a conspicuous police presence as a deterrent to
crime, see, e.g., Kirkham, G. & Wollan, L., Introduction to Law Enforcement,
NY, Harper and Row, 1980).

Najee Baker's killer and his two companions would not have been allowed

to enter the property on the night of the murder if Wake Forest security Officer John Jolley had followed the university's policy of checking the student IDs of all occupants of vehicles seeking to enter the campus. Video footage shows Jolley putting out a sign indicating one entrance was closed and subsequently waving arriving cars through the other entrance without checking IDs of everyone in each vehicle. During the 24-minute time period shown on the tape, numerous cars without campus decals or stickers were allowed to enter university property unchecked in contravention of WFU policy. Having been able to penetrate the outer level of campus security with impunity, Austin then proceeded to purchase three tickets for The Barn—again apparently without having to produce student IDs for Smith or Hall.

It is both tragic and ironic to realize that something as simple as failing to follow the Wake Forest policy of not allowing persons without a valid student ID to enter the campus was a **proximate and significant cause of the murder of Najee Baker**. Neither the killer, Jakier Austin, nor his accomplice, Malik Smith, entered the campus surreptitiously on the night of the murder. Neither were students at Wake Forest or any other college or university. Even if Austin still had a student ID from WSSU, there is nothing in the materials I reviewed to suggest that Smith or Hall, who were both minors at the time, had valid student IDs of any kind. On the night of the murder, Malik Smith was out on bond for two prior arrests involving potential violence (one for carrying a concealed firearm and the other for possessing a stolen firearm). In October 2017, he was arrested for gun possession and possession of heroin with intent to sell. Significantly, less than a year before the murder of Najee, Wake Forest was notified by the WSPD that Jakier Austin had been arrested on January 22, 2017 and charged with "WEAPON-POSSESSION & DISCHARGE OF FIREARMS" and "POSS STOLEN GOODS." (WFU-13837-13847).

Even though the trio of interlopers managed to get past the vehicle security checkpoint, a secondary student ID check at the point of purchasing tickets **should have been in place** because of known problems with unauthorized individuals entering events at The Barn. Evidence reveals there were times when the front door was left unattended, while the back door was accessible and never monitored. If the student event hosts that night had been required to provide a list of all registered guests to WFUPD prior the

event, as had been Wake Forest policy for at least some period in the past for on-campus events with off-campus guests, and as Wake Forest knew or should have known was a standard policy and practice of other colleges and universities in the area for on-campus parties open to off-campus guests (WFU-3725-3730), Austin and Smith would have been barred from entering since their names would not have been on the authorized list of invitees. Requiring the student events hosts to provide a registered guest list also would have enabled Wake Forest to vet the guest list for individuals, like Austin, about whom Wake Forest had received prior information indicating they could pose real and dangerous threats to the University community and its on-campus guests. WFU's failure to follow the CPTED recommendation of **controlling access** to campus property became literally a matter of life and death on the night of January 19-20, 2018.

Despite the history of unresolved security problems at The Barn, the administration of Wake Forest University negligently and arbitrarily reduced the number of officers at the site in 2014/2015 and touted it as a cost-cutting measure. This radical decision apparently emanated from Dr. Adam Goldstein, WFU's Dean of Students & Associate V.P. for Campus Life of Students. With all due respect, Dr. Goldstein has no background, experience or training in either law enforcement or security. Arbitrarily going from the presence of up to nine law enforcement officers to a single police officer in order to cut costs, make students "less reliant on law enforcement for event management practices," and create a "more welcoming environment" for event sponsors and their guests (WFU_1632-1637) at an entertainment venue long plagued by disturbances and fights represents a classic example of opting for an archaic model of entirely "**reactive policing**" as opposed to "**proactive policing**." The latter refers to law enforcement strategies that are intended to deter and prevent crimes before they occur. Conversely, "reactive policing" involves primarily responding to crimes once they have taken place (see, e.g., Weisburd, D., et al., "*Proactive Policing": Effects on Crime and Communities*: Consensus Study Report, The National Academies of Sciences, Engineering & Medicine, November 2017).

The single officer strategy initiated at The Barn several years before the murder of Najee Baker involved basically placing a lone police officer in a

vehicle outside the venue. The solo officer would then respond— '**react**'—
to events occurring either inside or outside the venue as needed, but
generally would only intervene in altercations once law enforcement
backup units had arrived (see WFU Sgt. Gravely's depo, February 19, 2021).
My experience as a former police officer in a crisis intervention unit has
been that promptly intervening in conflict situations is often essential to
prevent them from escalating. Having to wait for backup before responding,
even if the wait time is just a few minutes, can often materially impact the
effectiveness of a law enforcement response. As police psychologist Dr.
Laurence Miller has observed, "*Officers have to be able to react quickly and
go from '0 to 60' at a moment's notice*" (see, Miller, L., "*Patrol Psychology
101: Communication and Conflict Resolution*," Police One, April 18, 2008.
The consequences of relying on a 'reactive' model of policing at The Barn—
with resulting delay in the ability of officers to quickly de-escalate conflict
situations—are evident in the records I have reviewed in connection with
this litigation, including in the testimony from the two WFUPD officers who
responded to the report of an altercation in The Barn on January 19-20,
2018, Officers Bottoms and Felts. Both officers admitted that they did not
know who was involved in the altercation when they entered The Barn and
did not do anything to learn their identities. (see WFUPD Officer Bottom's
depo, December 3, 2020, and WFUPD Officer Felt's depo, January 19, 2021).

The dramatic reduction in police presence at The Barn's entertainment
events was part of a program to "***phase law enforcement out of event
management tasks***," replace those law enforcement officers with student
Event Resource Managers (ERMs), and transfer responsibility for the
oversight and planning of entertainment events at The Barn to Wake
Forest's Office of Student Engagement. This action constituted a dereliction
of Wake Forest University's nondelegable duty to assure that activities at
The Barn were conducted in such a way as to reasonably assure the safety
of attendees at entertainment events being held there. It would have been
impossible to achieve that end by placing a group of students in charge of
making decisions concerning the security and law enforcement needs for
such occasions.

As someone who was a full time university faculty member for twenty
years, I have the greatest respect for students and the meaningful
contributions they can make to improving many aspects of an educational

institution; however, as a criminologist who has specialized in crime prevention for decades, I realize that even the best and most dedicated students on any campus simply lack the professional knowledge or the experience and skill to effectively or safely respond to incidents requiring immediate police action or intervention. Similarly, they lack the professional knowledge or the experience and skill to address the kind of complex security and safety needs that existed at The Barn prior to the preventable tragedy that occasioned this litigation. As retired Police Chiefs Willie Williams and Thomas Moss warned in their 2014 report for Wake Forest University, "[a]dults and police should play a major role in the decision of assigning students to tasks that may be better managed by an adult." (see WFU-1656-1657).

Given the history of serious security problems at The Barn, it is inconceivable that the administration of Wake Forest University could have reasonably expected such a dramatic reduction in the number of police officers assigned to entertainment events at The Barn to do anything except exacerbate existing security deficiencies. While one of the expressed reasons for this action was to cut staff costs associated with entertainment events at The Barn, it should have been clear that the consequence of any such savings would have been increased danger to attendees. The ability of a sufficient number of law enforcement officers being able to readily observe actions both inside The Barn and in the area surrounding it would have had a deterrent effect on potential troublemakers who would be aware of a significant police presence throughout the venue. Based on the documents and testimony I have reviewed in this case, it is apparent that many members of the WFUPD believed, based on their experience at The Barn, that a sufficient number of law enforcement officers were needed at and around The Barn during events as a deterrent, and they repeatedly expressed that view to their superiors (see WFU Sgt. Fisher's depo, November 20, 2020, and exhibits). In addition, through its own "Campus party research," Wake Forest University was on notice before it dramatically reduced the number of police officers assigned to events at The Barn that ***none of the other colleges or universities that were surveyed deemed it appropriate or safe to staff on-campus parties with a single law enforcement officer***:

| Campus | Capacity of Venue | College ID Required | Pre-Sale Tickets | Metal Detection | Other Staff On-site | Police/Security |
|---|---|---|---|---|---|---|
| Davidson | Outdoors | In the future | No | Under evaluation | Yes | 4-6 Officers Notes: Due to a riot that occurred at Spring Floric Event involving UNC-Charlotte and NC A&T students policy is under revision. |
| Duke | various | No | Yes | No | Yes | 2 to 4 officers |
| Elon | Various | Yes | Yes | No | Yes | Greek life Representative and 1 officer for every hundred students. |
| Furman | Varies | Sometimes | Event Specific | Event Specific | Event Specific | Each event is reviewed by Public Safety and staffed in accordance with anticipated number attending, open to off-campus, alcohol served and security requirements of the performer(s) |
| NC A& T | Various | Yes | Yes | Yes | Yes – Greek Life3 | 2 to 6 officers |
| UNC | Various | Yes | Yes | Event specific | Yes | 4 to 7 officers |
| UNCW | Varies | Yes | Yes | Yes | Yes | 2 to 4 officers |
| Wake Forest | Varies | Yes | Yes | | Yes | 2 to 4 officers |
| WSSU | Gym | Yes | Yes | Yes | Yes | Up to 14 officers |
| J. C. Smith | Gym | Yes | Yes | Yes | Yes | 2 to 4 officers |

(see WFU-3546-3548.)

Notwithstanding this knowledge and history, during his deposition, former WFU Sergeant Gravely testified that he disagreed that "placing an officer inside the Barn to float through the crowd and monitor potential risks" could improve safety at Barn events, because it could "agitate the crowd." (see WFU Sgt. Gravely's depo, February 19, 2021, p. 51). His testimony in this regard is in dramatic contrast to the position taken by numerous other universities surveyed by Wake Forest itself. The erroneous nature of that view is also evident from incidents that occurred at The Barn after Wake Forest's dramatic reduction in the number of police officers assigned to entertainment events at The Barn. For example, in February 2016, after a Barn event where there were "[t]hree separate fights where blows were thrown, including a female guest swinging and missing at a Rhino Security Officer," Wake Forest administration was put on notice that as far as Rhino

was concerned, "***without bag checks and wands it was irresponsible to host a 500 person party***" with only "6 Rhino Security and 1 WFUPD Officer." (WFU-6956-6969).

The Wake Forest University administration also had access to recommendations from many highly experienced law enforcement professionals who were very familiar with security problems at The Barn. Durham County Sheriff Clarence F. Birkhead was one such individual. At the request of WFUPD Chief Regina Lawson, the sheriff personally observed a fraternity party at The Barn on the night of Saturday, November 16, 2013. The sheriff stated **534** people were in attendance at the party he observed [close to the official maximum capacity of **570**] when a fight broke out in front of the facility. It was common for event organizers to *push the envelope* of The Barn's 570 official occupant capacity e.g., in April 2014, the Kappa Alpha Psi fraternity hosted a party at The Barn with **650** attendees— **80 more than the maximum capacity**.

Sheriff Birkhead described how officers entered in an attempt to gain control on the night he was there but were unable to do so. Members of the host fraternity also tried to break up the fight without success. Other fights erupted in front of The Barn as people ran out of the building. A Wake Forest student was trampled during the ensuing panic caused by the fights. Sheriff Birkhead recalled EMS was unable to reach the building because of the number of people in the roadway. Sheriff Birkhead reported the same was true of responding police backup units who were attempting to assist officers at the scene. According to public statements by Wake Forest, there were **475** attendees at The Barn on the night Najee Baker was murdered.

In addition to poor lighting in the interior of The Barn, **chronically inadequate lighting also existed in the area surrounding it.** Darkness is a well-established attractant to criminals of all types (e.g., armed robbers, rapists and car burglars) at large entertainment events. In the instant case, poor lighting in the area including the road leading to The Barn and nearby parking lots—together with the conspicuous absence of highly visible police patrol, would undoubtedly have emboldened the killer of Najee Baker and his companion to retrieve weapons from their car, if they were not already armed when they left The Barn, and ambush Najee Baker after the party was shut down as he walked to the parking lot (on the importance

of conspicuous police presence as a deterrent to crime, see, e.g., Kirkham, G. & Wollan, L., Introduction to Law Enforcement (NY: Harper & Row, 1980, Chapter 3).

Research reveals public parking facilities pose the greatest risk of attack by a stranger—a danger which increases at late night events at places such as bars, movie theatres and other entertainment venues. (see, e.g., Harrell, E. "*Violent Victimization Committed by Strangers: 1993-2010*" U.S. Bureau of Justice Statistics, December 11, 2012). Parking Lot 'W' had been the site of numerous previous altercations during events that were held at The Barn before Najee was killed. (see WFU Sgt. Fisher's depo, November 20, 2020, and exhibits).

Conspicuous proactive patrol by marked police units in close proximity to late night events is extremely important at times of pedestrian egress from such locations as people walk to their cars. WFUPD officers appear to have recognized the importance of conspicuous proactive patrol in security plans they developed before Wake Forest University dramatically reduced the number of officers assigned to events at The Barn in 2014/2015. (see WFU-543-545, WFU-4003-4004). One of the WFU officers involved in the review and/or development of those security plans was former WFU Sergeant Fisher. WFU Sergeant Fisher admitted in his deposition that based on his experience working and receiving reports about events at the Barn, having officers in high visibility positions and remaining close to the crowd of attendees as they were being let out of The Barn would have helped reduce risks and other potentially dangerous situations. (see WFU Sgt. Fisher's depo, November 20, 2020, p. 108).

A conspicuous proactive police presence is especially important when events have been abruptly shut down because of a disturbance. Disputants leaving such a venue may still be in the grip of emotions such as anger and may again become violent if they encounter people with whom they had previously been involved in an altercation. The longstanding history of security related problems at The Barn necessitated thorough **pre-event planning** involving **prompt deployment** of patrol units to the immediate area whenever an entertainment event ended or was terminated by police due to a disturbance. Such police vehicles should have continued proactive patrol until all attendees had left the campus.

In the parlance of what criminologists call "***victimology***," the university's failure to enforce its official policy of requiring all attendees seeking access to entertainment events at The Barn to display a valid student ID was an act that clearly facilitated the murder of Najee Baker (see, e.g., Doerner, W. & Lab, S., Victimology (Rutledge, 8th Edition, March 23, 2017). Access control conditions on this campus were so lax on the night of the murder Austin and Smith could have easily entered The Barn carrying concealed firearms since no metal detection wands were in use at the entrance.

Something as simple as a shoving or inadvertently bumping another person on the kind of crowded dance floor shown in The Barn's security video from the night of the murder can easily trigger a fight. Unless quickly nipped in the bud, a single fight in such a setting can quickly mushroom into multiple serious acts of violence. Placement of a sufficient number of officers at strategic points in the interior of the building, in addition to **actively monitoring** high resolution "PZT" ("Pan-Zoom-Tilt") cameras within the 8,000 square foot venue would enable officers on the floor to be aware of and react promptly to any potential problems.

The numerous flagrant violations of well-established standards and procedures in the field of crime prevention and private security discussed in this report collectively combined to create a criminogenic ***perfect storm*** on the night Najee Baker was murdered.

As previously noted, attendance at the event being held on the night of January 19-20, 2018 should have been limited in advance to a predetermined number of invitees law enforcement officials regarded as manageable from a security standpoint.

Radio communication should have existed at The Barn between police and Rhino security officers--as well as with a "virtual patrol" officer specifically assigned to monitor CCTV scans from video cameras inside the facility. All attendees should have been subject to bag and ID checks, as well as required to submit to a handheld body wand scan for weapons as a condition of entry. A formal policy should have been in place requiring removal (and/or arrest) by police of any person violating the law or creating a disturbance on the property. Such individuals would be **escorted to their**

**vehicles or off the premises by a law enforcement officer** (not by student ERMs or Rhino security personnel) and informed that they would be subject to arrest if they returned to the event.

On the night Najee Baker was murdered, the audio of WFU officers' "BWCs" [body-worn cameras] captured expressions of obvious frustration by officers of the WSPD. After the killing, one officer, Lt. Edward Branshaw of the WSPD remarked *"If my kids went here, and I found out they were renting [this] out for all these problems that keep happening all the time, that's crazy!"* (WFU-16613). Another officer who responded to the scene, WSPD patrol officer Andy Gravely, put it succinctly: "*You know ... it's kind of dangerous when you only have one officer working ... and a huge crowd.*" (WFU-16611). The late Harvard philosopher George Santayana once said, "*Those who cannot remember the past are condemned to repeat it.*" The material I have examined in connection with this matter makes it abundantly clear the administration of Wake Forest University either knew or reasonably should have known from previous disturbances and violent events at The Barn it was only a matter of time before a tragedy like the one that has occasioned this litigation occurred. Wake Forest University was clearly on notice that "[m]any more Officers are needed for events like this, both WFUPD and WSPD," and "[i]f funding is not available for an appropriate number of Officers then the event should not be held." (WFU-753-757). As one WFUPD officer ominously warned in 2013: "*As I have stated before, this is an Officer Safety Issue. We have been lucky so far that no one has been hurt, either Officer's [sic], students, or other participants. If proactive steps are not taken, I am concerned the end result will not be good.*" (WFU-13434).

It is my professional opinion to a reasonable degree of scientific certainty that the decision by Wake Forest University to deliberately "*phase law enforcement out*" of late night events at The Barn greatly increased the risk that future events would involve serious injury or even death to attendees.

In conclusion, I am attaching herewith a current copy of my professional vita which sets forth my complete credentials as a criminologist. I have also provided a copy of my fee and expense policies; along with a list of all attorneys who have retained my services as a case consultant and/or expert

witness during the past four years, including details concerning all civil and criminal litigation I have participated in during this period of time.

Please do not hesitate to contact me should you require any additional Information at this time.

Very truly yours,

George L. Kirkham, D.Crim.
Professor Emeritus

# Professional Vita

## Education

B.A. Criminology, California State University at San Jose ("With Distinction" and "Departmental Honors in Criminology")

M.S. Criminology, California State University at San Jose

Doctor of Criminology (under full scholarship) University of California at Berkeley

## Present Occupation

Professor Emeritus, College of Criminology and Criminal Justice, Florida State University, Tallahassee, Florida.

## Law Enforcement Consultation

Experience as a private consultant and expert witness for both plaintiff and defense in over 2,000 cases of civil litigation arising from police actions, private security operations and jail and confinement conditions in nearly every state.

Executive Director and Certification Board Member of the National Academy of Police Specialists (N.A.P.S)

Former Associate Member: International Association of Chiefs of Police (l.A.C.P)

Former Member: Police Benevolent Association (P.B.A.)

Certified Police Officer, State of Florida (1973-1992)

Author, with Professor James D. White, of a series of police civil liability training videos and instructional manuals currently in use throughout the United States (See "Publications") in the training of both line officers and administrators.

Past Member, Board of Directors, Americans for Effective Law Enforcement;
A.E.L.E. is a non-profit legal research organization founded by Fred lnbau, John Henry Wigmore Professor of Law Emeritus at Northwestern University; it serves the law enforcement profession through amicus curiae briefs, publications, workshops and research programs.

Member, Board of Directors, International Law Enforcement Stress Association (ILESA).

Director, National Conference on Stress in Policing (Orlando, Florida).

## Served as an instructor, lecturer, or consultant to the following agencies and organizations:

Callahan Commission, Massachusetts Police Training Council

British Metropolitan Police, Peel Centre

New York City Police Department, Police Benevolent Association

NBC News, for proposed documentary on convicted mass-murderer Theodore Bundy

Detroit Police Officers' Association

Philadelphia Police Department

Pennsylvania State Police

Virginia State Police

Maine State Police

Yonkers, New York, Police Department

Police Officers Association of Michigan

Albuquerque, New Mexico Police Department

Cincinnati, Ohio Police Department

Dayton, Ohio Police Department

Roanoke, Virginia Police Department

Toronto Metropolitan Police

United States Military Police Training Center, Fort McClellan, Alabama

United States Treasury Department, Consolidated Federal Law Enforcement Training Center

Federal Bureau of Investigation, Quantico, Virginia Northwestern Traffic Institute

International Association of Women Police

North Carolina Law Enforcement Officer's Association

Advisory Council on Sheriff Affairs, Lorain, Ohio

Florida Sheriff's Association Florida Peace Officer's

Association

State of Indiana, Fraternal Order of Police

Southern Police Institute

Law Enforcement Assistance Administration (L.E.A.A.)

Kenosha, Wisconsin Professional Police Association

Ohio Association of Police Chiefs

Western Colorado Peace Officers Association

National Association of State Directors of Law Enforcement Training (N.A.S.D.L.E.T.)

Florida Police Standards and Training Commission Jacksonville, Florida Police

Department

St. Petersburg, Florida Police Department

Tallahassee, Florida Police Department

Office of the State Attorney, 16th Judicial Circuit of Florida (for investigative evaluation of organizational and personnel problems within the Key West, Florida Police Department)

Office of the State Attorney, 15th Judicial Circuit of Florida, Palm Beach County,

Florida Office of the State Attorney, Miami, Florida

Member, Selection Board for Chief of Police for Fort Walton Beach,

Florida New Port Richey, Florida Police Department

National Institute for Occupational Health and Safety, U.S. Department of Health, Education and Welfare (for police stress research)

Leon County Sheriff's Department

Florida Highway Patrol

National College of District Attorneys

California District Attorneys' Association

Florida Criminal Justice Educators Association

Americans for Effective Law Enforcement (A.E.L.E.), Evanston, Illinois, Past Board Member

Florida Public Defenders Association

Florida Professional Practices Council

State of Utah Peace Officers Association

Columbia, South Carolina Criminal Justice Academy

Wisconsin Department of Justice

Florida Police Task Force, Governor's Committee on Criminal Justice Standards and

Goals Utah League of Cities

## Other Professional Experience

Research Criminologist, Systems Analysis Division, Stanford Research Institute, Menlo Park, California.

Project Director and Research Associate, The Center for Interdisciplinary Studies, California State University at San Jose

Consulting Editor, Journal of Police Science and Administration

Editorial Consultant, Harper and Row Publishers, Media

Division Graduate, Florida Police Standards and Training

Academy Police Patrolman, City-County of Jacksonville, Florida

Police Officer, City of Tallahassee, Florida

Deputy Sheriff, Leon County, Florida

Agent, Organized Crime Division, Broward County Sheriff's Department under U.S. Department of Justice Grant

Correctional Counselor, California Department of Corrections, Soledad State Prison

Director, National Study of Jail Inmates on Work Release, Santa Clara County Jail, Elmwood Rehabilitation Facility

Criminologist & Psychoanalyst Bernard L. Diamond, M.D.

## Published Works:

### Books

George Kirkham & Leonard Territo, Ivory Tower Cop (Durham: Carolina Academic Press, 2009). Republished: London, I.A. Books, 2019.

George Kirkham & Leonard Territo, Criminal Investigation Instructor's Manual for Ivory Tower Cop (Durham: Carolina Academic Press, 2009). Republished: London, I.A. Books, 2019.

Leonard Territo & George Kirkham, International Sex Trafficking of Women and Children: Understanding the Global Epidemic (New York: Looseleaf Law Publications, 2010).

George L. Kirkham & Laurin Wollan, Introduction to Law Enforcement (New York: Harper and Row, 1979).

George L. Kirkham, Signal Zero: The True Story of a Professor Who Became a Cop (New York: J.B. Lippincott, 1976). Selected by Book-of-the- Month Club as November 1976 Alternate. Republished: London, I.A. Books, 2019. (Motion picture options sold to David Hartman of ABC).

### Educational Films & Video Tapes

George L. Kirkham and James D. White, Police Human Relations: Non-Verbal Communication, Parts I, II, & III (Tallahassee, Florida: The Florida State University and the Tallahassee Police Department, Freestyle Productions, (1989).

George L. Kirkham and James D. White, Police Civil Liability: Negligent Operation of Police Motor Vehicles (New York: Harper and Row, 1978).

George L. Kirkham and James D. White, Negligent Use of Police Firearms (New York: Harper and Row, 1978).

George L. Kirkham and James D. White, Police Use of Deadly Force (New York: Harper and Row, 1979).

George L. Kirkham and James D. White, Excessive Force and the Police (New York: Harper and Row, 1979).

George L. Kirkham and James D. White, Police Supervisory Liability (New York: Harper and Row, 1979).

George L. Kirkham and James D. White, Police Officers and the Federal Civil Rights Act (New York: Harper and Row, 1979)

George L. Kirkham, Police: The Human Dimension: "Stress" (New York: Harper and Row, 1976)

George L. Kirkham, Officer Stress Awareness (New York: Harper and Row, 1976)

George L. Kirkham, Internal Adaptations to Stress in Modern Law Enforcement New York: Harper and Row, 1976)

George L. Kirkham, External Reactions to Stress in Policing (New York: Harper and Row, 1976).

George L. Kirkham, The Police Marriage: Personal Issues (New York: Harper and Row, 1976).

George L. Kirkham, Police Children: Issues and Problems (New York: Harper and Row, 1976).

George L. Kirkham, The Police Marriage: Social Pressures Affecting It (New York: Harper and Row, 1976).

George L. Kirkham, Police Authority and Informal Discretion, Part I (New York: Harper and Row, 1976).

George L. Kirkham, Police Authority and Informal Discretion, Part II (New York: Harper and Row, 1976).

George L. Kirkham, Minorities and the Police (New York: Harper and Row, 1976).
* Recipient of the Golden Eagle Award, Council on International Non-Theatrical
* Events: selected to represent the United States in motion picture events abroad. Also awarded The Chris Plaque, Columbus Film Festival (1976).

George L. Kirkham, Police Ethics: Part I (New York: Harper and Row, 1976).

George L. Kirkham, Police Ethics: Part II (New York: Harper and Row, 1976).

George L. Kirkham, The Police Officer in the Community Part I (New York: Harper and Row, 1976).

George L. Kirkham, The Police Officer in the Community: Part II (New York: Harper and Row, 1976).

## Articles and Professional Papers

George L. Kirkham, "Police Firearms Accidents," Police (May, 1989), Vol. 12, No.3.

George L. Kirkham, Convener, "Death Behind Bars," (Panel Presentation on the problem of suicide in Jails and Prisons), Southern Conference on Corrections, (February, 1989).

George L. Kirkham and James D. White, "A Police Civil Liability Handbook," Harper and Row, 1976).

George L. Kirkham, "The Policeman and the Law: A Changing Perspective," Barrister (December, 1976).

George L. Kirkham, "The Criminologist as Police Officer; A Participant-Observation Study," paper presented to the American Society of Criminology; subsequently published in Donal E.J. MacNamara and Frank Reidel, Police: Problems and Prospects (New York: Praeger, 1975)

George L. Kirkham, "On the Etiology of Police Aggression in Black Communities," paper presented to the American Society of Criminology (1974).

George L. Kirkham, "Doc Cop," Human Behavior (May, 1975).

George L. Kirkham, "A Professor's Street Lessons," F.B.I. Law Enforcement Bulletin (March, 1974); reprinted as "From Professor to Patrolman: A Fresh Perspective on the Police," The Journal of Police Science and Administration (May, 1974): also reprinted by numerous law enforcement journals throughout the world, including Interpol.

George L. Kirkham, "Jail Inmates on Work Furlough," with T. Conway Esselstyn, Ph.D., et. al., Criminologica (November, 1969). Also presented by Dr. Kirkham at the joint annual meeting of the American Society of Criminology and the American Association for the Advancement of Science (1968).

George L. Kirkham, "Evaluating Work Furlough," with Alvin Rudoff, Ph. D., et. al., Federal Probation (March, 1971).

George L. Kirkham, "The Potential Rehabilitative Role of Work Release Programs for Jail and Prison Inmates," paper presented at the First Inter-American Congress on Criminology, San Juan, Puerto Rico, 1971

George L. Kirkham, "The Utility of Internships as an Educational Device in the Field of

Criminology," paper presented (in absentia) at the Second Inter-American Congress of Criminology, Caracas, Venezuela (1971)

"Work Release Programs for Jail Inmates: Their Economic and Rehabilitative Value" with T. Conway Esselstyn, Ph.D. and Alvin Rudoff, Ph.D.

## Research Grants

"Model Police Interpersonal Communications Training Project," Law Enforcement Assistance Administration

"Training Municipal Police in Community Relations and Emotional Control Skills," Law Enforcement Assistance Administration

"Enrichment of the Criminology Curriculum at Florida State University"

"Training Correctional Personnel in Stress Management Techniques," National Institute of Corrections and Florida Division of Corrections (with Professor James D. White)

## Awards & National Recognition

Innovative research and work in the field of law enforcement have been the subject of numerous national media programs and publications, including:

CBS "60 Minutes"

NBC "Tomorrow Show"

ABC "Good Morning America"

Newsweek

U.S. News & World Report

People Magazine

Reader's Digest

Designated Professor Emeritus "…in recognition of meritorious service to the university."

J. Edgar Hoover Award "... for outstanding contributions to effective law enforcement" (Miami Beach, 1976)

Distinguished Service Award, Reserve Law Officers Association of America

26th Annual Freedom's Foundation at Valley Forge Award for the 1975 article, "What a Professor Learned When He Became A Cop"

"Award of Appreciation in Recognition of Outstanding Service on Behalf of Municipal Police in the State of Ohio," Ohio Association of Chiefs of Police

"Award of Recognition," Toronto Metropolitan Police

Optimist International Award for Outstanding Service to Law Enforcement"

"Award in Recognition of Outstanding Service to Law Enforcement Nationwide," Florida Peace Officers Association

"Award for Outstanding Contributions to Law Enforcement Education and the American Justice System," California Association of Justice Educators

"Award of Recognition," Southern Police Institute, University of Louisville

Listed in "Who's Who in Law Enforcement"

Founder, Officer Ernest Ponce de Leon Memorial Law Enforcement Scholarship at Florida State University College of Criminology and Criminal Justice

CALL DR. GEORGE KIRKHAM

(800) 488-9231

RULE 26 CASE LIST

# RULE 26 CASE LIST

2020

BARBARA & ELMER YOUNG V. CUMBERLAND COUNTY
CASE # CLOSED
COURT: CUMBERLAND COUNTY, MAINE
ATTY.: PETER MARCHESI

KAREN DAVIS, ET AL. V. HEB GROCERY COMPANY, ET AL.
CASE # 2015-CI-17990
COURT: 45TH JUDICIAL DISTRICT, BEXAR COUNTY, TEXAS
ATTY.: EMILY A. GEARHART/VALADEZ

JESSE GONZALEZ V. PUBLIX SUPERMARKET #1372
ATTY.: MICHAEL C. BIRD

LARRY NELSON V. WAWA, INC., ET AL.
COURT: 5TH JUDICIAL CIRCUIT, LAKE COUNTY, FLORIDA
ATTY.: WILLIAM G. HYLAND, JR.

JOHN DEATON V. TOWN OF BARRINGTON, ET AL.
CASE # 120-CV-00015-WES
COURT: DISTRICT COURT OF RHODE ISLAND
ATTY.: JOHN DEATON

GREG BURROUGH V. CITY OF LAUREL, ET AL.
CASE # 2:19-CV-48-TEM-MTT
COURT: U.S. FOR SOUTHERN DISTRICT OF MISSISSIPPI-EASTERN DIVISION
ATTY.: SENATOR CHRISTOPHER MCDANIEL/BRETT W. ROBINSON


HENRY REID V. INTERNATIONAL SPEEDWAY CORP., ET AL.
CASE # 2017-31873 CI-CI
COURT: VOLUSIA COUNTY, FLORIDA
ATTY.: BRIAN MATTHEWS


JAHEIM CURRIE V. COOKOUT RESTAURANT
CASE # PRE-SUIT
ATTY.: VANESSA N. GARRIDO


BOBBYE BAILEY V. PALMETTO RIDGE ESTATES LTD. PARTNERSHIP
CASE # PRE-SUIT
ATTY.: W. DOUGLAS MARTIN


NATHANIEL EDWARDS V. SERGEANT JONATHAN CATER, ET AL.
CASE # 18-CV-50035
COURT: U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS
ATTY.: DEBORAH A. OSTVIG


COLON XIOMERA V. CROSS COUNTY OWNERS, ET AL.
CASE # 50-2020-CA-006498XXXX-MB
COURT: 15TH JUDICIAL CIRCUIT FOR PALM BEACH COUNTY
ATTY.: ALANA WEATHERSTONE


JUSTIN PHILLIP REID V. THE QUAD APTS.
CASE # 2020-CA-001186-0
COURT: 9TH JUDICIAL DISTRICT FOR ORANGE COUNTY, FLORIDA
ATTY.: VINCENT D'ASSARO


RUDY REYES & CLARISSA MILLER V. WALMART
CASE # 31-2020-CA-00530
COURT: 19TH JUDICIAL CIRCUIT, INDIAN RIVER COUNTY, FLORIDA
ATTY.: DAVE KLEINBERG


ALLEN CONTI V. STUART BOWL, LLC
CASE # PRE-SUIT
ATTY.: IAN KOVEN


CECELIA PHILLIPS & RALSTON HALL, ET AL. V. STATE SECURITY
CASE # CA-CE-2000-4247
COURT: 17TH CIRCUIT IN BROWARD COUNTY, FLORIDA
ATTY.: JASON VILLARES

GARDNER-SUPERNOR V. YATES GROUP, INC, ET AL.
CASE # 60CV-19-2647
COURT: CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS
ATTY.: JEFFREY ELLIOTT

ESTATE OF KRISTEN DUNCAN V. CARBONDALE TOWERS
CASE # PRE-SUIT
ATTY.: ROBERT T. GARWOOD

MOHAMED V. OFF THE TRAXX
CASE # 05-2020-CA-038654
COURT: BREVARD COUNTY CIRCUIT COURT, FLORIDA
ATTY.: DOUGLAS BEAM

ESTATE OF ROBERT ANTHONY & VALERIE ANTHONY V. NORTHLAND INVESTMENT CORP.
CASE # 9:19-CV-80862-RS
COURT: U.S. SOUTHERN DISTRICT OF FLORIDA
ATTY.: KATIE M. MERWIN

DEL ROSSI V. EMPORIUM SHOPPES
COURT: PALM BEACH COUNTY, 15TH CIRCUIT COURT OF FLORIDA
ATTY.: MARK HEKTNER/WILLIAM W. PRICE

LAZARO FRESNEDO V. PORKY'S GYM III, INC
CASE # 2016-004-301-DA-01
COURT: 11TH JUDICIAL CIRCUIT MIAMI DADE COUNTY
ATTY.: SAMUEL FALK

FLORES, ET AL. V. HILLSBOROUGH COUNTY
CASE # 20-CA-000742
COURT: HILLSBOROUGH COUNTY
ATTY.: MICHAEL J. TRENTALANGE

GALLOWAY V. SEASIDE HOUTEX, LLC, ET AL.
CASE # 2020-079-79
COURT: 281ST CIRCUIT IN HARRIS COUNTY, TEXAS
ATTY.: J. JAVIER GUTIERREZ

YULY SOLANO & ARYANA BALUJA V. INLET HARBOR CLUB CONDO ASSOCIATION, ET AL.
CASE # 50-2017-CA-012409-MB-AG
COURT: 15TH JUDICIAL DISTRICT OF PALM BEACH COUNTY, FLORIDA
ATTY.: ANIKA C. GRANT

ESTATE OF LOGAN CLARK V. WARREN COUNTY, OHIO SHERRIFF'S DEPARTMENT
COURT: WARREN COUNTY, OHIO
ATTY.: SCOTT BEST

CHRISTOPHER WARLEN V. THE TIPSY WHALE, ET AL.
CASE: CLOSED
ATTY.: W. DOUGLAS MARTIN

STATE OF SOUTH CAROLINA V. GARY BENNETT
COURT: HORRY COUNTY, 15TH JUDICIAL CIRCUIT
ATTY.: AMY LAWRENCE-LOVELY

KIM MITCHELL AS P.R. OF COFFMAN V. CITY OF SOUTH DAYTONA BEACH, ET AL.
CASE # 6:20-CV-01084
COURT: U.S. MIDDLE DISTRICT OF FLORIDA – ORLANDO DIVISION
ATTY.: JASON RECKSIEDLER

JULIANA ZHITNITISKY, ET AL. V. LINCOLN APARTMENT MANAGEMENT LTD. PARTNERSHIP, ET AL.
CASE # 2018-12631
COURT: 215TH JUDICIAL DISTRICT OF HARRIS COURT, TEXAS
ATTY.: RUSTY SEWELL

DANIEL MEADOWS V. TPG HOTELS & RESORTS, INC, ET AL.
CASE # 50-2019-CA-009380-XXXX-MB
COURT: CIRCUIT COURT OF THE 15TH JUDICIAL DISTRICT OF PALM BEACH COUNTY, FLORIDA
ATTY.: JEFFREY BOGERT

CALL DR. GEORGE KIRKHAM

(800) 488-9231

RULE 26 CASE LIST ⌄

# RULE 26 CASE LIST

2019 ⌄

JEREMIAH HENDERSON V. AUSTIN MCCLAIN
U.S. DISTRICT COURT – WESTERN DISTRICT OF VIRGINIA
CASE # 7:19-CV-685
ATTY.: GARY BOWMAN

THE ESTATE OF LOGAN CLARK V. WARREN COUNTY OHIO SHERIFF'S DEPARTMENT
WARREN COUNTY, OHIO
NOT FILED
ATTY.: SCOTT BEST/JEFFREY SHIPP

KEITH LAMONT SCOTT
COURT: MECKLENBURG COUNTY
CASE # 18-CVS-16700
ATTY.: CHARLES G. MONNETT, III

HEATHER HOLMES V. D/B/A ALLURE OF ABACOA AND KLINGBEIL CAPITAL MANAGEMENT
PALM BEACH COUNTY, FLORIDA
CASE # 50-2019-CA-008134
ATTY.: SHANE T. KIRK

PEOPLE OF THE STATE OF MICHIGAN V. MICHAEL GARY COHEN
COURT: 13TH JUDICIAL CIRCUIT COURT – TRAVERSE COUNTY
CASE # 2016-012495-SH

ATTY.: ROBERT P. TREMP/JAMES HUNT

NIMELY V. BROTHERS FIVE & 7 ELEVEN
COURT: 4TH JUDICIAL CIRCUIT IN DUVAL COUNTY
CASE # 2016-CA-0670
ATTY.: LAURA STARRETT

NELSON, EMILY (MINOR) V. WILLOW KEY APTS
COURT: CIRCUIT COURT OF ORANGE COUNTY, FLORIDA
CASE # 2018-CA-013945-0
ATTY.: VARUN RAMNARINE

TATUM, E/O TRAVIS V. STONYBROOK APTS.
COURT: 15TH JUDICIAL DISTRICT COURT OF PALM BEACH COUNTY, FLORIDA
CASE # 2016-CA-009656
ATTY.: DOUGLAS H. MORRIS

SHANNON FREEMAN V. BEACON HILL APTS., ET AL.
COURT: 9TH JUDICIAL CIRCUIT OF ORANGE COUNTY
CASE # 2017-CA-8988-0
ATTY.: NICHOLAS PANAGAKIS

GUYE TURNER V. DISTRICT OF COLUMBIA
DISTRICT OF COLUMBIA
CASE # 2018CA-008132B
ATTY.: PAUL ZUKERBERG

ZHITNITSKY, ET AL. V. MCP RIVEREWAY, LLC, ET AL.
DISTRICT OF COLUMBIA
CASE # 2018-12631
ATTY.: RUSTY SEWELL

ADA HICKS V. ASYLUM ENTERTAINMENT, ET AL.
COURT: 127TH JUDICIAL DISTRICT OF HARRIS COUNTY, TEXAS
CASE # 2017-59911
ATTY.: ROBERT J. KILLEEN, JR.

JESSICA HOLLAND, ET AL. V. TOWN OF PENDLETON, ET AL.
COURT: ANDERSON COUNTY OF SOUTH CAROLINA
CASE # 17-CP-04-02248
ATTY.: C. CARTER ELLIOTT, JR.

ARLEY IDROBO V. SUNOCO FOOD MART
ATTY.: LOUIS A. DEFREITAS, JR.

RICHARD WOODS V. THE BALLROOM
PALM BEACH CIRCUIT
CASE # 50216-CA-009986-XXXXMB-AE
ATTY.: TREVOR M. GORDON

BENAVIDES V. WALMART STORE, TEXAS
COURT: 45TH DISTRICT OF BEXAR COUNTY, TEXAS
CASE # 2018-CI20656
ATTY.: J. RYAN LOYA

WILLIAM DEALINGS V. SHERWOOD LIQUORS, INC.
DUVAL COUNTY OF FLORIDA
CASE # 16-2018-CA-007623
ATTY.: DAVID THOMPSON

TEEL V. LOZADA, ET AL.
U.S. SOUTHERN DISTRICT OF FLORIDA
CASE # 2:18-CV-14367
ATTY.: TODD NORBRATEN/GUY RUBIN

JESSICA GARCIA V. WALMART, INC.
COURT: 448TH JUDICIAL DISTRICT FOR EL PASO COUNTY, TEXAS
CASE # 2019-DCV-3471
ATTY.: ROBERT AMMONS

ESTATE OF DALTON DOBKINS V. STARWOOD CAPITAL
COURT: 15TH JUDICIAL DISTRICT OF PALM BEACH COUNTY, FLORIDA
CASE # 2018-CA-011509
ATTY.: JEFFREY F. BOGERT/DAX DIETIKER

BELLO/MEDINA V. HONEY HILL MOBILE HOME PARK
NOT FILED
ATTY.: DAVID KLEINBERG

VASSILI MIRONOV V. SIDNEY MAURICE NOWELL, ET AL.
COURT: 7TH JUDICIAL CIRCUIT OF FLAGLER COUNTY
CASE # 2018-CA-000591
ATTY.: DAVID KLEINBERG

LAZARO FRESNEDO V. PORKY'S GYM III, INC
PALM BEACH CIRCUIT
CASE # 2016-004
ATTY.: SAMUEL FALK

KOVARI V. BREVARD EXTRADITIONS, LLC., ET AL.
COURT: U.S. DISTRICT FOR THE WESTERN DISTRICT OF VIRGINIA
CASE # CL16-785

ATTY.: JAMES S. LISKOW

ESTATE OF JUAN COLCHADO DUQUE V. DELTA TACTICAL FORCE PROTECTION, INC., ET AL.
COURT: 15TH JUDICIAL DISTRICT OF PALM BEACH COUNTY, FLORIDA
CASE # 2019-10861-CA-50
ATTY.: SEAN L. WILSON

CORDREY V DOUGHTY, ET AL.
U.S. DISTRICT COURT FOR DELAWARE
CASE # 1:17-CV-01512
ATTY.: PATRICK C. GALLAGHER

JANE DOE V. CHARLOTTE MECKLENBURG BOARD OF EDUCATION
U.S. DISTRICT OF NORTH CAROLINA
CASE # 3:18CV-586-RVC-DSC
ATTY.: DOUGLAS FIERBERG

THE ESTATE OF NAJEE ALI BAKER V. WAKE FOREST UNIVERSITY
U.S. MIDDLE DISTRICT OF NORTH CAROLINA
CASE # 1:19CV-477
ATTY.: DOUGLAS FIERBERG

BANKS V. WILHITE SILVER LAKES, ET AL.
COURT: SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE COUNTY OF SAN BERNARDINO
CASE # CIVDS-1515213
ATTY.: RICHARD GONZALEZ

GWENDOLYN MCPHAUL, ET AL. V. SIMON PROPERTY GROUP, INC., ET AL.
COURT: STATE COURT FULTON COUNTY STATE OF GEORGIA
CASE # 16-EV-005416
ATTY.: JOHN A. MOORE

RIVIERA, JORGE V. VR. PARK 9 HOLIDAYS LP
NOT FILED
ATTY.: S. MAX KARRICK

CALL DR. GEORGE KIRKHAM

(800) 488-9231

RULE 26 CASE LIST ⌄

# RULE 26 CASE LIST

2018 ⌄

JANIS CLARO V. CITY OF SULPHUR, OK., ET AL.
EASTERN DISTRICT OF OKLAHOMA
CASE # CIV-16-428-SPS
ATTY.: BARRETT T. BOWERS

DERRICK BUTLER V. 7-11
NO LITIGATION
ATTY.: VINCENT M D'ASSARO

JAMES STEWART V UNIVERSITY TRAILS, ET AL.
LEON COUNTY, FLORIDA
CASE # 2018-CA-179
ATTY.: MATTHEW D. POWELL

DANIEL DAVIES V. BSO & ARMOR CORRECTIONAL
U.S. DISTRICT COURT – SOUTHERN DISTRICT OF FLORIDA
CASE # 18-606-37-KMM-SNOW
ATTY.: BRITTANY HENDERSON/BRAD EDWARDS

ESTATE OF SAHARA BARKLEY V. GIANT OIL, INC.
DUVAL COUNTY – FOURTH JUDICIAL CIRCUIT
CASE # 2018-CP-0286
ATTY.: PAUL E BUEKER

BECKHANS V PHILIPS EDISON & CO
PALM BEACH COUNTY COURT
CASE # 50-2018-CA-013-XXXX-MBAF
ATTY.: MARK R. HANSON

JANE DOE V EXCEL RESIDENTIAL SERVICES, ET AL.
HARRIS COUNTY COURT
CASE # 2017-84-4535
ATTY.: ARNOLD & ITKIN

HJALMARSON V. STUART SHAW FAMILY
190TH DISTRICT COURT – HARRIS COUNTY
CASE # 2016-12960
ATTY.: DANIEL CIENFUEGOS, JR./RON MCLAIN

BANKS V WILHITE, SILVER LAKES, ET AL.
SAN BERNADINO COUNTY COURT
CASE # CIVDS-1515-213
ATTY.: RICHARD I. GONZALEZ

KAREN RUSSO V. CITY OF DAYTONA BEACH, FLORIDA
VOLUSIA COUNTY COURT
CASE # 2018-30906-CICI
ATTY.: KEITH C. WARNOCK

LANDERS, ET SL. V. HIGHLANDS AT EAST ATLANTA
STATE COURT OF DEKALB COUNTY, GEORGIA
CASE # 17A 66896
ATTY.: SHANE E. BARTLETT

WEST, ET AL. V. EAGLES CRESTE HOUSING PARTNERS, ET AL.
STATE COURT OF FULTON COUNTY, GEORGIA
CASE # CAFN:17-EV-003176
ATTY.: SHANE E. BARTLETT

KIMBLE, ET AL. V. TZADEK ACQUISITIONS, D/B/A KINGS TRAIL APTS.
FOURTH JUDICIAL CIRCUIT OF DUVAL COUNTY
CASE # 2017-CA006741
ATTY.: KEVIN J. VANDER KOLK

WILSON MORALES V. CITY OF BUFFALO, N.Y., ET AL.
ERIE COUNTY SUPREME COURT
CASE # 2012-2132
ATTY.: JONATHAN M. GORSKI

CORY HANLON V. SUS HI HOLDINGS, ET AL.
PALM BEACH COUNTY – FIFTEENTH JUDICIAL CIRCUIT
CASE # 50- 2017-CA-011255XXXMB
ATTY.: RICHARD SCHULER

HOLLANT V. CITY OF NORTH MIAMI, ET AL.
U.S. DISTRICT COURT
CASE # 17-CV-24197
ATTY.: ERIC P. HOCKMAN

GOMEZ V. RUFFIN (STEWART)
PALM BEACH COUNTY COURT
CASE # 50-2017-CA-11263AA
ATTY.: LAURIE A. PRIMUS

ESTATE OF ARTHUN, ET AL. V. TORRES
THIRTEENTH JUDICIAL DISTRICT COURT - COUNTY OF VALENCIA, STATE OF NEW MEXICO
CASE # D-1314-CV-2018-00915
ATTY.: DAVID C. CHAVEZ

ROSE BROWN V. ATLANTIC CITY POLICE DEPT., ET AL.
U.S. DISTRICT COURT OF NEW JERSEY
CASE # 15-CV-06711-JEI
ATTY.: JAMES J. CARTER

QUINTA TORY SANDERS V. MISSISSIPPI COUNTY, ET AL.
U.S. DISTRICT COURT – EASTERN DISTRICT OF MISSOURI – SE DIVISION
CASE # 1:18-CV-00269
ATTY.: JESSICA AGNELLY

HICKMAN V. JOHNSON & FLORIDA HIGHWAY PATROL
BREVARD COUNTY COURT
CASE # 2017-CA-056720
ATTY.: DOUGLAS R. BEAM

MATHIS (ESTATE OF XAVIER) V. MANAGEMENT CORP.
ORANGE COUNTY CIRCUIT COURT
CASE # 2016-CA-25330
ATTY.: JACKSON W. ADAM

DENIS DUDDY V. WHITEHALL CONDOMINIUM ASSN., INC.
FIFTEENTH JUDICIAL COURT OF PALM BEACH COUNTY
CASE # 50-2017-CA006141XXXXMB(AN)
ATTY.: MARK W. HEKTNER

WASHINGTON V. WESTLAKE
190TH JUDICIAL COURT OF HARRIS COUNTY
CASE # 2016-73417
ATTY.: NICHOLAS A. MURROW

ABDIRISAK MOHAMED, CORRISSA BARNETT & CASEY FULMER
CLATSOP COUNTY COURT
CASE # 17-CV-50614
ATTY.: JON A. ZBINDEN

A.E. & E.W. V. JOSHUA NIELD, ET AL.
U.S. DISTRICT COURT FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CASE # 3:17-CV-01885
ATTY.: TIMOTHY L. EVES

ESTATE OF JOSHUA DOMBO
COURT OF STAFFORD COUNTY
CASE # CL18-2021
ATTY.: JONATHAN E. HALPERIN

KRISTENSEN, ET AL. V. U.S.A.
U.S. DISTRICT COURT FOR THE WESTERN DISTRICT OF AUSTIN
CASE # 17-CV-00126LY
ATTY.: KEITH HYDE/D'JUANA PARKS

HERRIOT V. UNIVERSAL PROTECTION SERVICE, INC., ET AL.
FOURTH JUDICIAL CIRCUIT IN DUVAL COUNTY FLORIDA
CASE # 2016-CA-007954XXXX-MA
ATTY.: JEFFREY F. BOGERT

ALLYSON REED V. CYNERGI CONDOMINIUM ASSN.
MIAMI (DADE) COUNTY COURT
CASE # 2018-006746CA-01
ATTY.: AARON P. DAVIS

MARCUS GREEN V. CHRISTOPHER DANIELS
2ND JUDICIAL COURT – LEON COUNTY FLORIDA
CASE # 2016-CA-002470
ATTY.: WILLIAM KEMPNER

CALL DR. GEORGE KIRKHAM

(800) 488-9231

RULE 26 CASE LIST

# RULE 26 CASE LIST

2017

CROCKETT V. CAPTAIN HIRAM'S (D)
INDIAN RIVER COUNTY COURT
SETTLED
CASE # 2014-CA-000329
ATTY. DOUGLAS R. BEAM

HARRINGTON CHERYL V. BLUE DOG GROUP D/B/A
SPORTS PAGE BAR & GRILL
18TH JUDICIAL CIRCUIT OF COURT. BREVARD COUNTY, FLORIDA
CASE # 05-2013-CA25856-XXXX-XX
ATTY. DOUGLAS R. BEAM

RICHARD HICKMAN V. CLARENCE "BUTCH" JOHNSON & FHP
BREVARD COUNTY COURT
CASE # 6:18-CV-218-OR1-22KRS
ATTY. DOUGLAS R. BEAM

JONATHAN TOUCHTON V. DEBAUCHERY, ET AL.
BREVARD COUNTY COURT
CASE # 17-CA-056719
ATTY. DOUGLAS R. BEAM

BOOKER V. MCCABE, ET AL.
CHARLESTON DIVISION OF FEDERAL COURT
CASE # 2:15-CV-0430-MGL-MGB
ATTY. J EDWARD BELL III

LEONARD GARCIA V. THE CITY OF BUDA, ET AL.
WESTERN DIST. OF TEXAS-AUSTIN COURT
CASE # 1:17-CV-00377
ATTY. ROBERT FLORES

FERGUSON V. RESIDENCE INN, ET AL. (D)
BROWARD COUNTY COURT
CASE # CACE-1602-2290
ATTY. MARISHA BUNN

YOLANDA LUCAS V. ELLINGTON DEVELOPMENT (D)
DADE COUNTY COURT
CASE # 2014-8661-CA-01
ATTY. ANTHONY SOTO

JESSIE WATSON V. WOODSTOCK PROPERTY OWNERS ASSOCIATION
PALM BEACH COUNTY COURT
CASE # 502017-CA-007443
ATTY. ENIKA CAMPBELL GRANT

ANTON GALLMON
U.S. DIST. COURT COLOMBIA. DIST. OF S.C.
CASE # 3:17-CV-00059-TLW-PJG
ATTY. GRAHAME E. HOLMES

LITTIA HINSON V. MARTIN COUNTY SHERIFF'S OFFICE & JAMES WARREN
U.S. DIST. COURT FOR THE SOUTHERN DIST. OF FLORIDA
CASE # 217-CV-14018
ATTY. STUART KAPLAN

ESTATE OF LAURA LEMIEUX V BERKELEY
COUNTY SHERIFF'S OFFICE
BERKLEY COUNTY COURT
CASE # 2017CP-082571
ATT. VICKI KNIGHT/ED BELL

HIRAYAMA (STEARNEY) V. UNITED STATES OF AMERICA
U.S. DISTRICT COURT FOR DISTRICT OF ARIZONA - PRESCOTT DIVISION
CASE # 16-CV-08060
ATTY. DENNIS T. SCHOEN

/

LEROY CHAMBLISS V. DIST. OF COLUMBIA
SUPERIOR COURT FOR THE DIST. OF COLUMBIA
CASE # 2016-CA-00-6616B
ATTY. GEOFFREY D. ALLEN

ESTATE OF DONKEVIOUS JOHNSON (QUIMBLEY) V. INDIGO LAKES GOLF CLUB
VOLUSIA COUNTY COURT
CASE # 2016-31-114-CI-CI
ATTY. RICHARD A. RYLES

DAVIS V EDWARDS, ET AL.
U.S. DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA
CASE # 3:16-CV-00855-MHT-GMB
ATTY. GRIFFIN SIKES, JR.

GOLDMAN V. SAMAHA, ET AL.
PALM BEACH COUNTY COURT
CASE # 50-2016-CA-013528-XXXXMB
ATTY. THEODORE BABBIT

LANCASTER III MARVIN V NIGHT AFTER NIGHT
ORANGE COUNTY COURT
SETTLED
ATTY. VINCENT M. D'ASSARO

VINCENT LUCKETT V. ORLANDO HOUSING AUTHORITY & OMEGA APARTMENTS
ORANGE COUNTY COURT
ATTY. VINCENT M. D'ASSARO

ANTONOFF & POOLE V. UNITED STATES OF AMERICA, ET AL.
U.S. DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE # 17-60717-CIV-WPD
ATTY. RICHARD F. HUSSEY

BESS, KARL V CITY OF ORLANDO & FLAVA SQUAD ENTERTAINMENT
ORANGE COUNTY CIRCUIT COURT
CASE # 2015-CA-927-0
ATTY. JAMES T. LYNCH

BOSSO V. BAINBRIDGE PROPERTY MANAGEMENT, ET AL.
15TH JUDICIAL CIRCUIT OF PALM BEACH COUNTY COURT
CASE # 2016CA-009-052
ATTY. CLAIRE HURLEY/CHELSEA FURMAN

JANE DOE & JOHN DOE V WATSON REALTY CORP.
4TH COURT JUDICIAL CIRCUIT FOR DUVAL COUNTY, FL
CASE # 16-2017-CA-001150-XXXXMA

ATTY. DONNY OWENS

MIRTHA CASANEDA V RAMCO - GERSHENSON
PALM BEACH COUNTY COURT
CASE # 1989-0110
ATTY. STEPHEN N. HARBER

STRONG V. 2825 CENTRAL, LLC D/B/A SUNRISE TOWER APARTMENTS & TRIUMP HOUSING MANAGEMENT
LEE COUNTY COURT
CASE # 15-CA-3030
ATTY. DANIELLE M. BALCZOM

LOWMAN V. GMF JACKSONVILLE POOL, LLC
DUVAL COUNTY CIRCUIT COURT
CASE # 2017-CA-00504
ATTY. GLENN E. COHEN

CHRISTOPHER SHIVALIER V HURON SOPHIE APTS.
DUVAL COUNTY – 4TH JUDICIAL COURT CIRCUIT OF FLORIDA
CASE # 16-2017-CA-003465
ATTY. JANEEN KIRCH

CHAMBERS V ECKERD COLLEGE
PINELLAS COUNTY COURT
CASE # 15-CI-00659
ATTY. RALPH L. GONZALEZ

CARPENTER V SUN KEY APTS.
ORANGE COUNTY COURT
CASE # 2014CA-000202
ATTY. MARTIN J. JAFFE

A.J. (MINOR) V MIDWAY COMPANIES
129TH DISTRICT COURT OF HARRIS COUNTY, TEXAS
CASE # 2015-25596
ATTY. RYAN MACLEOD

COREY STANLEY, JR. V. GLITZ ULTRA LOUNGE
ORANGE COUNTY CIRCUIT COURT
ATTY. MATTHEW T. MORGAN

Fee & Expense Policies

Agreement

### Case Preparation
It is my practice once I have been requested to participate in a case and have agreed to do so to require remittance of a $7,500 retainer. This retainer fee covers in its entirety whatever research and analysis I may have to engage in to effectively evaluate your case and prepare for trial. Specifically, it encompasses the following: my analysis and evaluation of all relevant case documents; any specialized research which I may conduct or direct my research assistants to conduct; all conference calls and meetings which you may wish to schedule for purposes of discussing the case or obtaining guidance throughout the discovery process. The Retainer does not cover the preparation of written reports and affidavits, which are discussed below. I encourage you to contact me as often as you wish during the development of your case. All communications regarding cases will be with me personally. The retainer is non-refundable.

### Reports and Affidavits
I meticulously prepare every written report requested by a client and personally conduct all research required for its preparation. It has been my experience over the years that the thoroughness and quality of my reports often prove helpful in successfully resolving complex litigation. Due to the substantial time normally required to prepare a written report, I will provide your office with an itemized invoice at the rate of $300 per hour for any requested report. This sum is due and payable in full upon receipt and acceptance of the final report. I utilize the same billing procedure with respect to the preparation of affidavits.

### Discovery Depositions
The Polycom video teleconference system gives attorneys the option of deposing me from their location without incurring the time and expense of traveling to mine. There is no additional charge to either side should you elect to do a video deposition from your location or locations (the HDX 9002 has the capability of tying my office conference site to three other locations simultaneously). I am pleased if requested to make a video recording of any discovery deposition taken at my location and to provide copies of it to all participating attorneys at no charge. If your office does not currently have a VTC capability, you can easily add one to your existing computer or laptop with readily available software; alternatively, you can attend a video deposition either through a VTC equipped law office or Polycom compatible rental site in your area.

In the event that opposing counsel wish to depose me in person, they have the option of doing so at my Palm Beach Gardens office or having me travel to another location. I charge a flat fee of $3,000 for discovery depositions conducted in Palm Beach Gardens. Depositions conducted beyond Palm Beach Gardens involve a flat fee of $6,000 plus travel and per diem expenses. I require that all deposition fees and expenses be paid in full at the time a deposition is taken. I rely upon the firm with which I am working to communicate my Fee & Expense Policies to opposing counsel.

### Mediation Videos
It is my practice to charge a flat fee of $6,000 for any De Bene Esse videotaped deposition which is intended for use at trial in lieu of my personal appearance. The same flat fee is due if any other video of audio product containing my professional opinion is used in lieu of my personal appearance at a trial.

### Trial Testimony

In the event that a case is not settled and proceeds to the stage of trial, my fee for expert witness testimony is $6,000 plus whatever travel and per diem expenses are associated with my court appearance. I will provide your firm with a detailed written invoice reflecting this sum. The full invoice amount must be received prior to my departure for trial.

In the unlikely event that conditions at a trial necessitate my presence for additional days, there will be a flat fee of $2,400 for each day (or any portion thereof). This sum will be due and payable at the time my appearance.

### Trial Cancellation Policy

I normally begin my preparation for trial testimony one week prior to my scheduled appearance. In the event a case is settled or continued during that period of the time I charge a flat cancellation fee of $2,500. (This covers any preparation work I may have done, as well as any related expenses such as airfare penalties).

### Other Professional Services

In cases involving premises liability issues, at your request my office will obtain and compile relevant computer assisted dispatch (CAD) records regarding police calls for service on the property in question, as well as law enforcement reports concerning crime at and around the location. My crime statistician will then develop a concise graphic presentation using this data-- including appropriate tables, graphs, pie charts and explanatory narrative to facilitate my analysis as a criminologist and for your use as an attorney. This service is included as part of my flat case preparation fee.

For many years I have utilized the off-duty assistance of currently employed and highly experienced police command officers to conduct specialized research at my direction, as well as to keep me apprised of the most recent developments in law enforcement technology and procedures. Each of my police research assistants has a special area of expertise: e.g., security and crime prevention measures; use of force, including firearms and intermediate weapons such as the Taser, ASP and OC spray; SWAT and hostage negotiation; handling crisis calls involving emotionally disturbed persons(EDPs); personnel selection and training standards; criminal investigation protocols; arrest and jail custodial procedures.

**My professional resources also include the following:**

- 3 licensed private investigators with extensive police & security experience.

- A crime prevention/private security specialist certified to conduct lighting measurements with a calibrated instrument and to diagram the spatial distribution of illumination.

- A certified senior police crime data analyst and statistician

**Video Teleconferencing**
My office is equipped with a state-of-the-art high definition Polycom HDX 9002 video teleconference system. This enables me to have "face to face" meetings with attorney clients anywhere in the nation at their convenience to discuss case related issues.

**Participation in Mediation Videos**
I charge $300 per hour for video appearances and related preparation activity. My office will submit an itemized invoice for such services, which is due and payable at the time they are rendered.

## ANY OFFICIAL LISTING OR DESIGNATION OF ME AS AN EXPERT IN A CASE WITHOUT MY EXPRESS PERMISSION AND FORMAL RETENTION IS STRICTLY PROHIBITED

I understand and accept the above terms and conditions relative to Dr. Kirkham's professional services.

1 1 / 13 / 19

SIGNATURE                                        DATE

Jaybers FterBgiLG

PRINTED NAME

4 of 4

Case 1:19-cv-00477-CCE-LPA   Document 77-17   Filed 05/26/21   Page 54 of 54